Exhibit "1"

# COMPLAINT
# AND DEMAND FOR JURY TRIAL

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN
AND FOR ORANGE COUNTY,
FLORIDA

CASE NO.:

WAYNE AUTOMATIC FIRE SPRINKLERS,
INC., a Florida corporation,

        Plaintiff,

vs.

INSYS THERAPEUTICS, INC., an Arizona
corporation, GESSLER CLINIC, P.A.,
a Florida professional association,
EDWARD LUBIN, M.D., an individual,
UMR, INC., a Delaware corporation, and
OPTUMRX, INC., a California corporation,

        Defendants.

_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiff, WAYNE AUTOMATIC FIRE SPRINKLERS, INC., a Florida

corporation ("Wayne"), by and through its undersigned counsel, sues Defendants,

INSYS THERAPEUTICS, INC. an Arizona corporation ("Insys"), GESSLER

CLINIC, P.A. a Florida professional association (the "Practice"), EDWARD

LUBIN, M.D., an individual ("Dr. Lubin"), UMR, INC., a Delaware corporation

("UMR"), and OPTUMRX, INC., a California corporation ("OptumRx"), and

states as follows:

## **Exhibit "1"**

## NATURE OF THE ACTION

1.     This action stems from a massive fraud scheme and criminal enterprise utilized to obtain money from Wayne for illegally prescribed pain killers through Wayne's employee health insurance plan. Insys is the manufacturer and promoter of a powerful narcotic drug called Subsys.  Under the terms of Wayne's employee health insurance plan, Subsys prescriptions are only covered if the drug was prescribed to treat breakthrough cancer pain, which is the only approved use of the drug.

2.     With the sole motivation of financial gain including kickbacks, Dr. Lubin and the Practice illegally prescribed Subsys to an individual who was covered under Wayne's employee health insurance plan but did not have cancer, let alone breakthrough cancer pain.  In so doing, Insys, Dr. Lubin and the Practice (collectively referred to as the "RICO Defendants") combined with the object and purpose of illegally distributing Subsys and fraudulently receiving payment from Wayne for the illegal distribution of this highly addictive narcotic.

3.     In the off-label marketing and illegal distribution of Subsys, The RICO Enterprise Defendants intentionally violated several Florida criminal and civil laws to lure unwitting patients and health insurance plan providers to receive and pay for Subsys, including the Florida Anti-Kickback Statute (Fla. Stat. § 456.054), the Florida Patient Brokering Act (Fla. Stat. § 817.505), the Florida

Racketeer Influenced and Corrupt Organization Act (Fla. Stat. § 895.03(3)) ("RICO"), the Florida Civil Remedies for Criminal Practices Act ("CRCPA") (Fla. Stat. § 772.103(3)), the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201-501.203) ("FDUPTA"), the laws governing pain management clinics and their physicians (Fla. Stat. § 458.3265), as well as general medical practice laws related to the distribution and prescribing of controlled substances (Fla. Stat. §§ 893.13(1)(a)1, (7)(b) and (8)(a)4.  The driving force behind the criminal enterprise is to transform unsuspecting patients to addicts while receiving payment from health insurance plan providers.

## JURISDICTION AND VENUE

4.     Wayne seeks injunctive relief and damages in excess of $75,000.00, exclusive of interest, costs and attorney's fees, against the RICO Defendants under the Florida Racketeer Influenced and Corrupt Organization Act pursuant to section 895.03(3), Florida Statutes, the Florida Civil Remedies for Criminal Practices Act pursuant to section 772.103(3), Florida Statutes, the Florida Deceptive and Unfair Trade Practices Act under sections 501.201-501.203, Florida Statutes, common law fraud, and civil conspiracy, as well as breach of contract against UMR and OptumRx.

5.     Wayne is a Florida corporation headquartered in Ocoee, Orange County, Florida.  Wayne installs, repairs, and monitors fire sprinkler and fire alarm

systems throughout Florida, including areas across Orange County, Florida.

6.     Insys is an Arizona corporation headquartered in Chandler, Arizona. Insys manufactures pharmaceutical drugs that are distributed, prescribed, and administered to patients throughout the United States, including Florida.

7.     The Practice is a Florida professional association with its principal place of business located in Winter Haven, Florida.  The Practice is privately owned and advertises pain management services on its website as follows:

> For patients with debilitating pain symptoms, a pain management/pain medicine specialist can provide much needed relief and support. Whether you're suffering from acute back and neck pain sustained in a car accident, or chronic pain due to cancer or a neurological condition, our compassionate specialists are expertly qualified to help manage your pain and improve your quality of life.

As such, the Practice is characterized as a Pain-Management Clinic (Fla. Stat. § 458.3265(1)(a)1c(I)).

8.     Dr. Lubin is a medical doctor employed by and practicing at the Practice in Winter Haven, Florida, in the area of pain management and pain medicine.

9.     UMR is a Delaware corporation registered to do business in Florida, and which is conducting business and has a registered agent in Florida.

10.    OptumRx is a California corporation registered to do business in Florida, and which is conducting business and has a registered agent in Florida.

11.    Venue is proper in Orange County, Florida, pursuant to Section

47.011, Florida Statutes, because the causes of action herein accrued in Orange County, Florida, in that Defendants' actions caused the Plan to pay nearly $200,000.00 in benefits for the Subsys prescriptions written for the Plan member, under the false pretense that the Plan member suffered from severe cancer pain.

12.     All conditions precedent to the maintenance of this action have been waived, excused, performed, or otherwise occurred.

13.     Wayne has retained the undersigned law firm and is obligated to pay for the attorneys' fees and costs incurred in the prosecution of this action.

14.     Wayne demands trial by jury of all issues triable by jury as a right under Florida law.

## GENERAL ALLEGATIONS

### The FDA Approval of Subsys for Breakthrough Cancer Pain

15.     Subsys is a Schedule II opioid drug manufactured and promoted by Insys. "A substance in Schedule II has a high potential for abuse and has a currently accepted but severely restricted medical use in treatment in the United States, and abuse of the substance may lead to severe psychological or physical dependence." Fla. Stat. § 893.03(2)(b).

16.     Subsys is a sublingual (under the tongue) spray that delivers the powerful and highly addictive narcotic fentanyl, a Schedule II controlled substance. Fla. Stat. § 893.03(2)(b)9. Subsys is in a class of drugs known as

Transmucosal Immediate-Release Fentanyl ("TIRF").

17.     Due to the substantial risk for abuse, addiction, and overdose, Subsys and other TIRF drugs are available only through a restricted program required by the FDA called the Transmucosal Immediate-Release Fentanyl Risk Evaluation and Mitigation Strategy (the "TIRF REMS Access Program").   Under the TIRF REMS Access Program, outpatients, healthcare professionals who prescribe to outpatients, pharmacies, and distributors must enroll in the program, and must comply with its requirements.  The goal of the TIRF REMS Access Program is to mitigate the risk of abuse, addiction, and overdose by ensuring that TIRF products are only prescribed to appropriate patients.

18.     The Food Drug and Cosmetic Act, 21 U.S.C. § 9, *et seq.* (the "FDCA"), requires drug manufacturers to submit a new drug application ("NDA") for all prescription drugs sold in the United States.  The NDA must include clinical trials sufficient to prove to the U.S. Food and Drug Administration's ("FDA") satisfaction that the drug is safe and effective for each and every use for which the drug will be sold.  It is unlawful for companies to promote drugs for uses the FDA has not approved.

19.     Based on the NDA submitted by Insys, the FDA approved Subsys only for the "management of breakthrough pain in cancer patients 18 years of age or older who are already receiving and who are tolerant to opioid therapy for their

underlying cancer pain." Because Subsys was only approved for the treatment of breakthrough cancer pain, it is unlawful for Insys to promote the drug for other uses.

20.    The FDA also determined that Subsys is only intended to be prescribed by "pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." The FDA further determined that "[d]ue to the risk of respiratory depression, Subsys is contraindicated in the management of acute or postoperative pain including headache/migraine and in opioid non-tolerant patients."

21.    In its public filings, Insys has acknowledged that Subsys has only been approved for the treatment of breakthrough cancer pain. For example, in its Form 10-K for the fiscal year ending December 31, 2013, Insys noted that it had received "marketing approval for Subsys from the FDA on January 4, 2012 for the treatment of BTCP [breakthrough cancer pain]. BTCP is characterized by sudden, often unpredictable, episodes of intense pain which can peak in severity at three to five minutes despite background pain medication."

22.    Finally, to help protect against Subsys' potentially fatal side effects, and to reduce the risk of abuse, the FDA determined that doctors should use the lowest possible dose of Subsys that adequately treats a patient's symptoms. This is achieved through "titration" where the doctor initially prescribes 100 micrograms

and slowly increases to higher dosages at a specified schedule while waiting at each dose level to determine whether the patient's pain is adequately managed. Subsys is available in strengths of 100 mcg, 200 mcg, 400 mcg, 600 mcg, 800 mcg, 1200 mcg, and 1600 mcg.  Although patients benefit from using the lowest possible dose, Insys earns more money when a higher dose is prescribed, as do Insys sales representatives, whose compensation is based on commission.

**Insys' Deceptive Promotion and Illegal Distribution of Subsys**

23.    Insys received FDA approval to market Subsys for breakthrough cancer pain in January 2012, and it began marketing the drug in March 2012.  By December 2013, Subsys held a 28.3% market share, and was the most prescribed branded TIRF product.  By December 2014, Subsys's market share had grown to 40.2%, and it was again the most prescribed TIRF product.

24.    On information and belief, Insys achieved such a rapid growth in the market share of Subsys through a multitude of fraudulent and illegal practices, many of which have drawn the scrutiny of government regulators and law enforcement.

25.    For example, in June 2015, a nurse practitioner, Heather Alfonso, pled guilty in federal court in Connecticut to accepting $83,000 in kickbacks from Insys in exchange for writing Subsys prescriptions.  In her guilty plea, Ms. Alfonso admitted that Insys paid her $83,000 in "speaking fees" for hosting programs

where the only attendees were individuals who had no license to prescribe controlled substances, such as medical assistants, receptionists, and personal friends of Ms. Alfonso.  Ms. Alfonso further admitted that she did not make any presentation regarding Subsys at the majority of these events, and that she instead understood that she was receiving the "speaker fees" in exchange for writing Subsys prescriptions.  At the time of her indictment, Ms. Alfonso was the highest prescriber of Subsys in Connecticut.

26.    In another example, in August 2015, Insys agreed to a $1.1 million settlement with the Oregon Attorney General to resolve allegations that Insys marketed Subsys for off-label uses such as neck and back pain.  The Oregon Attorney General also alleged that Insys provided kickbacks and other illegal financial incentives to physicians to induce them to increase Subsys prescriptions. Among other improper financial incentives, Insys paid "speaking fees" to doctors that were in actuality kickbacks to reward frequent prescribers of Subsys, and to induce additional prescriptions.  The Oregon Attorney General further alleged that Insys improperly pressured doctors to increase the dosage of Subsys prescribed to patients, rather than following the FDA's directions regarding titration to determine the effective dosage.

**The Wayne Employee Health Benefit Plan and the**
**Administrative Services Agreement between Wayne, UMR, and OptumRx**

27.    Wayne provides health insurance benefits to its employees and

9

covered dependents of its employees, such as children and spouses, through the Wayne Automatic Fire Sprinklers, Inc. Health Benefit Plan (the "Plan"). The Plan is self-funded by Wayne, meaning that Wayne funds the Plan out of its own assets. Although some of the costs of the Plan are covered by employees through contributions, deductibles, and other payments, all claim payments and reimbursements are paid out of the general assets of Wayne.

28.    The terms of the Plan are summarized in a Summary Plan Description (the "SPD"). (A true and correct copy of the SPD in effect between July 1, 2011 and December 31, 2014 is attached hereto as **Exhibit A**.)

29.    Wayne is the Sponsor and Plan Administrator of the Plan. As Plan Administrator, Wayne retained two third party administrators, UMR, Inc. ("UMR") and OptumRx (formerly known as Prescription Solutions), to evaluate claims and handle other duties for the Plan, pursuant to an Administrative Services Agreement effective July 1, 2011 (the "ASA"). (A true and correct copy of the ASA is attached hereto as **Exhibit B**.)

30.    Under the ASA, UMR was retained to evaluate and process claims for benefits, and OptumRx was charged with evaluating and processing pharmacy claims.

31.    With regard to the evaluation and processing of claims for benefits, UMR agreed in the ASA to "receive and review Claims for Covered Services

under the Plan **and will use commercially reasonable efforts, consistent with industry standards, to compute the Covered Services payable**, if any, in accordance with the terms and conditions of the Plan.  (Ex. B at § 6.2.2 (emphasis added.))  The ASA in turn defines "Claims" as "every written or electronic request received by UMR for the payment of Covered Services under the applicable Plan," and "Covered Services" as "any amount payable under the terms and conditions of the Plan, and as stated in the Summary Plan Description."  (*Id.* at §§ 1.5 and 1.7.)

32.    UMR further agreed to "[c]orrespond with the Covered Persons and providers of services if additional information is deemed necessary by UMR to complete the processing of claims."  (*Id.* at § 6.2.2.)

33.    UMR also agreed to provide fraud investigation and prevention services to Wayne in the ASA.  Specifically, section 6.2.3 of the ASA provides as follows:

> **6.2.3 Fraud Services.**   UMR's Special Investigation Unit reviews and investigates potentially fraudulent or inappropriate billings submitted by providers and Covered Persons as a cost-containment service for Employer.   Claims that are identified as potentially fraudulent or inappropriate are pended in UMR's claims system, and following investigation, the identified Claims are either paid in accordance with the Plan, or are denied for such reasons as are uncovered by the Special Investigation Unit.

34.    In Section 6.2.4 of the ASA, UMR agreed that it would "be responsible for recovery costs and reimbursement of any unrecovered overpayment to the extent the overpayment was due to UMR's gross negligence."

35.    UMR also agreed to indemnify Wayne, in pertinent part as follows:

**11.2 UMR Indemnifies Employer:**    UMR will indemnify Employer and hold Employer harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, that Employer may incur, including reasonable attorneys' fees, which arise out of (i) the gross negligence or willful misconduct of UMR or UMR's vendors, subcontractors or authorized agents in the performance of their obligations under this Agreement or (ii) UMR's material breach of this Agreement, all as determined by a court or other tribunal having jurisdiction of the matter.

36.    The ASA also provided that UMR would be responsible for any services performed by any subcontractors, as follows:

**14.2. Subcontractors.**    Employer agrees that UMR can use its affiliates as subcontractors, or other subcontractors, to perform services under this Agreement.  UMR will be responsible for those services to the same extent that UMR would have been responsible had UMR performed those services without the use of an affiliate or subcontractor.

37.    OptumRx is an affiliate of UMR, and it was retained to evaluate and process pharmacy claims under the ASA.  Addendum No. 5 to the ASA provided that OptumRx (previously known as Prescription Solutions) "will accept and process Claims submitted by network pharmacies in the HIPAA designated standard format, or any other designated standard as required by law (or as otherwise permitted under the network provider agreement)."  (Ex. B at p. 27.) Addendum No. 5 to the ASA further provided that OptumRx "shall accept and process Claims submitted by Covered Persons when such Covered Person submits Claims properly completed on a Prescription Solutions standard paper claim form,

12

together with proper proof of payment." (*Id.*)

38.     OptumRx also agreed to perform prior authorization reviews of prescriptions, as further detailed below.  (*See* Ex. B (Fee Schedule).)  The fees for any prior authorization reviews conducted by OptumRx were to be paid to UMR, under the ASA.  (*Id.*)

39.     Under the Plan, certain medications, including Subsys, are included on a "Prior Authorization List," meaning that benefits will be paid for prescriptions if the prescription was approved by Wayne, or its third party administrator, prior to the prescription being filled.

40.     Under the terms of the Plan, prior authorization will only be granted if the drug is being prescribed for an FDA approved use.  (*Id.*)  The Plan further provides that benefits will not be provided for "Approved Prescription products with no approved Food and Drug Administration (FDA) indications for the purpose for which prescribed, unless the Plan determines the use to be appropriate based on generally accepted medical practice.  (*Id.* at pp. 57-58.)

41.     As noted above, the FDA has only approved Subsys for the treatment of breakthrough cancer pain.  Accordingly, claims for Subsys prescriptions would only be covered under the Plan if the medication was prescribed to treat breakthrough cancer pain, unless the Plan determined in its discretion that the medication was medically necessary for a non-approved use.

### The RICO Defendants Defraud the Plan Related to the
### <u>Illegal Distribution of Subsys to Plan Member Patient 001</u>

42.     On or about December 31, 2013, an individual contacted OptumRx's prior authorization department and identified himself as "David" from the Practice. David indicated that he was calling in reference to a Plan member, Patient 001[1]. Patient 001 is the spouse of a Wayne employee and is a covered dependent under the Plan.

43.     During the December 2013 call, David informed OptumRx's prior authorization department that Patient 001 had been diagnosed with "malignant cancer pain" by Dr. Lubin.  David further stated that Dr. Lubin had prescribed Subsys to Patient 001, and requested that OptumRx authorize the prescription for reimbursement under the Plan.

44.     Based upon the representations made by David during the December 2013 telephone call, OptumRx approved Subsys as a covered medication under the Plan.

45.     In its prior authorization review of the Subsys prescription for Patient 001, OptumRx did not request any supporting documentation from "David," Dr. Lubin, or the Practice showing that Patient 001 suffered from malignant cancer pain.  OptumRx did not perform any type of chart review in its prior authorization

---

[1] To protect the privacy of the patient, the name has been replaced with a patient identifier.  The identity will be disclosed to the parties and the Court in accordance with an appropriate protective order.

review of the Subsys prescription for Patient 001.

46.     In addition, OptumRx did nothing to verify that "David" actually worked for the Practice or that he was authorized by Patient 001, Dr. Lubin, or the Practice to provide information regarding Patient 001's condition or to request prior authorization for the Subsys prescription.   Indeed, OptumRx did not even request or require that David provide his last name or any other identifying information.  Instead, OptumRx simply accepted, without any further investigation, the representations of "David" regarding Patient 001's condition and related Subsys prescription.

47.     Between January 2014 and October 2014, Dr. Lubin wrote sixteen (16) prescriptions for Subsys for Patient 001.  In his first prescription on or about January 6, 2014, Dr. Lubin prescribed 400 mcg of Subsys to Patient 001, despite the FDA's instruction that the physician initially prescribe the lowest dosage of 100 mcg, and then slowly increase the dosage if the initial dosage does not ameliorate the patient's pain.

48.     After initially prescribing 400 mcg of Subsys to Patient 001, Dr. Lubin quickly increased the dosage to 800 mcg in February 2014, and then to 1200 mcg in June 2014.

49.     Despite the impropriety of the distribution of Subsys by the RICO Defendants to Patient 001, Claims for each of the sixteen (16) Subsys prescriptions

written by Dr. Lubin for Patient 001 were submitted to the Plan for reimbursement as Covered Services (the "Fraudulent Claims").

### UMR and OptumRx Approve Payment of Fraudulent Claims for the Subsys Illegally Distributed by the RICO Enterprise Defendants

50.    UMR received and reviewed the Fraudulent Claims and determined that each of the Fraudulent Claims constituted Covered Services payable under the terms of the Plan.

51.    On information and belief, UMR failed to undertake reasonable efforts to verify that Patient 001 had been prescribed Subsys for breakthrough cancer pain, or that the Fraudulent Claims for those prescriptions were otherwise Covered Services under the Plan.

52.    Among other omissions, UMR failed to (1) contact Dr. Lubin or the Practice to verify Patient 001's alleged diagnosis of breakthrough cancer pain, (2) failed to request any records from Dr. Lubin or the Practice related to Patient 001's alleged diagnosis, (3) failed to contact Patient 001 regarding her condition and alleged diagnosis, and (4) failed to perform any type of chart review related to Patient 001's diagnosis and related Subsys prescriptions.

53.    Instead, on information and belief, UMR relied entirely upon the prior authorization review conducted by its affiliate/subcontractor, OptumRx, related to Patient 001's Subsys prescriptions.  UMR's reliance upon the prior authorization review conducted by OptumRx was not reasonable, especially in light of the fact

that OptumRx apparently performed no prior authorization review other than relying entirely on the statements of "David" during the December 2013 telephone call.

54.    In reliance upon the prior authorization review performed by OptumRx and the claim review performed by UMR, Wayne paid the Fraudulent Claims related to Patient 001's Subsys prescriptions.  Between January 2014 and October 2014, the Plan paid benefits totaling $198,055.08 for Dr. Lubin's sixteen (16) prescriptions of Subsys to Patient 001.

### UMR and OptumRx's Belated Fraud Investigation and the RICO Defendants' Continued Efforts to Defraud the Plan While Concealing the Nature of the Criminal Enterprise

55.    In or about October 2014, Wayne learned that Patient 001 was addicted to Subsys and was debilitated due to her addiction.  Wayne also learned at that time that Patient 001 had not been diagnosed with cancer.  Upon learning of Patient 001's condition, Wayne demanded that UMR and OptumRx investigate whether the Fraudulent Claims related to Patient 001's Subsys prescriptions were a sham.

56.    In October 2014, OptumRx contacted Dr. Lubin and the Practice – apparently for the first time – and requested medical charts and other documentation supporting the diagnosis of malignant cancer pain.

57.    In November 2014, UMR and OptumRx acknowledged that, based

upon records they had obtained from Dr. Lubin and/or the Practice, Patient 001 had never been diagnosed with breakthrough cancer pain.

58.     Despite the acknowledgment of UMR and OptumRx that Patient 001 did not suffer from breakthrough cancer pain, and that the Fraudulent Claims submitted for her Subsys prescriptions were therefore a sham, UMR and OptumRx refused to indemnify or reimburse Wayne for the benefits paid by Wayne arising from the Fraudulent Claims.

59.     In November 2014, OptumRx informed Dr. Lubin and the Practice that the prior authorization of Subsys had been revoked, based upon the fact that Patient 001 did not suffer from breakthrough cancer pain.

60.     On January 28, 2015, an individual identifying herself as Jeanna Flores from the Practice contacted OptumRx's prior authorization department and again requested approval of a Subsys prescription for Patient 001.  During that call, Ms. Flores stated that Subsys had been prescribed for the treatment of Patient 001's breakthrough cancer pain.

61.     OptumRx approved the prescription of Subsys to Patient 001, based upon Ms. Flores' representations that the medication had been prescribed to treat breakthrough cancer pain.

62.     On February 17, 2015, OptumRx again revoked its authorization of Subsys for Patient 001, after receiving additional information suggesting that

18

Patient 001 did not suffer from breakthrough cancer pain.

63.     On February 24, 2015, Ms. Flores again contacted OptumRx's prior authorization department and indicated that she was calling on behalf of Dr. Lubin and the Practice to request authorization of Subsys for Patient 001.

64.     Also on February 24, 2015, Ms. Flores faxed a written request, on the letterhead of the Practice and Dr. Lubin, to OptumRx seeking approval of the Subsys prescription for Patient 001.

65.     OptumRx subsequently contacted the Practice regarding Ms. Flores' request for approval of the Subsys prescription for Patient 001.  When it contacted the Practice, OptumRx was informed that the Practice did not employ an individual named Jeanna Flores.  The Practice also informed OptumRx that it did not employ any individuals named David, the name given by the individual who first contacted OptumRx in December 2013, identified himself as an employee of the Practice, and requested approval of Subsys for Patient 001 to treat breakthrough cancer pain.

66.     If the Practice is to be believed, and on information and belief, "David" and Jeanna Flores were employed by Insys when they contacted OptumRx and requested authorization for the illegal Subsys prescriptions for Patient 001.  On information and belief, at all times material, Insys had a Patient Services Center, which "assisted" patients obtain prior authorization for Subsys prescriptions.  On information and belief, the pattern and practice of the Insys Patient Services Center

19

was for its employees and representatives to falsely represent to insurance companies and other third party payors that the patient suffered from breakthrough cancer pain in order to obtain authorization for Subsys.  On information and belief, employees in the Insys Patient Services Center were trained to evade insurance companies' prior authorization procedures through false and misleading statements regarding the patient's condition and diagnosis.

67.    Dr. Lubin and the Practice were complicit in the conduct of "David" and Jeanna Flores in contacting OptumRx on their behalf regarding the illegal Subsys prescriptions to Patient 001, even if they were not employed by the Practice.

68.    On March 31, 2015, an Insys "Appeals Specialist," Priscilla Sandoval, submitted an appeal to OptumRx requesting authorization of Subsys for Patient 001.  Ms. Sandoval's facsimile attached a "Letter of Medical Necessity" from Dr. Lubin that stated, for the first time, that Patient 001 suffered from "severe chronic low back pain, leg pain, and joint pain," rather than breakthrough cancer pain.

69.    By submitting an appeal requesting authorization of Subsys for treatment of Patient 001's "severe chronic low back pain, leg pain, and joint pain," Insys promoted and sought authorization for Subsys for an indication not approved by the FDA.

## The RICO Enterprise Pays Kickbacks to
## Dr. Lubin for Illegally Distributing Subsys

70.     Florida's Anti-Kickback Statute prohibits any healthcare provider or any provider of health care services from offering, paying, soliciting, or receiving "a kickback, directly or indirectly, overtly or covertly, in cash or kind, for referring or soliciting patients." Fla. Stat. § 456.054(2).

71.     The Anti-Kickback Statute provides a broad definition of "kickback" which includes any "remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items." Fla. Stat. § 456.054(1). Under the plain language of the Anti-Kickback Statute, violations are also violations of the Patient Brokering Act. Fla. Stat. § 456.054(3).

72.     In 2014, during the period in which Dr. Lubin wrote sixteen (16) illegal Subsys prescriptions for Patient 001, Insys paid Dr. Lubin a total of $105,477.65 in alleged travel reimbursements and "[c]ompensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program."

73.     Dr. Lubin received as much as $7500.00 from Insys for a single "speaking engagement." Dr. Lubin also sometimes received several "speaking engagement" fees from Insys over the span of a few days, such as a $3700.00 payment on September 23, 2014, a $2200.00 payment on September 25, 2014, and

21

a $2200.00 payment on September 30, 2014.

74.   On information and belief, Insys paid Dr. Lubin more than $100,000.00 in fees in 2014 not in connection with legitimate speaking engagements, but to compensate him as a member of the RICO Enterprise to have the Practice and Dr. Lubin illegally distribute Subsys, as it did with Ms. Alonso in Connecticut.

75.   On information and belief, Insys also paid Dr. Lubin more than $100,000.00 in "speaking engagement" fees to compensate the Practice and him to increase the dosages of Subsys prescriptions written for his patients.  As noted above, in the case of Patient 001, Dr. Lubin ignored the FDA's directive to begin a patient on the lowest dose of 100 mcg, and instead started Patient 001 with a much higher dosage of 400 mcg.  Less than one month after starting Patient 001 on the already high dosage of 400 mcg, Dr. Lubin increased Patient 001's dosage to 800 mcg, and then to the extremely high dosage of 1200 mcg.  These high dosages caused Patient 001 to become addicted to Subsys, and later debilitated.

76.   As a member of the Practice, Dr. Lubin, in illegally prescribing Subsys to Patient 001, clearly acted for the sole purpose of receiving monetary gain from the RICO Enterprise, through Insys.  Thus, the RICO Defendants violated the Anti-Kickback Statute by Insys offering and paying kickbacks, directly or indirectly, to the Practice and Dr. Lubin, in cash or in kind, to

incentivize the Practice and Dr. Lubin to illegally distribute Subsys.

## COUNT I
## CIVIL REMEDIES FOR CRIMINAL PRACTICES AGAINST
## <u>INSYS, THE PRACTICE AND DR. LUBIN</u>

77.     This is an action for damages under the CRCPA, section 772.101, *et seq.*, Florida Statutes.  This action is a distinct and separate legal remedy under Fla. Stat. §§ 772.101 through 772.104, and it is brought in addition to and or as alternative the other claims set forth herein.

78.     Wayne incorporates and realleges paragraphs 1 through 76 above, as if more fully set forth herein.

79.     Pursuant to Fla. Stat. § 772.102(3), enterprise is defined as "any individual, sole proprietorship, partnership, corporation, . . . or other legal entity, . . . or group of individuals associated in fact although not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

80.     At all times material, as set forth above, the RICO Defendants acts are and were unlawful under Fla. Stat. § 772.103(3) because the RICO Defendants were all "[e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity . . . ."

81.     At all times material, each of the RICO Defendants participated in the

criminal enterprise, with such enterprise furnishing the structure and the vehicle for the commission of a pattern of continuous criminal racketeering activity.

82. The criminal enterprise is vast, motivated by illegal financial gain, and is believed to have far reaching national implications, with many other yet unnamed and unknown individuals and entities involved.

83. The criminal enterprise is distinct from any individual and utilizes otherwise legitimate businesses to cover for the enterprise.

84. The structure of the criminal enterprise is well defined, with each member or participant having an apparent and ostensibly legitimate position in the medical community, yet each member of the enterprise operates for the fraudulent purpose of the enterprise.

85. Each of the RICO Defendants, by, through and with its or his officers, employees, agents, or representatives, devised or engaged in a scheme whereby they were associated with the criminal enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity.

86. Pursuant to the CRCPA, a pattern of criminal activity is defined as "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents." Fla. Stat. § 772.102(4).

87.    The pattern of criminal activity, as defined by Fla. Stat. § 772.102(1), includes:

a.  The illegal manufacture, sale or delivery of Subsys in violation of Fla. Stat. § 893.13(1)(a)1 by Insys;

b.  The illegal manufacture, sale or delivery of Subsys in violation of Fla. Stat. § 893.13(1)(a)1 by the Practice;

c.  The illegal manufacture, sale or delivery of Subsys in violation of Fla. Stat. § 893.13(1)(a)1 by Dr. Lubin;

d.  The illegal prescribing of Subsys by Dr. Lubin for the sole purpose of receiving monetary gain in violation of Fla. Stat. § 893.13;

e.  The solicitation of Dr. Lubin by Insys for Dr. Lubin to illegally prescribe Subsys for the sole purpose of receiving monetary gain in violation of Fla. Stat. § 893.13;

f.  The misleading advertising of the Practice as legitimately proficient in pain management so as to induce unwitting patients to seek treatment from the Practice and Dr. Lubin and thereby providing the RICO Defendants more opportunities to illegally distribute Subsys in violation of Fla. Stat. §§ 817.06 and/or 817.41; and

g.  The misleading advertising of Dr. Lubin as legitimately proficient in pain management so as to induce unwitting patients to seek treatment from the Practice and Dr. Lubin and thereby providing the RICO Defendants more opportunities to illegally distribute Subsys in violation of Fla. Stat. §§ 817.06 and/or 817.41.

88.    The criminal acts of the RICO Defendants occurred repeatedly over a substantial period of time, were continuous, and were not isolated incidents or events.

89.    The criminal acts of the RICO Defendants constitute a pattern of

criminal activity in that they have the same or similar intents, results, methods of commission of creating Subsys addicts out of unwitting patients in order to illegally sell Subsys and be paid for it by unsuspecting third party payors such as Wayne.

90. Each RICO Defendant is essential to the criminal enterprise, providing the necessary appearance of legitimacy for the fraudulent and criminal scheme to unsuspecting plan providers such as Wayne.

91. Each RICO Defendant played a role in the management or operation of scheme perpetrated by and through the criminal enterprise.

92. The RICO Defendants' pattern of racketeering activity is related, because it manifests in the same or similar methods of commission having related characteristics perpetrated for the same objectives against the same or similar victims, including Wayne.

93. The criminal enterprise gained considerable consideration from the pattern of criminal activity, in the form of the payments for Subsys, and the RICO Defendants continue to profit financially from the criminal acts described above.

94. Wayne was injured by reason of the RICO Defendants' violations of Fla. Stat. §§ 772.101 through 772.104, and suffered direct loss in the form of the money Wayne paid for the Fraudulent Claims for the illegally distributed Subsys, plus attorney's fees and costs.

WHEREFORE, under the provisions of Chapter 772, Florida Statutes, Wayne requests this Court enter judgment against the RICO Defendants, Insys, the Practice and Dr. Lubin, for all damages authorized by law, including all damages actually sustained (trebled as authorized by law), attorney's fees, costs, and such other relief as deemed just and proper.

**COUNT II**
**INJUNCTIVE AND MONETARY RELIEF UNDER FLORIDA RICO AGAINST INSYS, THE PRACTICE AND DR. LUBIN**

95.    This is an action for injunctive relief and damages under Florida RICO (Fla. Stat. §§ 895.01 through 895.06) and is brought in addition to or as an alternative to the other causes of action set forth herein.

96.    Wayne incorporates and realleges paragraphs 1 through 94 above, as if more fully set forth herein.

97.    Wayne is an aggrieved person under the meaning of Fla. Stat. § 895.03(6).

98.    At all times material, the RICO Defendants engaged in racketeering activity within the meaning of Fla. Stat. § 895.02(1).

99.    Specifically, the RICO Defendants committed, to attempted to commit, conspired to commit, or solicited another person to commit the following crimes:

  a.  The illegal manufacture, sale or delivery of Subsys in violation of Fla. Stat. § 893.13(1)(a)1 by Insys;

b. The illegal manufacture, sale or delivery of Subsys in violation of Fla. Stat. § 893.13(1)(a)1 by the Practice;

c. The illegal manufacture, sale or delivery of Subsys in violation of Fla. Stat. § 893.13(1)(a)1 by Dr. Lubin;

d. The illegal prescribing of Subsys by Dr. Lubin for the sole purpose of receiving monetary gain in violation of Fla. Stat. § 893.13;

e. The solicitation of Dr. Lubin by Insys for Dr. Lubin to illegally prescribe Subsys for the sole purpose of receiving monetary gain in violation of Fla. Stat. § 893.13;

f. The misleading advertising of the Practice as legitimately proficient in pain management so as to induce unwitting patients to seek treatment from the Practice and Dr. Lubin and thereby providing the RICO Defendants more opportunities to illegally distribute Subsys in violation of Fla. Stat. §§ 817.06 and/or 817.41; and

g. The misleading advertising of Dr. Lubin as legitimately proficient in pain management so as to induce unwitting patients to seek treatment from the Practice and Dr. Lubin and thereby providing the RICO Defendants more opportunities to illegally distribute Subsys in violation of Fla. Stat. §§ 817.06 and/or 817.41.

100. The above criminal acts constitute a pattern of racketeering under Fla. Stat. § 895.02(4).

101. The RICO Defendants have continually and regularly engaged in this pattern of racketeering since at least 2014 through the present.

102. The pattern of racketeering by the RICO Defendants involves crimes that are part of the regular and normal course of business for the RICO Defendants. As a result, there is a real and credible threat that the racketeering activities of the

RICO Defendants will continue indefinitely into the future.

103.   At all times material, the RICO Defendants, acting knowingly and with criminal intent, violated Fla. Stat. § 895.03(1) by receiving proceeds derived directly or indirectly from the pattern of racketeering activity.   The RICO Defendants utilized the proceeds to operate the criminal enterprise described herein.

104.   Wayne has been damaged as a result of the pattern of racketeering by the RICO Defendants in that Wayne paid the Fraudulent Claims.

105.   Wayne is entitled to temporary and permanent injunctive relief Fla. Stat. §§ 895.05(1) and 895.05(6) and, if such injunctive relief is not issued, other victims shall suffer irreparable harm at the hands of the RICO Defendants.

106.   Said injunctive relief should include, but not be limited to, the following (a) prohibiting the RICO Defendants from illegally marketing, promoting or distributing of Subsys; (b) barring the submission of sham claims related to the illegal distribution of Subsys; (c) precluding any efforts by the RICO Defendants from collecting on any sham claims related to the illegal distribution of Subsys; and (d) prohibiting each RICO Defendant from engaging in the same type of criminal endeavor as the enterprise was engaged.

WHEREFORE, under the provisions of Fla. Stat. §§ 895.05(1) and 895.05(6), Wayne requests this Court enter judgment against the RICO

Defendants, Insys, the Practice and Dr. Lubin, for (a) prohibiting the RICO Defendants from illegally marketing, promoting or distributing of Subsys; (b) barring the submission of sham claims related to the illegal distribution of Subsys; (c) precluding any efforts by the RICO Defendants from collecting on any sham claims related to the illegal distribution of Subsys; and (d) prohibiting each RICO Defendant from engaging in the same type of criminal endeavor as the enterprise was engaged, attorney's fees, costs, and such other relief as deemed just and proper.

## COUNT III
## VIOLATION OF FDUTPA AGAINST THE RICO DEFENDANTS

107.   This is an action for damages under the FDUTPA, Chapter 501, Part II, *et seq.*, Florida Statutes.  This action is a distinct and separate legal action and it is brought in addition to and or as alternative the other claims set forth herein.

108.   Wayne incorporates and realleges paragraphs 1 through 76 above, as if more fully set forth herein.

109.   Wayne is a consumer under the meaning of Fla. Stat. § 501.203(7).

110.   Under Fla. Stat. § 501.203(8), "trade or commerce" is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." As defined, the RICO Defendants are engaged in "trade or commerce" in their

distribution, prescribing and/or sales of Subsys.

111.   FDUPTA provides that "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204(1).

112.   The RICO Defendants, acting individually and in concert, have committed acts and engaged in practices which offend established public policy, and are unethical, oppressive, unscrupulous, or substantially injurious to consumers.  The RICO Defendants have also committed acts which have caused, or are likely to cause, substantial injury to consumers which could not reasonably be avoided.  As a result of this conduct, the RICO Defendants have engaged in unfair acts or practices under Fla. Stat. § 501.204(1).

113.   The RICO Defendants, acting individually and in concert, have made false representations, omissions, acts, or practices related to Subsys which are material and likely to mislead similarly situated consumers acting reasonably.  As a result, the RICO Defendants have engaged in deceptive acts or practices under Fla. Stat. § 501.204(1).

114.   The RICO Defendants, by the foregoing, have engaged in procedural and substantive unconscionable acts or practices under Fla. Stat. § 501.204(1).

115.   As a direct and proximate result of the RICO Defendants violating FDUTPA, as set forth above, Wayne is aggrieved and has suffered a loss in that the

Plan sponsored by Wayne paid the Fraudulent Claims for the illegally prescribed Subsys to Wayne's plan member.

WHEREFORE, under the provisions of Chapter 501, Part II, Florida Statutes, Wayne requests this Court enter judgment against Insys, the Practice, and Dr. Lubin, for injunctive relief, compensatory damages, attorney's fees, costs, and such other relief as deemed just and proper.

## COUNT IV
## COMMON LAW FRAUD/FRAUDULENT MISREPRESENTATION
## AGAINST THE RICO DEFENDANTS

116.   This is an action against the RICO Defendants for committing common law fraud, specifically, fraudulent misrepresentations and material omission of truths.  This action is a distinct and separate legal action and it is brought in addition to and or as alternative the other claims set forth herein.

117.   Wayne incorporates and realleges paragraphs 1 through 76 above, as if more fully set forth herein.

118.   The RICO Defendants, acting individually and in concert, made material false representations and omissions as to material truths regarding to Patient 001 and Subsys which were likely to mislead Wayne into paying the Fraudulent Claims.

119.   At the time the representations were made and the omissions occurred relating to Patient 001 and the Fraudulent Claims, the RICO Defendants knew that

they were false and fraudulent.

120.   The RICO Defendants made the above-described false and fraudulent representations and omitted material truths about Patient 001 and the Fraudulent Claims to induce Wayne to rely upon them.

121.   Wayne relied upon the false representations and omissions of material truths by the RICO Defendants that the Fraudulent Claims were valid and were for the lawful prescription of Subsys to Patient 001.

122.   As a direct and proximate result of the RICO Defendants' misrepresentations and material omissions, Wayne was damaged.

123.   By virtue of the foregoing fraud by the RICO Defendants, Wayne is entitled to compensatory damages.

124.   Wayne intends to seek leave of Court to assert a claim for punitive damages, pursuant to Section 768.72, Florida Statutes.

WHEREFORE, Wayne requests this Court enter judgment against the RICO Defendants, Insys, the Practice and Dr. Lubin, for compensatory damages, costs, and such other relief as deemed just and proper.

## COUNT V
## CIVIL CONSPIRACY AGAINST THE RICO DEFENDANTS

125.   This is an action against the RICO Defendants for civil conspiracy. This action is a distinct and separate legal action and it is brought in addition to and or as alternative the other claims set forth herein.

126.   Wayne incorporates and realleges paragraphs 1 through 76 above, as if more fully set forth herein.

127.   Wayne seeks to remedy the civil wrong arising from the conspiracy by the RICO Defendants to defraud health care plan providers such as Wayne, which resulted in damage to Wayne.

128.   The RICO Defendants agreed and conspired to do an unlawful act by unlawful means, namely, to illegally distribute Subsys and receive payment through the submission of the Fraudulent Claims.

129.   As also set forth above, each party to the conspiracy committed overt acts in pursuance of the conspiracy including, but not limited to, the following:

a.   Insys promoting and marketing Subsys for pain management not associated with breakthrough cancer pain;

b.   Insys making false representations to the Plan regarding Patient 001's diagnosis;

c.   The Practice advertising and promoting itself as engaged in legitimate pain management;

d.   Dr. Lubin advertising and promoting himself as a medical practitioner legitimately treating patients in need of pain management;

e.   Dr. Lubin, as a member of the Practice, accepting kickbacks from Insys to illegally prescribe and distribute Subsys to patients who were not suffering from breakthrough cancer pain; and

f.   Dr. Lubin and the Practice submitting the Fraudulent Claims for payment of the illegally prescribed Subsys.

130.   As a direct and proximate result of the RICO Defendants' overt acts in furtherance of their conspiracy to receive payment from the Fraudulent Claims related to the illegally distributed Subsys, Wayne was damaged.

131.   By virtue of the foregoing conspiracy by the RICO Defendants, Wayne is entitled to compensatory and damages.

132.   Wayne intends to seek leave of Court to assert a claim for punitive damages, pursuant to Section 768.72, Florida Statutes.

WHEREFORE, Wayne requests this Court enter judgment against Insys, the Practice, and Dr. Lubin, for compensatory damages, costs, and such other relief as deemed just and proper.

## COUNT VI
## BREACH OF CONTRACT AGAINST UMR AND OPTUMRX

133.   This is an action for breach of contract against UMR and OptumRx. This action is separate and distinct from and an alternative to the other claims brought by Wayne herein.

134.   Wayne incorporates and realleges paragraphs 1 through 69 above, as if more fully set forth herein.

135.   As set forth above, UMR and OptumRx were contractually obligated to Wayne under the ASA.

136.   In allowing Wayne to pay the Fraudulent Claims, UMR and OptumRx breached their contractual obligations to Wayne under the ASA, by, *inter alia*:

(1) failing to properly perform a Prior Authorization Review with respect to the Fraudulent Claims, (2) failing to use commercially reasonable efforts, consistent with industry standards, to compute the Covered Services payable, in accordance with the terms and conditions of the Plan, (3) failing to correspond with Patient 001, Dr. Lubin, or the Practice to obtain additional information to determine whether the Fraudulent Claims represented Covered Services under the Plan, (4) failing to appropriately investigate the Fraudulent Claims, (5) failing to assume responsibility for, and reimburse Wayne, for the Fraudulent Claims, and (6) failing to indemnify Wayne for the Fraudulent Claims.

137.   As a result of the breaches by UMR and OptumRx, Wayne was damaged.

138.   Wayne is entitled to recover the damages from UMR and OptumRx that resulted from the breaches of the ASA by UMR and OptumRx.

WHEREFORE, Wayne requests this Court enter judgment against the UMR and OptumRx, for monetary damages, costs, and such other relief as deemed just and proper.

DATED this January 26, 2016.

STOVASH, CASE & TINGLEY, P.A.

By: */s/ Amy S. Tingley*
　　　Amy S. Tingley, Esquire
　　　Florida Bar Number 0068871
　　　Primary Email: atingley@sctlaw.com

Secondary Email: lprentice@sctlaw.com
Matthew J. Pearce, Esquire
Florida Bar Number 108368
Primary Email: mpearce@sctlaw.com
Secondary Email: rbryan@sctlaw.com
The VUE at Lake Eola
220 North Rosalind Avenue
Orlando, Florida 32801
Telephone:  (407) 316-0393
Telecopier:  (407) 316-8969

# WAYNE AUTOMATIC FIRE SPRINKLERS INC OCOEE FL

## Health Benefit Summary Plan Description
## 7670-00-410975

**BENEFITS ADMINISTERED BY**



**EXHIBIT "A"**

# Table of Contents

INTRODUCTION.................................................................................................................................. 1

PLAN INFORMATION ...................................................................................................................... 2

BENEFIT CLASS DESCRIPTION ................................................................................................... 4

LOCATION DESCRIPTION.............................................................................................................. 5

MEDICAL SCHEDULE OF BENEFITS - EPO .............................................................................. 6

MEDICAL SCHEDULE OF BENEFITS - PPO ............................................................................ 11

TRANSPLANT SCHEDULE OF BENEFITS ................................................................................ 16

PRESCRIPTION SCHEDULE OF BENEFITS ............................................................................. 17

OUT-OF-POCKET EXPENSES AND MAXIMUMS..................................................................... 18

ELIGIBILITY AND ENROLLMENT ............................................................................................. 20

SPECIAL ENROLLMENT PROVISION ....................................................................................... 24

TERMINATION ................................................................................................................................ 26

PRE-EXISTING CONDITION PROVISION ................................................................................. 28

HIPAA PORTABILITY RIGHTS ................................................................................................... 30

COBRA CONTINUATION OF COVERAGE................................................................................ 31

UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994 .................. 39

PROVIDER NETWORK.................................................................................................................. 40

COVERED MEDICAL BENEFITS ................................................................................................ 42

TELADOC SERVICES.................................................................................................................... 49

HOME HEALTH CARE BENEFITS.............................................................................................. 50

TRANSPLANT BENEFITS ............................................................................................................ 51

PRESCRIPTION BENEFITS ......................................................................................................... 54

MENTAL HEALTH BENEFITS..................................................................................................... 60

SUBSTANCE ABUSE AND CHEMICAL DEPENDENCY BENEFITS ...................................... 62

UTILIZATION MANAGEMENT................................................................................................... 64

COORDINATION OF BENEFITS ................................................................................................. 68

RIGHT OF SUBROGATION, REIMBURSEMENT AND OFFSET.............................................. 72

**GENERAL EXCLUSIONS** ................................................................................................... 75

**CLAIMS AND APPEAL PROCEDURES** ............................................................................ 81

**FRAUD** .................................................................................................................................. 88

**OTHER FEDERAL PROVISIONS** ...................................................................................... 89

**HIPAA ADMINISTRATIVE SIMPLIFICATION MEDICAL PRIVACY AND SECURITY PROVISION** ....... 91

**STATEMENT OF ERISA RIGHTS** ..................................................................................... 95

**PLAN AMENDMENT AND TERMINATION INFORMATION** .................................... 97

**GLOSSARY OF TERMS** ...................................................................................................... 98

# WAYNE AUTOMATIC FIRE SPRINKLERS INC

## GROUP HEALTH BENEFIT PLAN

## SUMMARY PLAN DESCRIPTION

## INTRODUCTION

The purpose of this document is to provide You and Your covered Dependents, if any, with summary information on benefits available under this Plan as well as information on a Covered Person's rights and obligations under the WAYNE AUTOMATIC FIRE SPRINKLERS INC Health Benefit Plan (the "Plan").  As a valued Employee of WAYNE AUTOMATIC FIRE SPRINKLERS INC, we are pleased to sponsor this Plan to provide benefits that can help meet Your health care needs.  Please read this document carefully and contact Your Human Resources or Personnel office if You have questions.

WAYNE AUTOMATIC FIRE SPRINKLERS INC is named the Plan Administrator for this Plan.  The Plan Administrator has retained the services of independent Third Party Administrators to process claims and handle other duties for this self-funded Plan.  The Third Party Administrators for this Plan are UMR, Inc. (hereinafter "UMR") for medical claims, and Prescription Solutions for pharmacy claims.  The Third Party Administrators do not assume liability for benefits payable under this Plan, as they are solely claims paying agents for the Plan Administrator.

The employer assumes the sole responsibility for funding the Plan benefits out of general assets; however, Employees help cover some of the costs of Covered Benefits through contributions, Deductibles, out-of-pocket, and Plan Participation amounts as described in the Schedule of Benefits.  All claim payments and reimbursements are paid out of the general assets of the employer and there is no separate fund that is used to pay promised benefits.  The Plan is intended to comply with and be governed by the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments.

Some of the terms used in this document begin with a capital letter, even though the term normally would not be capitalized.  These terms have special meaning under the Plan.  Most terms will be listed in the Glossary of Terms, but some terms are defined within the provision the term is used.  Becoming familiar with the terms defined in the Glossary will help to better understand the provisions of this Plan.

Individuals covered under this Plan will be receiving an identification card to present to the provider whenever services are received.  On the back of this card are phone numbers to call in case of questions or problems.

This document summarizes the benefits and limitations of the Plan and is known as a Summary Plan Description ("SPD").  It is being furnished to You in accordance with ERISA.

This document becomes effective on July 1, 2011.

## PLAN INFORMATION

| | |
|---|---|
| **Plan Name** | WAYNE AUTOMATIC FIRE SPRINKLERS INC GROUP BENEFIT PLAN |
| **Name And Address Of Employer** | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>222 CAPITOL CT<br>OCOEE FL 34761 |
| **Name, Address And Phone Number Of Plan Administrator** | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>222 CAPITOL CT<br>OCOEE FL 34761<br>407-656-3030 |
| **Named Fiduciary** | WAYNE AUTOMATIC FIRE SPRINKLERS INC |
| **Employer Identification Number Assigned By The IRS** | 59-1824363 |
| **Plan Number Assigned By The Plan** | 501 |
| **Type Of Benefit Plan Provided** | Self-Funded Health & Welfare Plan providing Group Health Benefits |
| **Type Of Administration** | The administration of the Plan is under the supervision of the Plan Administrator.  The Plan is not financed by an insurance company and benefits are not guaranteed by a contract of insurance.  UMR provides administrative services such as claim payments for medical and pharmacy claims. |
| **Name And Address Of Agent For Service Of Legal Process** | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>222 CAPITOL CT<br>OCOEE FL 34761<br><br>Services of legal process may also be made upon the Plan Administrator. |
| **Funding Of The Plan** | Employer and Employee Contributions<br><br>Benefits are provided by a benefit plan maintained on a self-insured basis by Your employer. |
| **Benefit Plan Year** | Benefits begin on January 1 and end on the following December 31.  For new Employees and Dependents, a Benefit Plan Year begins on the individual's Effective Date and runs through December 31 of the same Benefit Plan Year. |
| **ERISA Plan Year** | January 1 through December 31 |

**ERISA And Other Federal Compliance**

It is intended that this Plan meet all applicable requirements of ERISA and other federal regulations.  In the event of any conflict between this Plan and ERISA or other federal regulations, the provisions of ERISA and the federal regulations shall be deemed controlling, and any conflicting part of this Plan shall be deemed superseded to the extent of the conflict.

**Discretionary Authority**

The Plan Administrator shall perform its duties as the Plan Administrator and in its sole discretion, shall determine appropriate courses of action in light of the reason and purpose for which this Plan is established and maintained.  In particular, the Plan Administrator shall have full and sole discretionary authority to interpret all plan documents, including this SPD, and make all interpretive and factual determinations as to whether any individual is entitled to receive any benefit under the terms of this Plan.  Any construction of the terms of any plan document and any determination of fact adopted by the Plan Administrator shall be final and legally binding on all parties, except that the Plan Administrator has delegated certain responsibilities to the Third Party Administrators for this Plan.  Any interpretation, determination or other action of the Plan Administrator or the Third Party Administrators shall be subject to review only if a court of proper jurisdiction determines its action is arbitrary or capricious or otherwise a clear abuse of discretion.  Any review of a final decision or action of the Plan Administrator or the Third Party Administrators shall be based only on such evidence presented to or considered by the Plan Administrator or the Third Party Administrators at the time it made the decision that is the subject of review.  Accepting any benefits or making any claim for benefits under this Plan constitutes agreement with and consent to any decisions that the Plan Administrator or the Third Party Administrators make, in its sole discretion, and further, means that the Covered Person consents to the limited standard and scope of review afforded under law.

## BENEFIT CLASS DESCRIPTION

The Covered Person's benefit class is determined by the designations shown below:

| Class | Class Description | Benefit Plan | Network** |
|-------|-------------------|--------------|-----------|
| A01 | ALL ACTIVE EMPLOYEES WITH EPO PLAN | 001 | 0L-98 |
| A02 | ALL ACTIVE EMPLOYEES WITH PPO PLAN | 002 | 0L-XZ |
| C01 | ALL COBRA PARTICIPANTS WITH EPO PLAN | 001 | 0L-98 |
| C02 | ALL COBRA PARTICIPANTS WITH PPO PLAN | 002 | 0L-XZ |

**Note:  See Provider Network section of this SPD for network description.

## LOCATION DESCRIPTION

| Location | Description | Billing Division | Reporting Sub |
|----------|-------------|------------------|---------------|
| 001 | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>222 CAPITOL CT<br>OCOEE FL 34761 | 001 | 0001 |
| 002 | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>4683 LAREDO DR<br>FORT MYERS FL 33905 | 002 | 0002 |
| 003 | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>3121 NW 16TH TERRACE<br>POMPANO BEACH FL 33064 | 003 | 0003 |
| 004 | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>3226 CHERRY PALM DR<br>TAMPA FL 33619 | 004 | 0004 |
| 005 | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>4370 MOTORSPORT DR<br>CONCORD NC 28027 | 005 | 0005 |
| 006 | WAYNE AUTOMATIC FIRE SPRINKLERS INC<br>11326 DISTRIBUTION AVE W<br>JACKSONVILLE FL 32256 | 006 | 0006 |

# MEDICAL SCHEDULE OF BENEFITS - EPO

### Benefit Plan(s) 001

All health benefits shown on this Schedule of Benefits are subject to the following:  Lifetime and annual maximums, Deductibles, Co-pays, Plan Participation rates, and out-of-pocket maximums, if any.  Refer to the Out-of-Pocket Expenses section of this SPD for more details.

Benefits are subject to all provisions of this Plan including any benefit determination based on an evaluation of medical facts and Covered Benefits.  Refer to the Covered Medical Benefits and General Exclusions sections of this SPD for more details.

Important:  Notification may be required before benefits will be considered for payment.  Failure to obtain notification may result in a penalty or increased out-of-pocket costs.  Refer to the Utilization Management section of this SPD for a description of these services and notification procedures.

Notes:  Refer to the Provider Network section for clarifications and possible exceptions to the In-Network or Out-of-Network classifications.

If a benefit maximum is listed in the middle of a column on the Schedule of Benefits, that means that it is a combined Maximum Benefit for services that the Covered Person receives from all In-Network and Out-of-Network providers and facilities.

**The only Out-of-Network benefits that would apply to the Deductibles and Annual Out-of-Pocket Maximum would be for Ambulance Transportation, Emergency Room / Physicians and Wigs.**

| | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Annual Deductible Per Calendar Year:** | | |
| • Per Person | $250 | |
| • Per Family | $500 | |
| **Plan Participation Rate, Unless Otherwise Stated Below:** | | |
| • Paid By Plan After Satisfaction Of Deductible | 80% | |
| **Annual Out-Of-Pocket Maximum:** | | |
| • Per Person | $2,000 | |
| • Per Family | $5,000 | |
| **Ambulance Transportation:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Chiropractic Services:** | | No Benefit |
| • Co-pay Per Visit | $40 | |
| • Maximum Visits Per Calendar Year | 25 Visits | |
| • Paid By Plan | 80% (Deductible Waived) | |
| **Durable Medical Equipment:** | | No Benefit |
| • Paid By Plan | 80% (Deductible Waived) | |
| **Emergency Services / Treatment:** | | |
| **Urgent Care:** | | No Benefit |
| • Co-pay Per Visit | $50 | |
| • Paid By Plan | 100% (Deductible Waived) | |

|  | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Walk-in Retail Health Clinics:** |  | No Benefit |
| • Co-pay Per Visit | $50 |  |
| • Paid By Plan | 100% |  |
|  | (Deductible Waived) |  |
| **Emergency Room / Emergency Physicians:** |  |  |
| • Co-pay Per Visit | $250 |  |
|   (Waived If Admitted As Inpatient Within 24 Hours) | | |
| • Paid By Plan | 100% |  |
|  | (Deductible Waived) |  |
| **Extended Care Facility Benefits Such As Skilled Nursing, Convalescent Or Subacute Facility:** |  | No Benefit |
| • Maximum Days Per Calendar Year | 60 Days |  |
| • Paid By Plan After Deductible | 80% |  |
| **Home Health Care Benefits:** |  | No Benefit |
| • Maximum Visits Per Calendar Year | 60 Visits |  |
| • Paid By Plan After Deductible | 80% |  |
| *Note:  A Home Health Care Visit Will Be Considered A Periodic Visit By Either A Nurse Or Therapist, As The Case May Be, Or Up To Four (4) Hours Of Home Health Care Services.* |  |  |
| **Hospice Care Benefits:** |  | No Benefit |
| **Hospice Services:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Bereavement Counseling:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Hospital Services:** |  | No Benefit |
| **Pre-admission Testing:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Inpatient Services / Inpatient Physician Charges Room And Board Subject To The Payment Of Semi-private Room Rate Or Negotiated Room Rate:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Outpatient Services / Outpatient Physician Charges:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Outpatient Lab And X-ray Charges:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Independent Lab And X-ray Charges:** |  |  |
| • Co-pay Per Draw Or Visit | $40 |  |
| • Paid By Plan | 100% |  |
|  | (Deductible Waived) |  |
| **Outpatient Surgery / Surgeon Charges:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Medical Diagnostic Mammograms:** |  | No Benefit |
| • Co-pay Per Visit | $25 |  |
| • Paid By Plan | 100% |  |
|  | (Deductible Waived) |  |

|  | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Mental Health, Substance Abuse And Chemical Dependency Benefits:** |  | No Benefit |
| **Inpatient Services / Physician Charges:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Outpatient Or Partial Hospitalization Services And Physician Charges:** |  |  |
| • Paid By Plan After Deductible | 80% |  |
| **Office Visit:** |  |  |
| • Co-pay Per Visit | $40 |  |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Nursery And Newborn Inpatient Expenses:** |  | No Benefit |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Nutritional Counseling:** |  | No Benefit |
| • Maximum Visits Per Lifetime | 5 Visits |  |
| • Co-pay Per Visit | $40 |  |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Orthotics:** |  | No Benefit |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Custom Molded Foot Orthotics:** |  |  |
| • Benefit Maximum Per Calendar Year | 1 Orthotic |  |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Physician Office Visit:** |  | No Benefit |
| **Primary Care Physician Office Visit:** |  |  |
| • Co-pay Per Visit | $25 |  |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Specialist Office Visit:** |  |  |
| • Co-pay Per Visit | $40 |  |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Physician Office Services:** |  | No Benefit |
| • Paid By Plan | 100% (Deductible Waived) |  |
| **Office Surgery:** |  |  |
| • Co-pay Per Visit | $40 |  |
| • Paid By Plan | 80% (Deductible Waived) |  |
| **Allergy Injections:** |  |  |
| • Co-pay Per Visit In Addition To Physician Office Visit Co-pay | $40 |  |
| • Paid By Plan | 100% (Deductible Waived) |  |

| | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Allergy Testing:** | | |
| • Co-pay Per Course Of Treatment In Addition To Physician Office Visit Co-pay | $40 | |
| • Paid By Plan | 100% (Deductible Waived) | |
| ***Note:  Unless Otherwise Stated One Co-pay Will Apply.  The Highest Co-pay Will Apply Per Visit.*** | | |
| **Private Duty Nursing:** | | No Benefit |
| • Maximum Visits Per Calendar Year | 30 Visits | |
| • Paid By Plan After Deductible | 80% | |
| **Preventive / Routine Care Benefits.  See Glossary Of Terms For Definition.  Benefits Include:** | | No Benefit |
| **Preventive / Routine Physical Exams At Appropriate Ages:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Immunizations:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Diagnostic Tests, Lab And X-rays At Appropriate Ages:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Mammograms And Breast Exams:** | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Pelvic Exams And Pap Test:** | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine PSA Test And Prostate Exams:** From Age 40 | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Screenings / Services At Appropriate Ages And Gender:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Colonoscopy, Sigmoidoscopy And Similar Routine Surgical Procedures Done For Preventive Reasons:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |

| | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Preventive / Routine Alcohol And Substance Abuse, Tobacco Use, Obesity, Diet And Nutrition Counseling:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Hearing Exams:** | | |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Preventive / Routine Eye Exam And Glaucoma Testing:** | | |
| • Maximum Exams Per Calendar Year | 1 Exam | 1 Exam |
| • Co-pay Per Visit | $40 | $40 |
| • Paid By Plan | 100% (Deductible Waived) | 100% (Deductible Waived) |
| **Prosthetics:** | | No Benefit |
| • Paid By Plan | 80% (Deductible Waived) | |
| **Second And Third Surgical Opinion:** | | |
| • Paid By Plan | 100% (Deductible Waived) | 100% (Deductible Waived) |
| **Teledoc Consultations (Contracted With Teledoc):** | | No Benefit |
| • Paid By Plan | 100% (Deductible Waived) | |
| **Temporomandibular Joint Disorder Benefits:** | | No Benefit |
| • Paid By Plan After Deductible | 80% | |
| **Therapy Services:** | | No Benefit |
| **Occupational / Physical Outpatient Hospital And Office Therapy:** | | |
| • Maximum Visits Per Calendar Year | 25 Visits | |
| • Paid By Plan After Deductible | 80% | |
| **Speech Outpatient Hospital And Office Therapy:** | | |
| • Maximum Visits Per Calendar Year | 25 Visits | |
| • Paid By Plan After Deductible | 80% | |
| **Wigs, Toupees Or Hairpieces Related To Cancer Treatment:** | | |
| • Benefit Maximum Per Lifetime | 2 Wigs, Toupees Or Hairpieces | |
| • Paid By Plan After Deductible | 80% | |
| **All Other Covered Expenses:** | | |
| • Paid By Plan After Deductible | 80% | |

# MEDICAL SCHEDULE OF BENEFITS - PPO

### Benefit Plan(s) 002

All health benefits shown on this Schedule of Benefits are subject to the following:  Lifetime and annual maximums, Deductibles, Co-pays, Plan Participation rates, and out-of-pocket maximums, if any.  Refer to the Out-of-Pocket Expenses section of this SPD for more details.

Benefits are subject to all provisions of this Plan including any benefit determination based on an evaluation of medical facts and Covered Benefits.  Refer to the Covered Medical Benefits and General Exclusions sections of this SPD for more details.

Important:  Notification may be required before benefits will be considered for payment.  Failure to obtain notification may result in a penalty or increased out-of-pocket costs.  Refer to the Utilization Management section of this SPD for a description of these services and notification procedures.

Notes:  Refer to the Provider Network section for clarifications and possible exceptions to the In-Network or Out-of-Network classifications.

If a benefit maximum is listed in the middle of a column on the Schedule of Benefits, that means that it is a combined Maximum Benefit for services that the Covered Person receives from all In-Network and Out-of-Network providers and facilities.

| | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Annual Deductible Per Calendar Year:** | | |
| • Per Person | $750 | $1,000 |
| • Per Family | $1,500 | $1,750 |
| **Plan Participation Rate, Unless Otherwise Stated Below:** | | |
| • Paid By Plan After Satisfaction Of Deductible | 80% | 60% |
| **Annual Out-Of-Pocket Maximum:** | | |
| • Per Person | $2,000 | $4,000 |
| • Per Family | $5,000 | $8,000 |
| **Ambulance Transportation:** | | |
| • Paid By Plan | 100% (Deductible Waived) | 100% (Deductible Waived) |
| **Chiropractic Services:** | | |
| • Co-pay Per Visit | $40 | Not Applicable |
| • Maximum Visits Per Calendar Year | 25 Visits | |
| • Paid By Plan After Deductible | 80% (Deductible Waived) | 60% |
| **Durable Medical Equipment:** | | |
| • Paid By Plan After Deductible | 80% (Deductible Waived) | 60% |
| **Emergency Services / Treatment:** | | |
| **Urgent Care:** | | |
| • Co-pay Per Visit | $50 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Walk-in Retail Health Clinics:** | | |
| • Co-pay Per Visit | $50 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |

|  | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Emergency Room / Emergency Physicians:** | | |
| • Co-pay Per Visit<br>(Waived If Admitted As Inpatient Within 24 Hours) | $250 | $250 |
| • Paid By Plan | 100%<br>(Deductible Waived) | 100%<br>(Deductible Waived) |
| **Extended Care Facility Benefits Such As Skilled Nursing, Convalescent Or Subacute Facility:** | | |
| • Maximum Days Per Calendar Year | 60 Days | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Home Health Care Benefits:** | | |
| • Maximum Visits Per Calendar Year | 60 Visits | |
| • Paid By Plan After Deductible | 80% | 60% |
| *Note:  A Home Health Care Visit Will Be Considered A Periodic Visit By Either A Nurse Or Therapist, As The Case May Be, Or Up To Four (4) Hours Of Home Health Care Services.* | | |
| **Hospice Care Benefits:** | | |
| **Hospice Services:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Bereavement Counseling:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Hospital Services:** | | |
| **Pre-admission Testing:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Inpatient Services / Inpatient Physician Charges Room And Board Subject To The Payment Of Semi-private Room Rate Or Negotiated Room Rate:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Outpatient Services / Outpatient Physician Charges:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Outpatient Lab And X-ray Charges:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Independent Lab And X-ray Charges:** | | |
| • Co-pay Per Visit | $40 | Not Applicable |
| • Paid By Plan After Deductible | 100%<br>(Deductible Waived) | 60% |
| **Outpatient Surgery / Surgeon Charges:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Medical Diagnostic Mammograms:** | | |
| • Co-pay Per Visit | $25 | Not Applicable |
| • Paid By Plan After Deductible | 100%<br>(Deductible Waived) | 60% |

|  | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Mental Health, Substance Abuse And Chemical Dependency Benefits:** | | |
| **Inpatient Services / Physician Charges:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Outpatient Or Partial Hospitalization Services And Physician Charges:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Office Visit:** | | |
| • Co-pay Per Visit | $40 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Nursery And Newborn Inpatient Expenses:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Nutrition Counseling:** | | |
| • Co-pay Per Visit | $40 | Not Applicable |
| • Maximum Visits Per Lifetime | 5 Visits | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Orthotics:** | | |
| • Paid By Plan After Deductible | 80% (Deductible Waived) | 60% |
| **Custom Molded Foot Orthotics:** | | |
| • Benefit Maximum Per Calendar Year | 1 Orthotic | |
| • Paid By Plan After Deductible | 80% (Deductible Waived) | 60% |
| **Physician Office Visit:** | | |
| **Primary Care Physician Office Visit:** | | |
| • Co-pay Per Visit | $25 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Specialist Office Visit:** | | |
| • Co-pay Per Visit | $40 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Physician Office Services:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Office Surgery:** | | |
| • Co-pay Per Visit | $40 | Not Applicable |
| • Paid By Plan | 80% (Deductible Waived) | 60% |
| **Allergy Injections:** | | |
| • Co-pay Per Visit In Addition To Physician Office Visit Co-pay | $40 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |

| | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Allergy Testing:** | | |
| • Co-pay Per Course Of Treatment In Addition To Physician Office Visit Co-pay | $40 | Not Applicable |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| ***Note:  Unless Otherwise Stated One Co-pay Will Apply.  The Highest Co-pay Will Apply Per Visit.*** | | |
| **Private Duty Nursing:** | | |
| • Maximum Visits Per Calendar Year | 30 Visits | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Preventive / Routine Care Benefits.  See Glossary Of Terms For Definition.  Benefits Include:** | | |
| **Preventive / Routine Physical Exams At Appropriate Ages:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Immunizations:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Diagnostic Tests, Lab And X-rays At Appropriate Ages:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Mammograms And Breast Exams:** | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Pelvic Exams And Pap Test:** | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine PSA Test And Prostate Exams:** From Age 40 | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Screenings / Services At Appropriate Ages And Gender:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Colonoscopy, Sigmoidoscopy And Similar Routine Surgical Procedures Done For Preventive Reasons:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |

| | IN-NETWORK | OUT-OF-NETWORK |
|---|---|---|
| **Preventive / Routine Alcohol And Substance Abuse, Tobacco Use, Obesity, Diet And Nutrition Counseling:** | | |
| • Paid By Plan | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Hearing Exams:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 60% |
| **Preventive / Routine Eye Exam And Glaucoma Testing:** | | |
| • Maximum Exams Per Calendar Year | 1 Exam | |
| • Co-pay Per Visit | $40 | $40 |
| • Paid By Plan | 100% (Deductible Waived) | 100% (Deductible Waived) |
| **Prosthetics:** | | |
| • Paid By Plan After Deductible | 80% (Deductible Waived) | 60% |
| **Second And Third Surgical Opinion:** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 100% (Deductible Waived) |
| **Teledoc Consultations (Contracted With Teledoc):** | | |
| • Paid By Plan After Deductible | 100% (Deductible Waived) | 100% (Deductible Waived) |
| **Temporomandibular Joint Disorder Benefits:** | | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Therapy Services:** | | |
| **Occupational / Physical Outpatient Hospital And Office Therapy:** | | |
| • Maximum Visits Per Calendar Year | 25 Visits | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Speech Outpatient Hospital And Office Therapy:** | | |
| • Maximum Visits Per Calendar Year | 25 Visits | |
| • Paid By Plan After Deductible | 80% | 60% |
| **Wigs, Toupees Or Hairpieces Related To Cancer Treatment:** | | |
| • Benefit Maximum Per Lifetime | 2 Wigs, Toupees Or Hairpieces | |
| • Paid By Plan After In-Network Deductible | 80% | 80% |
| **All Other Covered Expenses:** | | |
| • Paid By Plan After Deductible | 80% | 60% |

| TRANSPLANT SCHEDULE OF BENEFITS | |
|---|---|
| **Benefit Plan(s) ALL** | |
| **Transplant Services At A Designated Transplant Facility:** | |
| **Transplant Services:** | |
| • Paid By Plan After Deductible | 80% |
| **Travel And Housing:** | |
| • Maximum Benefit Per Transplant | $10,000 |
| • Paid By Plan After Deductible | 80% |
| Travel And Housing At Designated Transplant Facility For Up To One Year From Date Of Transplant. | |

| PRESCRIPTION SCHEDULE OF BENEFITS PRESCRIPTION SOLUTIONS Benefit Plan(s) ALL | |
|---|---|
| **By Participating Retail Pharmacy** | |
| • Covered Person's Co-pay Amount | For Up To A 30-Day Supply Or 100 Units: |
| Generic Products (Tier 1) | $15 |
| Preferred Brand Products (Tier 2) | $30 |
| Nonpreferred Brand Products (Tier 3) | $50 |
| **By Participating Mail Order Pharmacy** | |
| • Covered Person's Co-pay Amount Per Prescription Product | For Up To A 90-Day Supply: |
| Generic Products (Tier 1) | $30 |
| Preferred Brand Products (Tier 2) | $60 |
| Nonpreferred Brand Products (Tier 3) | $100 |
| **By Specialty Pharmacy Vendor** | |
| • Covered Person's Co-pay Amount | For Up To A 30-Day Supply Or 100 Units: |
| Generic Products (Tier 1) | $15 |
| Preferred Brand Products (Tier 2) | $30 |
| Nonpreferred Brand Products (Tier 3) | $50 |
| **By Non-Participating Pharmacy** | No Benefit |

# OUT-OF-POCKET EXPENSES AND MAXIMUMS

## CO-PAYS

A Co-pay is the amount that the Covered Person must pay to the provider each time certain services are received.  Co-pays do not apply toward satisfaction of Deductibles or out-of-pocket maximums.  The Co-pay and out-of-pocket maximum are shown on the Schedule of Benefits.

## DEDUCTIBLES

Deductible refers to an amount of money paid once a Plan Year by the Covered Person before any Covered Expenses are paid by this Plan.  A Deductible applies to each Covered Person up to a family Deductible limit.  When a new Plan Year begins, a new Deductible must be satisfied.

Deductible amounts are shown on the Schedule of Benefits.

Pharmacy expenses do not count toward meeting the Deductible of this Plan.  The Deductible amounts that the Covered Person incurs for Covered Expenses will be used to satisfy the Deductible(s) shown on the Schedule of Benefits.

**(Applies to Benefit Plan(s) 001)** The Deductible amounts that the Covered Person incurs at an in-network provider will apply to the in-network total individual and family Deductible.  The Deductible amounts that the Covered Person incurs at an out-of-network provider will apply to the in-network and out-of-network total individual and family Deductible.  The only Out-of-Network benefits that would apply to the Deductibles would be for Ambulance Transportation, Emergency Room / Physicians and Wigs.

**(Applies to Benefit Plan(s) 002)** The Deductible amounts that the Covered Person incurs at all benefit levels (whether Incurred at an in-network or out-of-network provider) will be used to satisfy the applicable benefit level's total individual and family Deductible.

If You have family coverage, any combination of covered family members can help meet the maximum family Deductible, up to each person's individual Deductible amount.

All Covered Expenses which are Incurred during the last three months of a Plan Year and applied toward satisfaction of the individual and family Deductible for that year, will also be applied toward the individual and family Deductible requirement for the next Plan Year.

If two or more covered family members are injured in the same Accident, only one Deductible needs to be met for those Covered Expenses which are due to that Accident, and Incurred during that calendar year.

## PLAN PARTICIPATION

Plan Participation means that, after the Covered Person satisfies the Deductible, the Covered Person and the Plan each pay a percentage of the Covered Expenses until the Covered Person's (or family's, if applicable) annual out-of-pocket maximum is reached.  The Plan Participation rate is shown on the Schedule of Benefits.  The Covered Person will be responsible for paying any remaining charges due to the provider after the Plan has paid its portion of the Covered Expense, subject to the Plan's maximum fee schedule, Negotiated Rate, or Usual and Customary amounts as applicable.  Once the annual out-of-pocket maximum has been satisfied, the Plan will pay 100% of the Covered Expense for the remainder of the Plan Year.

Any payment for an expense that is not covered under this Plan will be the Covered Person's responsibility.

**ANNUAL OUT-OF-POCKET MAXIMUMS**

The annual out-of-pocket maximum is shown on the Schedule of Benefits.  Amounts the Covered Person incurs for Covered Expenses, such as the Deductible, and any Plan Participation expense, will be used to satisfy the Covered Person's (or family's, if applicable) annual out-of-pocket maximum(s).  Pharmacy expenses that the Covered Person incurs do not apply toward the out-of-pocket maximum of this Plan.

The following will not be used to meet the out-of-pocket maximums:

- Co-pays.
- Penalties, legal fees and interest charged by a provider.
- Expenses for excluded services.
- Any charges above the limits specified elsewhere in this document.
- Co-pays and Participation amounts for Prescription products.
- Expenses Incurred as a result of failure to comply with notification requirements for Hospital confinement.
- Any amounts over the Usual and Customary amount, Negotiated Rate or established fee schedule that this Plan pays.

**(Applies to Benefit Plan(s) 001)** The eligible out-of-pocket expenses that the Covered Person incurs at an in-network provider will apply to the in-network total out-of-pocket maximum.  The eligible out-of-pocket expenses that the Covered Person incurs at an out-of-network provider will apply to the in-network and out-of-network total out-of-pocket maximum.  The only Out-of-Network benefits that would apply to the Annual Out-of-Pocket Maximum would be for Ambulance Transportation, Emergency Room / Physicians and Wigs.

**(Applies to Benefit Plan(s) 002)** The eligible out-of-pocket expenses that the Covered Person incurs at all benefit levels (whether Incurred at an in-network or out-of-network provider) will be used to satisfy the total out-of-pocket maximum.

**NO FORGIVENESS OF OUT-OF-POCKET EXPENSES**

The Covered Person is required to pay the out-of-pocket expenses (including Deductibles, Co-pays or required Plan Participation) under the terms of this Plan.  The requirement that You and Your Dependent(s) pay the applicable out-of-pocket expenses cannot be waived by a provider under any "fee forgiveness", "not out-of-pocket" or similar arrangement.  If a provider waives the required out-of-pocket expenses, the Covered Person's claim may be denied and the Covered Person will be responsible for payment of the entire claim.  The claim(s) may be reconsidered if the Covered Person provides satisfactory proof that he or she paid the out-of-pocket expenses under the terms of this Plan.

## ELIGIBILITY AND ENROLLMENT

### ELIGIBILITY AND ENROLLMENT PROCEDURES

You are responsible for enrolling in the manner and form prescribed by Your employer.  The Plan's eligibility and enrollment procedures include administrative safeguards and processes designed to ensure and verify that eligibility and enrollment determinations are made in accordance with the Plan.  The Plan may request documentation from You or Your dependents in order to make these determinations.  The coverage choices that will be offered to You will be the same choices offered to other similarly situated Employees.

### WAITING PERIOD

If eligible, You must complete a Waiting Period before coverage becomes effective for You and Your Dependents.  A Waiting Period is a period of time that must pass before an Employee or Dependent becomes eligible for coverage under the terms of this Plan.

You are eligible for coverage on the date listed below under the Effective Date section, upon completion of 90 consecutive calendar days of regular employment in a covered position.

The start of Your Waiting Period is the first full day of employment for the job that made You eligible for coverage under this Plan.

A Waiting Period will not count against You or Your Dependents for purposes of counting Creditable Coverage.  It is not considered a break in coverage.

### ELIGIBILITY REQUIREMENTS

An **eligible Employee** is a person who is classified by the employer on both payroll and personnel records as an Employee who normally works at least 30 or more hours per week and is on a regular payroll of the employer for that work, but for purposes of this Plan, it does not include the following classifications of workers as determined by the employer in its sole discretion:

- Temporary or leased employees.
- An Independent Contractor as defined in this Plan.
- A consultant who is paid on other than a regular wage or salary by the employer.
- A member of the employer's Board of Directors, an owner, partner, or officer, unless engaged in the conduct of the business on a full-time regular basis.

For purposes of this Plan, eligibility requirements are used only to determine a person's initial eligibility for coverage under this Plan.  An Employee may retain eligibility for coverage under this Plan if the Employee is temporarily absent on an approved leave of absence, with the expectation of returning to work following the approved leave as determined by the employer's leave policy, provided that contributions continue to be paid on a timely basis.  The employer's classification of an individual is conclusive and binding for purposes of determining eligibility under this Plan.  No reclassification of a person's status, for any reason, by a third-party, whether by a court, governmental agency or otherwise, without regard to whether or not the employer agrees to such reclassification, shall change a person's eligibility for benefits.

Note:  Eligible Employees and Dependents who decline to enroll in this Plan must state so in writing.  In order to preserve potential Special Enrollment rights, eligible individuals declining coverage must state in writing that enrollment is declined due to coverage under another group health plan or health insurance policy.  Proof of such plan or policy may be required upon application for Special Enrollment.  See the Special Enrollment section.

An **eligible Dependent** includes:

- Your legal spouse who is a husband or wife of the opposite sex in accordance with the federal Defense of Marriage Act provided he or she is not covered as an Employee under this Plan.  For purposes of eligibility under this Plan, a legal spouse does not include a common-law marriage spouse, even if such partnership is recognized as a legal marriage in the state in which the couple resides.  An eligible Dependent does not include an individual from whom You have obtained a legal separation or divorce.  Documentation on a Covered Person's marital status may be required by the Plan Administrator.

- A Dependent Child that resides in the United States until the Child reaches his or her 26th birthday.  The term "**Child**" includes the following Dependents:

  - ➢ A natural biological Child;
  - ➢ A step Child;
  - ➢ A legally adopted Child or a Child legally Placed for Adoption as granted by action of a federal, state or local governmental agency responsible for adoption administration or a court of law if the Child has not attained age 26 as of the date of such placement;
  - ➢ A Child under Your (or Your spouse's) Legal Guardianship as ordered by a court;
  - ➢ A Child who is considered an alternate recipient under a Qualified Medical Child Support Order (QMCSO).

- A Dependent does not include the following:

  - ➢ A foster Child;
  - ➢ A Child of a Domestic partner or under Your Domestic Partner's Legal Guardianship;
  - ➢ A grandchild;
  - ➢ Domestic Partners;
  - ➢ Any other relative or individual unless explicitly covered by this Plan;
  - ➢ A Dependent Child who is covered as a Dependent of another Employee at this company.

**NON-DUPLICATION OF COVERAGE:**  Any person who is covered as an eligible Employee shall not also be considered an eligible Dependent under this Plan.

**RIGHT TO CHECK A DEPENDENT'S ELIGIBILITY STATUS:**  The Plan reserves the right to check the eligibility status of a Dependent at any time throughout the year.  You and Your Dependent have a notice obligation to notify the Plan should the Dependent's eligibility status change throughout the Plan year.  Please notify Your Human Resources Department regarding status changes.

**EXTENDED COVERAGE FOR DEPENDENT CHILDREN**

A Dependent Child may be eligible for extended Dependent coverage under this Plan under the following circumstances:

- The Dependent Child was covered by this Plan on the day before the Child's 26th birthday; or
- The Dependent Child is a Dependent of an employee newly eligible for the Plan; or
- The Dependent Child is eligible due to a Special Enrollment event or a Qualifying Status Change event, as outlined in the Section 125 Plan.

**and** the Dependent Child fits the following category:

- If You have a Dependent Child covered under this Plan who is under the age of 26 and Totally Disabled, either mentally or physically, that Child's health coverage may continue beyond the day the Child would cease to be a Dependent under the terms of this Plan.  You must submit written proof that the Child is Totally Disabled within 31 calendar days after the day coverage for the Dependent would normally end.  The Plan may, for two years, ask for additional proof at any time, after which the Plan can ask for proof not more than once a year.  Coverage can continue subject to the following minimum requirements:

  - ➢ The Dependent must not be able to hold a self-sustaining job due to the disability; and
  - ➢ Proof must be submitted as required; and
  - ➢ The Employee must still be covered under this Plan.

A Totally Disabled Dependent Child older than 26 who loses coverage under this Plan may not re-enroll in the Plan under any circumstances.

---

**IMPORTANT:**  It is Your responsibility to notify the Plan Sponsor within 60 days if Your Dependent no longer meets the criteria listed in this section.  If, at any time, the Dependent does not meet the qualifications of Totally Disabled, the Plan has the right to be reimbursed from the Dependent and Employee for any medical claims paid by the Plan during the period that the Dependent did not qualify for extended coverage.  Please refer to the COBRA Section in this document.

---

Employees have the right to choose which eligible Dependents are covered under the Plan.

### EFFECTIVE DATE OF EMPLOYEE'S COVERAGE

Your coverage will begin on the later of:

- If You apply within Your Waiting Period, Your coverage will become effective the first Monday following the date You complete Your Waiting Period; or

- If You apply after the completion of Your Waiting Period, You will be considered a Late Enrollee. Coverage for a Late Enrollee will become effective July 1 following application during the annual open enrollment period.  (Persons who apply under the Special Enrollment Provision are not considered Late Enrollees).

- If You are eligible to enroll under the Special Enrollment Provision, Your coverage will become effective on the date set forth under the Special Enrollment Provision if application is made within 31 days of the event.

### EFFECTIVE DATE OF COVERAGE FOR YOUR DEPENDENTS

Your Dependent's coverage will be effective on the later of:

- The date Your coverage with the Plan begins if You enroll the Dependent at that time; or

- The date You acquire Your Dependent if application is made within 31 days of acquiring the Dependent; or

- July 1 following application during the annual open enrollment period.  The Dependent will be considered a Late Enrollee if You request coverage for Your Dependent more than 30 days of Your hire date, or more than 31 days following the date You acquire the Dependent; or

- If Your Dependent is eligible to enroll under the Special Enrollment Provision, the Dependent's coverage will become effective on the date set forth under the Special Enrollment Provision, if application is made within 31 days following the event; or

- The later of the date specified in a Qualified Medical Child Support Order or the date the Plan Administrator determines that the order is a QMCSO.

A contribution will be charged from the first day of coverage for the Dependent, if additional contribution is required.  In no event will Your Dependent be covered prior to the day Your coverage begins.

## ANNUAL OPEN ENROLLMENT PROVISION

During the annual open enrollment period, eligible Employees will be able to enroll themselves and their eligible Dependents for coverage under this Plan.  Eligible Employees and their Dependents who enroll during the annual open enrollment period will be considered Late Enrollees.  Covered Employees will be able to make a change in coverage for themselves and their eligible Dependents.

Coverage Waiting Periods and Pre-Existing Condition Limits are waived during the annual open enrollment period for covered Employees and covered Dependents changing from one Plan to another Plan or changing coverage levels within the Plan.

If You and/or Your Dependent become covered under this Plan as a result of electing coverage during the annual open enrollment period, the following shall apply:

- The annual open enrollment period shall typically be in the month of June.  The employer will give eligible Employees written notice prior to the start of an annual open enrollment period; and

- This Plan does not apply to charges for services performed or treatment received prior to the Effective Date of the Covered Person's coverage; and

- The Effective Date of coverage shall be July 1 following the annual open enrollment period.

## LIFETIME MAXIMUM RE-ENROLLMENT

Effective as of the first day of the first Plan Year beginning on or after September 23, 2010, this Plan will provide a 31 day enrollment opportunity for Covered Persons who previously reached their lifetime maximum under the Plan and who are otherwise eligible to enroll.  Covered Persons who may have reached their lifetime maximum under the Plan, and who are still enrolled in the Plan, will now be eligible to receive additional benefits under the Plan.

Coverage begins as of the first day of the Plan Year after the effective date if the Employer receives the completed enrollment form and the applicable contribution within 31 days of the date the Covered Person becomes eligible to enroll.

## DEPENDENT CHILD SPECIAL OPEN ENROLLMENT PERIOD

On the first day of the first Plan year beginning on or after September 23, 2010, this Plan will provide a 31 day Dependent Child special open enrollment period for Dependent Children who have not yet reached the limiting age under this Plan.  During this Dependent Child special open enrollment period, Employees who are adding a Dependent Child and who have a choice of coverage options will be allowed to change options.

Coverage begins on the first day of the Plan Year if the Employer receives the completed enrollment form and the applicable contribution within 31 days of the date the Dependent becomes eligible to enroll under this special open enrollment period.

During this special enrollment period, eligible Employees will be able to enroll themselves and their eligible Dependents for coverage under this Plan.  Covered Employees will also be able to make a change in coverage for themselves and their eligible Dependents.

## SPECIAL ENROLLMENT PROVISION
Under the Health Insurance Portability and Accountability Act

This Plan gives eligible persons special enrollment rights under this Plan if there is a loss of other health coverage or a change in family status as explained below.  The coverage choices that will be offered to You will be the same choices offered to other similarly situated Employees.

### LOSS OF HEALTH COVERAGE

Current Employees and their Dependents may have a special opportunity to enroll for coverage under this Plan if there is a loss of other health coverage.

If the following conditions are met:

- You and/or Your Dependents were covered under a group health plan or health insurance policy at the time coverage under this Plan is offered; and

- You and/or Your Dependent stated in writing that the reason for declining coverage was due to coverage under another group health plan or health insurance policy; and

- The coverage under the other group health plan or health insurance policy was:

  - ➢ COBRA continuation coverage and that coverage was exhausted; or
  - ➢ Terminated because the person was no longer eligible for coverage under the terms of that plan or policy; or
  - ➢ Terminated and no substitute coverage is offered; or
  - ➢ Exhausted due to an individual meeting or exceeding a lifetime limit on all benefits; or
  - ➢ No longer receiving any monetary contribution toward the premium from the employer.

You or Your Dependent must request and apply for coverage under this Plan no later than 31 calendar days after the date the other coverage ended, or in situations where an eligible person meets or exceeds a lifetime limit on all benefits, no later than 31 calendar days after a claim is denied for that reason.

- You and/or Your Dependents were covered under a Medicaid plan or state child health plan and Your or Your Dependents coverage was terminated due to loss of eligibility.  You must request coverage under this Plan within 60 days after the date of termination of such coverage.

You or Your Dependents may not enroll for health coverage under this Plan due to loss of health coverage under the following conditions:

- Coverage was terminated due to failure to pay timely premiums or for cause such as making a fraudulent claim or an intentional misrepresentation of material fact, or

- You or Your Dependent voluntarily canceled the other coverage, unless the current or former employer no longer contributed any money toward the premium for that coverage.

### CHANGE IN FAMILY STATUS

Current Employees and their Dependents, COBRA Qualified Beneficiaries and other eligible persons have a special opportunity to enroll for coverage under this Plan if there is a change in family status.

If a person becomes Your eligible Dependent through marriage, birth, adoption or Placement for Adoption, the Employee, spouse and newly acquired Dependent(s) who are not already enrolled, may enroll for health coverage under this Plan during a special enrollment period.  You must request and apply for coverage within 31 calendar days of marriage, birth, adoption or Placement for Adoption.

**NEWLY ELIGIBLE FOR PREMIUM ASSISTANCE UNDER MEDICAID OR CHILDREN'S HEALTH INSURANCE PROGRAM**

Current Employees and their Dependents may be eligible for a Special Enrollment period if the Employee and/or Dependents are determined eligible, under a state's Medicaid plan or state child health plan, for premium assistance with respect to coverage under this Plan.  The Employee must request coverage under this Plan within 60 days after the date the Employee and/or Dependent is determined to be eligible for such assistance.

**EFFECTIVE DATE OF COVERAGE UNDER SPECIAL ENROLLMENT PROVISION**

If an eligible person properly applies for coverage during this special enrollment period, the coverage will become effective:

- In the case of marriage, on the date of the marriage (Note:  Eligible individuals must submit their enrollment forms prior to the Effective Date of coverage in order for salary reductions to have preferred tax treatment from the date coverage begins); or

- In the case of a Dependent's birth, on the date of such birth; or

- In the case of a Dependent's adoption, the date of such adoption or Placement for Adoption; or

- In the case of eligibility for premium assistance under a state's Medicaid plan or state child health plan, on the date the approved request for coverage is received; or

- In the case of loss of coverage, on the date following loss of coverage.

**RELATION TO SECTION 125 CAFETERIA PLAN**

This Plan may also allow additional changes to enrollment due to change in status events under the employer's Section 125 Cafeteria Plan.  Refer to the employer's Section 125 Cafeteria Plan for more information.

## TERMINATION

For information about continuing coverage, refer to the COBRA section of this SPD.

### EMPLOYEE'S COVERAGE

Your coverage under this Plan will end on the earliest of:

- The end of the period for which Your last contribution is made, if You fail to make any required contribution towards the cost of coverage when due; or

- The date this Plan is canceled; or

- The date coverage for Your benefit class is canceled; or

- The day of the month in which You tell the Plan to cancel Your coverage if You are voluntarily canceling it while remaining eligible because of change in status, special enrollment or at annual open enrollment periods; or

- The day of the month in which You are no longer a member of a covered class, as determined by the employer except if You are temporarily absent from work due to active military duty.  Refer to USERRA under the USERRA section; or

- The day of the month in which Your employment ends; or

- The date You submit a false claim or are involved in any other form of fraudulent act related to this Plan or any other group plan.

### YOUR DEPENDENT'S COVERAGE

Coverage for Your Dependent will end on the earliest of the following:

- The end of the period for which Your last contribution is made, if You fail to make any required contribution toward the cost of Your Dependent's coverage when due; or

- The day of the month in which Your coverage ends; or

- The day of the month in which Your Dependent is no longer Your legal spouse due to legal separation or divorce, as determined by the law of the state where the Employee resides; or

- The day of the month in which Your Dependent Child attains the limiting age listed under the Eligibility section; or

- If Your Dependent Child qualifies for Extended Dependent Coverage as Totally Disabled, the day of the month in which Your Dependent Child is no longer deemed Totally Disabled under the terms of the Plan; or

- The day of the month in which Your Dependent Child no longer satisfies a required eligibility criteria listed in the Eligibility and Enrollment Section; or

- The date Dependent coverage is no longer offered under this Plan; or

- The day of the month in which You tell the Plan to cancel Your Dependent's coverage if You are voluntarily canceling it while remaining eligible because of change in status, special enrollment or at annual open enrollment periods; or

- The day of the month in which the Dependent becomes covered as an Employee under this Plan; or

- The date You or Your Dependent submits a false claim or are involved in any other form of fraudulent act related to this Plan or any other group plan.

## RESCISSION OF COVERAGE

As permitted by the Patient Protection and Affordable Care Act, the Plan reserves the right to rescind coverage.  A rescission of coverage is a retroactive cancellation or discontinuance of coverage due to fraud or intentional misrepresentation of material fact.

A cancellation/discontinuance of coverage is **not** a rescission if:

- it has only a prospective effect; or
- it is attributable to non-payment of premiums or contributions.

## REINSTATEMENT OF COVERAGE

A terminated Employee who is rehired after having been terminated from employment for a period of greater than 3 months, will be treated as a new hire and be required to satisfy all Eligibility and Enrollment requirements, with the exception of an Employee returning to work directly from COBRA coverage.  A terminated Employee who had been an active Employee for 24 consecutive months and is rehired within a 3 month or less lapse of service will be reinstated on the rehire date, and does not have to satisfy the employment Waiting Period or Pre-Existing Conditions provision.

## PRE-EXISTING CONDITION PROVISION

**Note:  Pre-Existing Condition exclusions will not apply to any Covered Person under the age of 19.**

A Pre-Existing Condition means an Illness or Injury for which medical advice, diagnosis, care or treatment was recommended or received within the six consecutive month period ending on the Covered Person's Enrollment Date.  Medical advice, diagnosis, care or treatment (including taking prescription drugs) is taken into account only if it is recommended or received from a licensed Physician.

This Plan has an exclusion for Pre-Existing Conditions.  Benefits will not be paid for Covered Expenses for a Pre-Existing Condition until the earliest of the following:

- 12 consecutive months from the Covered Person's Enrollment Date, if You apply for coverage when You are initially eligible for coverage or under Special Enrollment; or

- 18 consecutive months from the Covered Person's Enrollment Date, if the Covered Person is considered a Late Enrollee.

These times can be reduced by proof of Creditable Coverage as described below.

**EXCEPTIONS**

The Pre-Existing Condition exclusion does not apply to:

- Any person who, on the Enrollment Date, had 12 consecutive months (18 consecutive months if a Late Enrollee) of Creditable Coverage.

- Pregnancy, including complications.

- A newborn Dependent Child if application for enrollment is made or any Creditable Coverage is obtained for the newborn, within 31 days of birth, and there is no subsequent Significant Break in Coverage.

- An adopted Dependent Child or Dependent Child Placed for Adoption under the age of 19, if application for enrollment is made within 31 days of adoption or Placement for Adoption.

- Genetic information, in the absence of a diagnosis of an Illness related to such information.  For example, if You have a family history of diabetes but You Yourself have had no problem with diabetes, the Plan will not consider diabetes to be a Pre-Existing Condition just because You have a family history of this disease.

- Treatment recommendations made prior to the six consecutive month period before the Enrollment Date when the Covered Person did not act upon the recommendation.

- Any Employees or Dependents added as a result of an acquisition of an entire company or entire division moving into this Plan will be effective upon notification by the Employer to the Plan Administrator.  The Pre-Existing Condition exclusion period under this Plan will apply.  However, the Plan Administrator, in its discretion, may waive the Pre-Existing Condition exclusion period with respect to all similarly situated Employees who were covered under the other employer's group health plan at the time of such acquisition and/or honor any shorter Pre-Existing Condition exclusion period contained in such other employer's group health plan.

**REDUCTION OF PRE-EXISTING CONDITION EXCLUSION TIME PERIOD
(Creditable Coverage)**

If on the Enrollment Date, a Covered Person has less than 12 consecutive months (18 consecutive months for a Late Enrollee) of Creditable Coverage, the Plan will reduce the length of the Pre-Existing Condition exclusion period for each day of Creditable Coverage the Covered Person had in determining whether the Pre-Existing Condition exclusion applies.  See the HIPAA Portability Rights section of this SPD for more information on obtaining a Certificate of Creditable Coverage.

Creditable Coverage means that the Covered Person had coverage under a group health plan, health insurance policy, Medicare or any one of several other health plans as described in the Glossary of Terms section of this SPD, and coverage was not interrupted by a Significant Break in Coverage.

If a Covered Person has a Significant Break in Coverage, any days of Creditable Coverage that occur before the Significant Break in Coverage will not be counted by the Plan to reduce the Pre-Existing Condition exclusion time period.  Waiting Periods will not count towards a Significant Break in Coverage. In addition, the days between the date an individual loses health care coverage and the first day of the second COBRA election period under the Trade Act of 2002 will not count towards a Significant Break in Coverage.

**THE RIGHT TO REQUEST A REVIEW OF A DETERMINATION OF PRE-EXISTING CONDITION EXCLUSION PERIOD**

If a Covered Person feels that a determination of the Pre-Existing Condition Exclusion (PCE) period is incorrect, the Covered Person may submit a written request for review.

Send Your request to:

UMR
ENROLLMENT SERVICES
PO BOX 30543
SALT LAKE CITY UT 84130-0543

The written request must be made within 60 days from the date of the notice.  However, if the request is based on additional evidence that shows that You or Your Dependent had more Creditable Coverage than recognized originally, the Covered Person may take longer.

The written request should state the reasons that the Covered Person believes the original determination is incorrect and include any additional facts or evidence that shows that You or Your Dependent had more Creditable Coverage.

The request will usually be decided within 60 days after it is submitted.  If additional time is needed to complete the review, the Covered Person will be notified.  The Covered Person will be notified in writing of the decision on the request if the Covered Person submits additional evidence to consider or if the original Determination of PCE period is modified.  The Covered Person's original determination of PCE period will remain in effect until or unless the Covered Person receives written notification verifying a change from the original decision.

Similar to an initial determination, any new determination will set forth:

- The specific reason(s) for the decision; and
- The specific Plan provision(s) and other documents or information on which the decision is based.

## HIPAA PORTABILITY RIGHTS

**CERTIFICATES OF CREDITABLE COVERAGE**

New Employees and covered Dependents are encouraged to get a Certificate of Creditable Coverage from the individual's prior employer or insurance company.  However, not all forms of coverage are required to provide certificates.  If You or Your Dependents are having difficulty obtaining this, contact Your Human Resources or Personnel office for assistance.

Covered Persons will receive a Certificate of Creditable Coverage from this Plan when the person loses coverage under this Plan, when the person loses COBRA coverage, or upon a written request to this Plan if the individual is covered under this Plan or terminated from this Plan within the previous twenty four month period.  The Certificate of Creditable Coverage is evidence of Your coverage under this Plan. Covered Persons may need evidence of coverage to reduce a Pre-Existing Condition exclusion period under another plan, to help get special enrollment in another plan, or to get certain types of individual health coverage.

Please submit written requests for a Certificate of Creditable Coverage from this Plan to:

UMR
ENROLLMENT SERVICES
PO BOX 30543
SALT LAKE CITY UT 84130-0543

Keep these Certificates in a safe place in case You or Your Dependents obtain coverage under another health plan that has a Pre-Existing Condition Exclusion Provision or become eligible for a Special Enrollment period under another plan.  Proof of prior Creditable Coverage may reduce or eliminate the Pre-Existing Condition exclusion period, may be required to enroll in another plan under Special Enrollment, or may assist individuals in obtaining an individual insurance policy in the future.

## COBRA CONTINUATION OF COVERAGE

**Important.**  Read this entire provision to understand a Covered Person's COBRA rights and obligations.

The following is a summary of the federal continuation requirements under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended.  This summary generally explains COBRA continuation coverage, when it may become available to You and Your family, and what You and Your Dependents need to do to protect the right to receive it.  This summary provides a general notice of a Covered Person's rights under COBRA, but is not intended to satisfy all of the requirements of federal law.  Your employer or the COBRA Administrator will provide additional information to You or Your Dependents as required.

**The COBRA Administrator for this Plan is:  UMR**

**INTRODUCTION**

Federal law gives certain persons, known as Qualified Beneficiaries, the right to continue their health care benefits beyond the date that they might otherwise terminate.  The Qualified Beneficiary must pay the entire cost of the COBRA continuation coverage, plus an administrative fee.  In general, a Qualified Beneficiary has the same rights and obligations under the Plan as an active participant.

A Qualified Beneficiary may elect to continue coverage under this Plan if such person's coverage would terminate because of a life event known as a Qualifying Event, outlined below.  When a Qualifying Event causes (or will cause) a Loss of Coverage, then the Plan must offer COBRA continuation coverage.  Loss of Coverage means more than losing coverage entirely.  It means that a person ceases to be covered under the same terms and conditions that are in effect immediately before the Qualifying Event.  In short, a Qualifying Event plus a Loss of Coverage allows a Qualified Beneficiary the right to elect coverage under COBRA.

Generally, You, Your covered spouse, and Your Dependent Children may be Qualified Beneficiaries and eligible to elect COBRA continuation coverage even if the person is already covered under another employer-sponsored group health plan or is enrolled in Medicare at the time of the COBRA election.

**COBRA CONTINUATION COVERAGE FOR QUALIFIED BENEFICIARIES**

The length of COBRA continuation coverage that is offered varies based on who the Qualified Beneficiary is and what **Qualifying Event** is experienced as outlined below.

An Employee will become a Qualified Beneficiary if coverage under the Plan is lost because either one of the following Qualifying Events happens:

| Qualifying Event | Length of Continuation |
|---|---|
| • Your employment ends for any reason other than Your gross misconduct | up to 18 months |
| • Your hours of employment are reduced | up to 18 months |

(There are two ways in which this 18-month period of COBRA continuation coverage can be extended.  See the section below entitled "The Right to Extend Coverage" for more information.)

The spouse of an Employee will become a Qualified Beneficiary if coverage is lost under the Plan because any of the following Qualifying Events happen:

| Qualifying Event | Length of Continuation |
| --- | --- |
| • Your spouse dies | up to 36 months |
| • Your spouse's hours of employment are reduced | up to 18 months |
| • Your spouse's employment ends for any reason other than his or her gross misconduct | up to 18 months |
| • Your spouse becomes entitled to Medicare benefits (under Part A, Part B, or both) | up to 36 months |
| • You become divorced or legally separated from Your spouse | up to 36 months |

The Dependent Children of an Employee become Qualified Beneficiaries if coverage is lost under the Plan because any of the following Qualifying Events happen:

| Qualifying Event | Length of Continuation |
| --- | --- |
| • The parent-Employee dies | up to 36 months |
| • The parent-Employee's employment ends for any reason other than his or her gross misconduct | up to 18 months |
| • The parent-Employee's hours of employment are reduced | up to 18 months |
| • The parent-Employee becomes entitled to Medicare benefits (Part A, Part B, or both) | up to 36 months |
| • The parents become divorced or legally separated | up to 36 months |
| • The Child stops being eligible for coverage under the plan as a Dependent | up to 36 months |

**Note:  A spouse or Dependent Child newly acquired (newborn or adopted) during a period of continuation coverage is eligible to be enrolled as a Dependent.  The standard enrollment provision of the Plan applies to enrollees during continuation coverage.  A Dependent, other than a newborn or newly adopted Child, acquired and enrolled after the original Qualifying Event, is not eligible as a Qualified Beneficiary if a subsequent Qualifying Event occurs.**

## COBRA NOTICE PROCEDURES

**THE NOTICE(S) A COVERED PERSON MUST PROVIDE UNDER THIS SUMMARY PLAN DESCRIPTION**

To be eligible to receive COBRA continuation coverage, covered Employees and their Dependents have certain obligations with respect to certain Qualifying Events (including divorce or legal separation of the Employee and spouse or a Dependent Child's loss of eligibility for coverage as a Dependent) to provide written notices to the administrator.  Follow the rules described in this procedure when providing notice to the administrators, either Your employer or the COBRA Administrator.

A Qualified Beneficiary's written notice must include all of the following information:  (A form to notify the COBRA Administrator is available upon request.)

- The Qualified Beneficiary's name, their current address and complete phone number,
- The group number, name of the employer that the Employee was with,
- Description of the Qualifying Event (i.e., the life event experienced), and
- The date that the Qualifying Event occurred or will occur.

**Send all notices or other information required to be provided by this Summary Plan Description in writing to:**

**UMR**
**COBRA ADMINISTRATION**
**PO BOX 1206**
**WAUSAU WI  54402-1206**
**Phone Number:  (715) 841-2918 or (800) 207-1824**

For purposes of the deadlines described in this Summary Plan Description, the notice must be postmarked by the deadline.  In order to protect Your family's rights, the Plan Administrator should be informed of any changes in the addresses of family members.  Keep a copy of any notices sent to the Plan Administrator or COBRA Administrator.

## COBRA NOTICE REQUIREMENTS AND ELECTION PROCESS

### EMPLOYER OBLIGATION TO PROVIDE NOTICE OF THE QUALIFYING EVENT

Your employer will give notice to the COBRA Administrator when coverage terminates due to Qualifying Events that are the Employee's termination of employment or reduction in hours, death of the Employee, or the Employee becoming entitled to Medicare benefits due to age or disability (Part A, Part B, or both). Your employer will notify the COBRA Administrator within 30 calendar days when these events occur.

### EMPLOYEE OBLIGATION TO PROVIDE NOTICE OF THE QUALIFYING EVENT

The Covered Person must give notice to the Plan Administrator in the case of other Qualifying Events that are divorce or legal separation of the Employee and a spouse, a Dependent Child ceasing to be eligible for coverage under the Plan, or a second Qualifying Event.  The covered Employee or Qualified Beneficiary must provide written notice to the Plan Administrator in order to ensure rights to COBRA continuation coverage.  The Covered Person must provide this notice within the 60-calendar day period that begins on the latest of:

- The date of the Qualifying Event; or
- The date on which there is a Loss of Coverage (or would lose coverage); or
- The date on which the Qualified Beneficiary is informed of this notice requirement by receiving this Summary Plan Description or the General COBRA Notice.

The Plan Administrator will notify the COBRA Administrator within 30 calendar days from the date that notice of the Qualifying Event has been provided.

The COBRA Administrator will, in turn, provide an election notice to each Qualified Beneficiary within 14 calendar days of receiving notice of a Qualifying Event from the employer, covered Employee or the Qualified Beneficiary.

### MAKING AN ELECTION TO CONTINUE GROUP HEALTH COVERAGE

Each Qualified Beneficiary has the independent right to elect COBRA continuation coverage.  A Qualified Beneficiary will receive a COBRA election form that must be completed to elect to continue group health coverage under this Plan.  A Qualified Beneficiary may elect COBRA coverage at any time within the 60-day election period.  The election period ends 60 calendar days after the later of:

- The date Plan coverage terminates due to a Qualifying Event; or
- The date the Plan Administrator provides the Qualified Beneficiary with an election notice.

A Qualified Beneficiary must notify the COBRA Administrator of their election in writing to continue group health coverage and must make the required payments when due in order to remain covered.  If the Qualified Beneficiary does not choose COBRA continuation coverage within the 60-day election period, group health coverage will end on the day of the Qualifying Event.

**PAYMENT OF CLAIMS AND DATE COVERAGE BEGINS**

No claims will be paid under this Plan for services the Qualified Beneficiary receives on or after the date coverage is lost due to a Qualifying Event.  If, however, the Qualified Beneficiary has not completed a waiver and decides to elect COBRA continuation coverage within the 60-day election period, group health coverage will be reinstated back to the date coverage was lost, provided that the Qualified Beneficiary makes the required payment when due.  Any claims that were denied during the initial COBRA election period will be reprocessed once the COBRA Administrator receives the completed COBRA election form and required payment.

If a Qualified Beneficiary previously waived COBRA coverage but revokes that waiver within the 60-day election period, coverage will not be retroactive to the date of the Qualifying Event but instead will be effective on the date the waiver is revoked.

**PAYMENT FOR CONTINUATION COVERAGE**

Qualified Beneficiaries are required to pay the entire cost of continuation coverage, which includes both the employer and Employee contribution.  This may also include a 2% additional fee to cover administrative expenses (or in the case of the 11-month extension due to disability, a 50% additional fee).  Fees are subject to change at least once a year.

If Your employer offers annual open enrollment opportunities for active Employees, each Qualified Beneficiary will have the same options under COBRA (for example, the right to add or eliminate coverage for Dependents).  The cost of continuation coverage will be adjusted accordingly.

The **initial payment** is due no later than 45 calendar days after the Qualified Beneficiary elects COBRA as evidenced by the postmark date on the envelope.  This first payment must cover the cost of continuation coverage from the time coverage under the Plan would have otherwise terminated, up to the time the first payment is made.  If the initial payment is not made within the 45-day period, then coverage will remain terminated without the possibility of reinstatement.  There is no grace period for the initial payment.

The due date for **subsequent payments** is typically the first day of the month for any particular period of coverage, however the Qualified Beneficiary will receive specific payment information including due dates, when the Qualified Beneficiary becomes eligible for and elects COBRA continuation coverage.

If, for whatever reason, any Qualified Beneficiary receives any benefits under the Plan during a month for which the payment was not made on time, then the Qualified Beneficiary will be required to reimburse the Plan for the benefits received.

If the COBRA Administrator receives a check that is missing information or has discrepancies regarding the information on the check (i.e., the numeric dollar amount does not match the written dollar amount), the COBRA Administrator will provide a notice to the Qualified Beneficiary and allow him/her 14 days to send in a corrected check.  If a corrected check is not received within the 14-day timeframe, then the occurrence will be treated as non-payment and the Qualified Beneficiary(s) will be termed from the Plan in accordance with the plan language above.

**Note:  Payment will not be considered made if a check is returned for non-sufficient funds.**

**A QUALIFIED BENEFICIARY'S NOTICE OBLIGATIONS WHILE ON COBRA**

Always keep the COBRA Administrator informed of the current addresses of all Covered Persons who are or who may become Qualified Beneficiaries.  Failure to provide this information to the COBRA Administrator may cause You or Your Dependents to lose important rights under COBRA.

In addition, after any of the following events occur, written notice to the COBRA Administrator is required within 30 calendar days of:

- The date any Qualified Beneficiary marries.  Refer to the Special Enrollment section of this SPD for additional information regarding special enrollment rights.

- The date a Child is born to, adopted by, or Placed for Adoption by a Qualified Beneficiary.  Refer to the Special Enrollment section of this SPD for additional information regarding special enrollment rights.

- The date of a final determination by the Social Security Administration that a disabled Qualified Beneficiary is no longer disabled.

- The date any Qualified Beneficiary becomes covered by another group health plan.

- Additionally, if the COBRA Administrator or the Plan Administrator requests additional information from the Qualified Beneficiary, the Qualified Beneficiary must provide the requested information within 30 calendar days.

## LENGTH OF CONTINUATION COVERAGE

COBRA coverage is available up to the maximum periods described below, subject to all COBRA regulations and the conditions of this Summary Plan Description:

- For Employees and Dependents.  18 months from the Qualifying Event if due to the Employee's termination of employment or reduction of work hours.  (If an active Employee enrolls in Medicare before his or her termination of employment or reduction in hours, then the covered spouse and Dependent Children would be entitled to COBRA continuation coverage for up to the greater of 18 months from the Employee's termination of employment or reduction in hours, or 36 months from the earlier Medicare Enrollment Date, whether or not Medicare enrollment is a Qualifying Event.)

- For Dependents only.  36 months from the Qualifying Event if coverage is lost due to one of the following events:

  - ➢ Employee's death.
  - ➢ Employee's divorce or legal separation.
  - ➢ Former Employee becomes enrolled in Medicare.
  - ➢ A Dependent Child no longer being a Dependent as defined in the Plan.

## THE RIGHT TO EXTEND THE LENGTH OF COBRA CONTINUATION COVERAGE

While on COBRA continuation coverage, certain Qualified Beneficiaries may have the right to extend continuation coverage provided that written notice to the COBRA Administrator is given as soon as possible but no later than the **required** timeframes stated below.

**Social Security Disability Determination (For Employees and Dependents)**:  A Qualified Beneficiary may be granted an 11-month extension to the initial 18-month COBRA continuation period, for a total maximum of 29 months of COBRA in the event that the Social Security Administration determines the Qualified Beneficiary to be disabled some time before the 60th day of COBRA continuation coverage. This extension will not apply if the original COBRA continuation was for 36 months.

If the Qualified Beneficiary has non-disabled family members who are also Qualifying Beneficiaries, those non-disabled family members are also entitled to the disability extension.

The Qualified Beneficiary must give the COBRA Administrator a copy of the Social Security Administration letter of disability determination within 60 days of the later of:

- The date of the SSA disability determination;
- The date the Qualifying Event occurs;
- The date the Qualified Beneficiary loses (or would lose) coverage due to the Qualifying Event or the date that Plan coverage was lost; or
- The date on which the Qualified Beneficiary is informed of the requirement to notify the COBRA Administrator of the disability by receiving this Summary Plan Description or the General COBRA Notice.

Note:  Premiums may be higher after the initial 18-month period for persons exercising this disability extension provision available under COBRA.

If the Social Security Administration determines the Qualified Beneficiary is no longer disabled, the Qualified Beneficiary must notify the Plan of that fact within 30 days after the Social Security Administration's determination.

**Second Qualifying Events:  (Dependents Only)** If Your family experiences another Qualifying Event while receiving 18 months of COBRA continuation coverage, the spouse and Dependent Children in Your family who are Qualified Beneficiaries can receive up to 18 additional months of COBRA continuation coverage, for a maximum of 36 months, if notice of the second event is provided to the COBRA Administrator.  This additional coverage may be available to the spouse or Dependent Children who are Qualified Beneficiaries if the Employee or former Employee dies, becomes entitled to Medicare (Part A, Part B or both) or is divorced or legally separated, or if the Dependent Child stops being eligible under the Plan as a Dependent.  This extension is available only if the Qualified Beneficiaries were covered under the Plan prior to the original Qualifying Event.  A Dependent acquired during COBRA continuation (other than newborns and newly adopted Children) is not eligible to continue coverage as the result of a subsequent Qualifying Event.  These events will only lead to the extension when the event would have caused the spouse or Dependent Child to lose coverage under the Plan had the first qualifying event not occurred.

You or Your Dependents must provide the notice of a second Qualifying Event to the COBRA Administrator within a 60-day period that begins to run on the latest of:

- The date of the second Qualifying Event; or
- The date the Qualified Beneficiary loses (or would lose) coverage due to the second Qualifying Event; or
- The date on which the Qualified Beneficiary is informed of the requirement to notify the COBRA Administrator of the second Qualifying Event by receiving this Summary Plan Description or the General COBRA Notice.

**EARLY TERMINATION OF COBRA CONTINUATION**

COBRA continuation coverage may terminate before the end of the above maximum coverage periods for any of the following reasons:

- The employer ceases to maintain a group health plan for any Employees.  (Note that if the employer terminates the group health plan that the Qualified Beneficiary is under, but still maintains another group health plan for other similarly-situated Employees, the Qualified Beneficiary will be offered COBRA continuation coverage under the remaining group health plan, although benefits and costs may not be the same).

- The required contribution for the Qualified Beneficiary's coverage is not paid on time.

- After electing COBRA continuation coverage, the Qualified Beneficiary becomes entitled to and enrolled with Medicare.

- After electing COBRA continuation coverage, the Qualified Beneficiary becomes covered under another group health plan that does not contain any exclusion or limitation with respect to any Pre-Existing Condition(s) for the beneficiary.

- The Qualified Beneficiary is found not to be disabled during the disability extension.  The Plan will terminate the Qualified Beneficiary's COBRA continuation coverage one month after the Social Security Administration makes a determination that the Qualified Beneficiary is no longer disabled.

- Termination for cause, such as submitting fraudulent claims.

**SPECIAL NOTICE (Read This If Thinking Of Declining COBRA Continuation Coverage)**

Electing COBRA continuation coverage now may protect some of Your (or Your Dependent's) rights if You or Your Dependent need to obtain an **individual health insurance policy** soon.  The Health Insurance Portability and Accountability Act (HIPAA) requires that all health insurance carriers who offer coverage in the individual market must accept any eligible individuals who apply for coverage without imposing Pre-Existing Condition exclusions, under certain conditions.  Some of those conditions pertain to COBRA continuation coverage.  To take advantage of this HIPAA right, COBRA continuation coverage under this Plan must be elected and maintained (by paying the cost of coverage) for the duration of the COBRA continuation period.  In the event that an individual health insurance policy is needed, You or Your Dependent must apply for coverage with an individual insurance carrier after COBRA continuation coverage is exhausted and before a 63-day break in coverage.

If You or Your Dependent will be obtaining **group health coverage** through a new employer, keep in mind that HIPAA requires employers to reduce Pre-Existing Condition exclusion periods if there is less than a 63-day break in health coverage (Creditable Coverage).

**HEALTH COVERAGE TAX CREDIT PROGRAM (HCTC)**

The Trade Act of 2002 created a new health coverage tax credit for certain individuals who become eligible for trade adjustment assistance.  Trade adjustment assistance is generally available to only a limited group of individuals who have lost their jobs or suffered a reduction in hours as a result of import competition or shifts of production to other countries.  Under the new tax provisions, eligible individuals can either take a tax credit or get advance payment of 65% of premiums paid for qualified health insurance, including COBRA continuation coverage.  If You have questions about these new tax provisions, You may call the Health Coverage Tax Credit Customer Contact Center toll-free at 1-866-628-4282.  TTD/TTY callers may call toll-free at 1-866-626-4282.  More information about the Trade Act is available at www.doleta.gov/tradeact/2002act_index.cfm.

Special COBRA rights apply to certain Employees who are eligible for the health coverage tax credit.  These Employees are entitled to a second opportunity to elect COBRA coverage during a special second election period (if the Employee did not elect COBRA coverage already).  The special second COBRA election period lasts 60 days or less, beginning on the first day of the month in which the Employee becomes an eligible HCTC recipient, but the election must also be made within six months after the initial loss of group health coverage.  As a result, if the Employee finds out that he or she is eligible for this program with fewer than 60 days remaining in the six month period after initial loss of group health coverage, then this second election period will be less than 60 days.  The Employee must send the COBRA Administrator a copy of the confirmation letter from HCTC or the State Workforce Agency, stating the effective date of eligibility under this program.

COBRA coverage elected during the special second election period is not retroactive.  Coverage begins on the date that the special second election period begins, and the maximum COBRA coverage period will end on the same day it would have ended if COBRA coverage had been elected during the regular 60-day election period.  There is no retroactive coverage for the gap period from the initial loss of coverage to the first day of the special second election period.  For example, if an Employee's coverage ends on June 30 due to termination of employment, and the Employee elects COBRA coverage during a second 60-day election period that begins on November 1, the person would have no coverage from July 1 to October 31.  COBRA coverage would start on November 1 and would end 14 months later because the maximum COBRA coverage period would expire 18 months from loss of coverage due to termination of employment.  For purposes of Pre-Existing Condition exclusions, the Plan will not count any days between the initial loss of group health coverage and the first day of the special second election period as part of a 63-day Significant Break in Coverage.

## DEFINITIONS

**Qualified Beneficiary** means a person covered by this group health Plan immediately before the Qualifying Event who is the Employee, the spouse of a covered Employee or the Dependent Child of a covered Employee.  This includes a Child who is born to or Placed for Adoption with a covered Employee during the Employee's COBRA coverage period if the Child is enrolled within the Plan's Special Enrollment Provision for newborns and adopted Children.  This also includes a Child who was receiving benefits under this Plan pursuant to a Qualified Medical Child Support Order (QMCSO) immediately before the Qualifying Event.

**Qualifying Event** means Loss of Coverage due to one of the following:

- The death of the covered Employee.

- Voluntary or involuntary termination of the covered Employee's employment (other than for gross misconduct).

- A reduction in work hours of the covered Employee.

- Divorce or legal separation of the covered Employee from the Employee's spouse.  (Also, if an Employee terminates coverage for his or her spouse in anticipation of a divorce or legal separation, and a divorce or legal separation later occurs, then the later divorce or legal separation may be considered a Qualifying Event even though the ex-spouse lost coverage earlier.  If the ex-spouse notifies the Plan or the COBRA Administrator in writing within 60 calendar days after the divorce or legal separation and can establish that the coverage was originally eliminated in anticipation of the divorce or legal separation, then COBRA coverage may be available for the period after the divorce or legal separation).

- The covered former Employee becomes enrolled in Medicare.

- A Dependent Child no longer being a Dependent as defined by the Plan.

**Loss of Coverage** means any change in the terms or conditions of coverage in effect immediately before the Qualifying Event.  Loss of Coverage includes change in coverage terms, change in plans, termination of coverage, partial Loss of Coverage, increase in Employee cost, as well as other changes that affect terms or conditions of coverage.  Loss of Coverage does not always occur immediately after the Qualifying Event, but it must always occur within the applicable 18- or 36-month coverage period.  A Loss of Coverage that is not caused by a Qualifying Event may not trigger COBRA.

## UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994

### INTRODUCTION

Employers are required to offer COBRA-like health care continuation coverage to persons in the armed service if the absence for military duty would result in loss of coverage as a result of active duty. Employees on leave for military service must be treated like they are on leave of absence and are entitled to any other rights and benefits accorded to similarly situated Employees on leave of absence or furlough. If an employer has different types of benefits available depending on the type of leave of absence, the most favorable comparable leave benefits must apply to Employees on military leave.  Reinstatement following the military leave of absence cannot be subject to Pre-Existing Conditions and Waiting Periods.

### COVERAGE

The maximum length of health care continuation coverage required under USERRA is the lesser of:

- 24 months beginning on the day that the Uniformed Service leave begins, or
- a period beginning on the day that the Service leave begins and ending on the day after the Employee fails to return to or reapply for employment within the time allowed by USERRA.

### USERRA NOTICE AND ELECTION

An Employee or an appropriate officer of the uniformed service in which his or her service is to be performed must notify the employer that the Employee intends to leave the employment position to perform service in the uniformed services.  An Employee should provide notice as far in advance as is reasonable under the circumstances.  The Employee is excused from giving notice due to military necessity, or if it is otherwise impossible or unreasonable under all the circumstances.

Upon notice of intent to leave for uniformed services, Employees will be given the opportunity to elect USERRA continuation.  Dependents do not have an independent right to elect USERRA coverage. Election, payment and termination of the USERRA extension will be governed by the same requirements set forth under the COBRA Section, to the extent these COBRA requirements do not conflict with USERRA.

### PAYMENT

If the military leave orders are for a period of 30 days or less, the Employee is not required to pay more than the amount he or she would have paid as an active Employee.  For periods of 31 days or longer, if an Employee elects to continue health coverage pursuant to USERRA, such Employee and covered Dependents will be required to pay up to 102% of the full premium for the coverage elected.

### EXTENDED COVERAGE RUNS CONCURRENT

Employees and their Dependents may be eligible for both COBRA and USERRA at the same time. Election of either the COBRA or USERRA extension by an Employee on leave for military service will be deemed an election under both laws, and the coverage offering the most benefit to the Employee will generally be extended.  Coverage under both laws will run concurrently.  Dependents who choose to independently elect extended coverage will only be deemed eligible for COBRA extension because they are not eligible for a separate, independent right of election under USERRA.

## PROVIDER NETWORK

The word **"Network"** means an outside organization that has contracted with various providers to provide health care services to Covered Persons at a Negotiated Rate.  Providers who participate in a Network have agreed to accept the negotiated fees as payment in full, including any portion of the fees that the Covered Person must pay due to the Deductible, Participation amounts or other out-of-pocket expenses.  The allowable charges used in the calculation of the payable benefit to participating providers will be determined by the Negotiated Rates in the network contract.  A provider who does not participate in a Network may bill Covered Persons for additional fees over and above what the Plan pays.

Knowing which Network a provider belongs to will help a Covered Person to determine how much he or she will need to pay for certain services.  To obtain the highest level of benefits under this Plan, Covered Persons need to see an In-Network provider, however this Plan does not limit a Covered Person's right to choose his or her own provider of medical care at his or her own expense if a medical expense is not a Covered Expense under this Plan, or is subject to a limitation or exclusion.

To find out which Network a provider belongs to, please refer to the Provider Directory, or call the toll-free number that is listed on the back of the Plan's identification card.  The participation status of providers may change from time to time.

- If a provider belongs to one of the following Networks, claims for Covered Expenses will normally be processed in accordance with the **In-Network** benefit levels that are listed on the Schedule of Benefits:

     0L – United Healthcare Choice Plus

- If a provider belongs to one of the following Networks, claims for Covered Expenses will normally be processed in accordance with the **Out-of-Network** benefit levels that are listed on the Schedule of Benefits, but the providers have agreed to discount their fees.  This means that the Covered Person may pay a little less for a particular claim than they would for an Out-of-Network claim.

     98 – Multiplan Shared Savings
     XZ – First Health Shared Savings

- For services received from any other provider, claims for Covered Expenses will normally be processed in accordance with the **Out-of-Network** benefit levels that are listed on the Schedule of Benefits.  These providers charge their normal rates for services, so Covered Persons may need to pay more.  The Covered Person is responsible for paying the balance of these claims after the Plan pays its portion, if any.

**For Transplant Services at a Designated Transplant Facility the Preferred Provider Organization is:**

     **Sun Excel**

## EXCEPTIONS TO THE PROVIDER NETWORK RATES

Some benefits may be processed at In-Network benefit levels when provided by an Out-of-Network provider.  When Non-Network charges are covered in accordance with Network benefits, the charges are still subject to the Usual and Customary charge limitations.  The following exceptions may apply:

- Covered Services provided by a radiologist, anesthesiologist, pathologist or other professional services will be payable at the In-Network level of benefits when rendered by an Out-of-Network provider at an In-Network facility.
- Covered Services provided by a Physician during an Inpatient stay will be payable at the In-Network level of benefits when provided at an In-Network Hospital.

- Covered Services provided by an Emergency room Physician will be payable at the In-Network level of benefits when provided at an In-Network Hospital.
- If there is not an In-Network provider, or no In-Network provider is willing or able to provide the necessary service(s) to the Covered Person within a 50 mile radius of the Covered Person's residence, then the Out-of-Network charges will be processed as In-Network charges so long as the Covered Person provides appropriate documentation.
- If a Covered Person Incurs Emergency expenses while traveling on business or pleasure outside of the In-Network area.
- Covered Services provided a Covered Person as a medical Emergency and needing immediate medical care charges by an Out-of-Network Provider will be paid at the EPO benefit level as shown on the Schedule of Benefits.  This includes Clinically Eligible surgical follow-up care by the Emergency room Physician when the Covered Person is treated for an accidental Injury.

**Provider Directory Information**

Each covered Employee, those on COBRA, and Children or guardians of Children who are considered alternate recipients under a Qualified Medical Child Support Order, will automatically be given or electronically made available, a separate document, at no cost, that lists the participating Network providers for this Plan.  The Employee should share this document with other covered individuals in Your household.  If a covered spouse or Dependent wants a separate provider list, they should make a written request to the Plan Administrator.  The Plan Administrator may make a reasonable charge to cover the cost of furnishing complete copies to the spouse or other covered Dependents.

**TRANSITIONAL CARE**

Certain eligible expenses that would have been considered at the PPO benefit level by the prior Claims Administrator but which are not considered at the PPO benefit level by the current Claims Administrator may be paid at the applicable PPO benefit level if the Covered Person is currently under a treatment plan by a Physician who was a member of this Plan's previous PPO but who is not a member of the Plan's current PPO in the Employee or Dependent's network area.  In order to ensure continuity of care for certain medical conditions already under treatment, the PPO medical plan benefit level may continue for 90 days for conditions approved as transitional care.  Examples of medical conditions appropriate for consideration for transitional care include, but are not limited to:

- Cancer if under active treatment with chemotherapy and/or radiation therapy.
- Organ transplant patients if under active treatment (seeing a Physician on a regular basis, on a transplant waiting list, ready at any time for transplant).
- If the Covered Person is Inpatient in a Hospital on the effective date.
- Post acute Injury or Surgery within the past three months.
- Pregnancy in the second or third trimester and up to eight weeks postpartum.
- Behavioral Health – any previous treatment.

You or Your Dependent must call UMR within 30 days prior to the effective date or within 30 days after the effective date to see if You or Your Dependent are eligible for this benefit.

Routine procedures, treatment for stable chronic conditions, minor Illnesses and elective surgical procedures will not be covered by transitional level benefits.

## COVERED MEDICAL BENEFITS

This Plan provides coverage for the following Covered Benefits if services are authorized by a Physician and are necessary for the treatment of an Illness or Injury, subject to any limits, maximums, exclusions or other Plan provisions shown in this SPD.  The Plan does not provide coverage for services if medical evidence shows that treatment is not expected to resolve, improve, or stabilize the Covered Person's condition, or if a plateau has been reached in terms of improvement from such services.

1.  **Abortions:**  If a Physician states in writing that:
    - The mother's life would be in danger if the fetus were to be carried to term, or
    - Abortion is medically indicated due to complications with the pregnancy; or
    - The pregnancy is the result of rape or incest.

2.  **Allergy Treatment** including:  injections, testing and serum.

3.  **Ambulance Transportation:**  When Clinical Eligibility for Coverage is met, ground and air transportation by a vehicle designed, equipped and used only to transport the sick and injured to the nearest medically appropriate Hospital.

4.  **Anesthetics and their Administration.**

5.  **Aquatic Therapy.**  (See Therapy Services below)

6.  **Augmentation Communication Devices** and related instruction or therapy.

7.  **Autism Services:**  Limited treatment, consisting of:

    - Therapy to develop interactive skills and skills necessary to perform the significant Activities of Daily Living (see Glossary of Terms).  The therapy must be ordered by a licensed medical provider.  This therapy is not intended for schooling of an individual, even if the schooling requires a special environment.  The provider must submit a treatment plan including the type of therapy to be administered, the goals, periodic measures for the therapy, who will administer the therapy, and the patient's current ability to perform the desired results of the therapy.  The treatment plan must be approved in advance by the Plan Administrator and updated annually with a report on the patient's condition, progress and future treatment plans.  The provider must submit an evaluation every six months including objective evidence of progression towards goals.

    - Care provided in accordance with the approved treatment plan by a non-licensed medical provider who is not a member of the patient's family, if the provider has been specifically trained to interact with the autistic patient and certified by a licensed medical provider as capable of working with the Child.

    - Training and educational services provided by licensed medical providers (or non-licensed providers as described above) under an approved treatment plan for the parents or Legal Guardian of an autistic individual to teach the principles and practical applications of behavior modification.

8.  **Breast Reductions** if Clinical Eligibility for Coverage is met.

9.  **Cardiac Pulmonary Rehabilitation** when Clinical Eligibility for Coverage is met for Activities of Daily Living (See Glossary of Terms) as well as a result of an Illness or Injury.

10. **Cardiac Rehabilitation** programs are covered if referred by a Physician, for patients who have:

- had a heart attack in the last 12 months; or
- had coronary bypass surgery; or
- a stable angina pectoris.

Services covered include:

- Phase I, while the Covered Person is an Inpatient.
- Phase II, while the Covered Person is in a Physician supervised Outpatient monitored low-intensity exercise program.  Services generally will be in a Hospital rehabilitation facility and include monitoring of the Covered Person's heart rate and rhythm, blood pressure and symptoms by a health professional.  Phase II generally begins within 30 days after discharge from the Hospital.

11. **Cataract or Aphakia Surgery** as well as protective lenses following such procedure.

12. **Chiropractic Treatment** by a Qualified chiropractor.  Services for diagnosis by physical examination and plain film radiography, and when Clinical Eligibility for Coverage is met for treatments for musculoskeletal conditions.  Refer to Maintenance Therapy under the General Exclusions section of this SPD.

13. **Circumcision** and related expenses when care and treatment meet the Clinical Eligibility for Coverage.  Circumcision of newborn males is also covered as stated under nursery and newborn medical benefits.

14. **Cleft Palate And Cleft Lip:**  Benefits will be provided for the treatment of cleft palate or cleft lip.  Such coverage includes oral surgery and pre-graft palatal expander when the Clinical Eligibility for Coverage is met.

15. **Congenital Heart Disease:**  If a Covered Person is being treated for congenital heart disease, and chooses to obtain the treatment at an OptumHealth facility, the Plan will provide the same housing and travel benefits that are outlined in the Transplant Benefits section and on the Transplant Schedule of Benefits.

16. **Contraceptives:**  This Plan provides benefits for Prescription contraceptives regardless of purpose.  Prescription contraceptives that a Covered Person self-administers will be processed under the Prescription Benefits section of this document (oral tablets, patches, and self-insertable vaginal devices containing contraceptive hormones).  Prescription contraceptives that require a Physician to administer a hormone shot or insert a device will be processed under the Covered Medical Benefits in this SPD.

17. **Cornea Transplants** are payable at the percentage listed under All Other Covered Expenses on the Schedule of Benefits.

18. **Counseling Services** if the Clinical Eligibility for Coverage is met.

19. **Dental Services** include:

- The care and treatment of sound natural teeth and gums if an Injury is sustained in an Accident (other than one occurring while eating or chewing), excluding implants.  Treatment must be completed within 12 months of the Injury except when medical and/or dental conditions preclude completion of treatment within this time period.
- Inpatient or Outpatient Hospital charges including professional services for x-ray, lab, and anesthesia while in the Hospital if the Clinical Eligibility for Coverage is met.
- Removal of all teeth at an Inpatient or Outpatient Hospital or dentist's office if removal of the teeth is part of standard medical treatment that is required before the Covered Person can undergo radiation therapy for a covered medical condition.

20. **Diabetes Treatment:** Charges Incurred for the treatment of diabetes and diabetic self-management education programs and nutritional counseling.  Charges for dialysis for the treatment of acute renal failure or chronic irreversible renal insufficiency for the removal of waste materials from the body, including hemodialysis and peritoneal dialysis.  This also includes use of equipment or supplies, unless covered through the Prescription Benefits section.  Charges are paid the same as any other Illness.

21. **Durable Medical Equipment** subject to all of the following:

- The equipment must meet the definition of Durable Medical Equipment as defined in the Glossary of Terms.  Examples include, but are not limited to crutches, wheelchairs, hospital-type beds and oxygen equipment.
- The equipment must be prescribed by a Physician.
- The equipment is subject to review under the Utilization Management Provision of this SPD, if applicable.
- The equipment will be provided on a rental basis when available; however, such equipment may be purchased at the Plan's option.  Any amount paid to rent the equipment will be applied towards the purchase price.  In no case will the rental cost of Durable Medical Equipment exceed the purchase price of the item.
- The Plan will pay benefits for only ONE of the following:  a manual wheelchair, motorized wheelchair or motorized scooter, unless necessary due to growth of the person or changes to the person's medical condition require a different product, as determined by the Plan.
- If the equipment is purchased, benefits may be payable for subsequent repairs including batteries, or replacement only if required:
  - ➢ due to the growth or development of a Dependent Child;
  - ➢ when necessary because of a change in the Covered Person's physical condition; or
  - ➢ because of deterioration caused from normal wear and tear.
  The repair or replacement must also be recommended by the attending Physician.  In all cases, repairs or replacement due to abuse or misuse, as determined by the Plan, are not covered and replacement is subject to prior approval by the Plan.
- This Plan covers taxes, shipping and handling charges for Durable Medical Equipment.

22. **Emergency Room Hospital and Physician Services** including Emergency room services for stabilization or initiation of treatment of a medical Emergency condition provided on an Outpatient basis at a Hospital, as shown in the Schedule of Benefits.

23. **Extended Care Facility Services** for both mental and physical health diagnosis.  Charges will be paid under the applicable diagnostic code.  Covered Person must give notification for services in advance.  (Refer to the Utilization Management section of this SPD).  The following benefits are covered:

- Room and board.
- Miscellaneous services, supplies and treatments provided by an Extended Care Facility, including Inpatient rehabilitation.

24. **Foot Care (Podiatry)** that is recommended by a Physician as a result of infection.  The following charges for foot care will also be covered:

- Treatment of any condition resulting from weak, strained, flat, unstable or unbalanced feet, when surgery is performed.
- Treatment of corns, calluses and toenails when at least part of the nail root is removed or when needed to treat a metabolic or peripheral vascular disease.
- Physician office visit for diagnosis of bunions.  Treatment of bunions when an open cutting operation or arthroscopy is performed.
- Covered charges do not include Palliative Foot Care.

25. **Genetic Counseling** based on Clinical Eligibility for Coverage.

26. **Genetic Testing** based on Clinical Eligibility for Coverage.

27. **Hearing Services** include:

- Exams, tests, services and supplies to diagnose and treat a medical condition.
- Implantable hearing devices.

28. **Home Health Care Services:**  (Refer to Home Health Care section of this SPD).

29. **Hospice Care Services:**  Treatment given at a Hospice Care Facility must be in place of a stay in a Hospital or Extended Care Facility, and can include:

- **Assessment** includes an assessment of the medical and social needs of the Terminally Ill person, and a description of the care to meet those needs.
- **Inpatient Care** in a facility when needed for pain control and other acute and chronic symptom management, psychological and dietary counseling, physical or occupational therapy and part-time Home Health Care services.
- **Outpatient Care** provides or arranges for other services as related to the Terminal Illness which include:  Services of a Physician; physical or occupational therapy; nutrition counseling provided by or under the supervision of a registered dietitian.
- **Bereavement Counseling:**  Benefits are payable for bereavement counseling services which are received by a Covered Person's Close Relative when directly connected to the Covered Person's death and bundled with other hospice charges.  Counseling services must be given by a licensed social worker, licensed pastoral counselor, psychologist or psychiatrist.  The services must be furnished within six months of death.

The Covered Person must be Terminally Ill with an anticipated life expectancy of about six months.  Services, however, are not limited to a maximum of six months if continued Hospice Care is deemed appropriate by the Physician, up to the maximum hospice benefits available under the Plan.

30. **Hospital Services (Includes Inpatient Services, Surgical Centers And Birthing Centers).**  The following benefits are covered:

- Semi-private room and board.  For network charges, this rate is based on network repricing.  For non-network charges, any charge over a semi-private room charge will be a Covered Expense only when Clinical Eligibility for Coverage is met.  If the Hospital has no semi-private rooms, the Plan will allow the private room rate subject to Usual and Customary charges or the Negotiated Rate, whichever is applicable.
- Intensive care unit room and board.
- Miscellaneous and Ancillary Services.
- Blood, blood plasma and plasma expanders, when not available without charge.

31. **Hospital Services (Outpatient).**

32. **Infant Formula** administered through a tube as the sole source of nutrition for the Covered Person.

33. **Infertility Treatment** to the extent required to treat or correct underlying causes of infertility, when such treatment meets Clinical Eligibility for Coverage and cures the condition, alleviates the symptoms, slows the harm, or maintains the current health status of the Covered Person.

Infertility Treatment does not include Genetic Testing.  (See General Exclusions for details).

34. **Laboratory Or Pathology Tests And Interpretation Charges** for Covered Benefits.

35. **Maternity Benefits** for the Employee or spouse include:

- Prenatal and postnatal care.
- Hospital or Birthing Center room and board.
- Obstetrical fees for routine prenatal care.
- Vaginal delivery or Cesarean section.
- Diagnostic testing when Clinical Eligibility for Coverage is met.
- Abdominal operation for intrauterine pregnancy or miscarriage.
- Outpatient Birthing Centers.
- Midwives.

36. **Mental Health Treatment** (Refer to Mental Health section of this SPD).

37. **Modifiers or Reducing Modifiers** if Clinical Eligibility for Coverage is met, apply to services and procedures performed on the same day and may be applied to surgical, radiology and other diagnostic procedures.  For providers participating with a primary or secondary network, claims will be paid according to the network contract.  For providers who are not participating with a network, where no discount is applied, the industry guidelines are to allow the full Usual and Customary fee allowance for the primary procedure and a percentage (%) of the Usual and Customary fee allowance for all secondary procedures.  These allowances are then processed according to Plan provisions.  A global package includes the services that are a necessary part of the procedure.  For individual services that are part of a global package, it is customary for the individual services not to be billed separately.  A separate charge will not be allowed under the Plan.

38. **Nursery And Newborn Expenses Including Circumcision** are covered for the following Children of the covered Employee or covered spouse:  natural (biological) Children and newborn Children who are adopted or Placed for Adoption at the time of birth.

39. **Nutritional Supplements, Vitamins and Electrolytes** which are prescribed by a Physician and administered through enteral feedings, provided they are the sole source of nutrition.  This includes supplies related to enteral feedings (for example, feeding tubes, pumps, and other materials used to administer enteral feedings) provided the feedings are prescribed by a Physician, and are the sole source of nutrition.

40. **Occupational Therapy.**  (See Therapy Services below)

41. **Oral Surgery** includes:

- Excision of partially or completely impacted teeth.
- Excision of tumors and cysts of the jaws, cheeks, lips, tongue, roof and floor of the mouth when such conditions require pathological examinations.
- Surgical procedures required to correct accidental injuries of the jaws, cheeks, lips, tongue, roof and floor of the mouth.
- Reduction of fractures and dislocations of the jaw.
- External incision and drainage of cellulitus.
- Incision of accessory sinuses, salivary glands or ducts.
- Excision of exostosis of jaws and hard palate.

42. **Orthotic Appliances, Devices and Casts,** including the exam for required Prescription and fitting, when prescribed to aid in healing, provide support to an extremity, or limit motion to the musculoskeletal system after Injury.  These devices can be used for acute Injury or to prevent Injury.  Orthotic Appliances and Devices include custom molded shoe orthotics, supports, trusses, elastic compression stockings, and braces.

43. **Oxygen And Its Administration.**

44. **Pharmacological Medical Case Management** (Medication management and lab charges).

45. **Physical Therapy.**  (See Therapy Services below)

46. **Physician Services** for Covered Benefits.

47. **Pre-Admission Testing:**  The testing must be necessary and consistent with the diagnosis and treatment of the condition for which the Covered Person is being admitted to the Hospital.

48. **Prescription Medications** which are administered or dispensed as part of treatment while in the Hospital or at a medical facility (including claims billed on a claim form from a long-term care facility, assisted living facility or Skilled Nursing Facility) and that require a Physician's Prescription.  This does not include paper (script) claims obtained at a retail pharmacy, which are covered under the Prescription benefit.

(Refer to the Prescription Benefits section of this SPD for coverage if there is a written Physician's Prescription and medication is obtained from a pharmacy).

49. **Preventive / Routine Care** as listed under the Schedule of Benefits.  This also includes Preventive / Routine Care benefits for Children." Preventive / Routine Care includes services as mandated by the federal Patient Protection and Affordable Care Act (PPACA).

In addition to the mandated services, the following preventive care services are covered:

- Mammography (film and digitals) for all adult women.
- Computed tomographic colongraphy (virtual colonoscopy) for colon cancer screening.
- Osteoporosis screening for all women regardless of risk.
- Prostate cancer screening for all men age 40 and older.
- Wellness/physical exams for adults.

50. **Private Duty Nursing Services** when Outpatient care is required 24 hours a day.  This does not include Inpatient private duty nursing services.

51. **Prosthetic Devices.**  The initial purchase, fitting, repair and replacement of fitted prosthetic devices (artificial body parts, including limbs, eyes and larynx) which replace body parts.  Benefits may be payable for subsequent repairs or replacement only if required:

- Due to the growth or development of a Dependent Child; or
- When necessary because of a change in the Covered Person's physical condition; or
- Because of deterioration caused from normal wear and tear.

The repair or replacement must also be recommended by the attending Physician.  In all cases, repairs or replacement due to abuse or misuse, as determined by the Plan, are not covered and replacement is subject to prior approval by the Plan.

52. **Radiation Therapy and Chemotherapy.**

53. **Radiology and Interpretation Charges.**

54. **Reconstructive Surgery** includes:

- Following a mastectomy (Women's Health and Cancer Rights Act)
  The Covered Person must be receiving benefits in connection with a mastectomy in order to receive benefits for reconstructive treatments.  Covered Expenses are reconstructive treatments which include all stages of reconstruction of the breast on which the mastectomy was performed, surgery and reconstruction of the other breast to produce a symmetrical appearance; and prostheses and complications of mastectomies, including lymphedemas.
- Surgery to restore bodily function that has been impaired by a congenital Illness or anomaly, Accident, or from an infection or other disease of the involved part.

55. **Respiratory Therapy.**  (See Therapy Services below)

56. **Second and Third Surgical Opinion** must be given by a board-certified Specialist in the medical field relating to the surgical procedure being proposed.  The Physician providing the second opinion must not be affiliated in any way with the Physician who rendered the first opinion.

57. **Sleep Disorders** if Clinical Eligibility for Coverage is met.

58. **Sleep Studies.**

59. **Speech Therapy.**  (See Therapy Services below)

60. **Sterilizations (Voluntary).**

61. **Substance Abuse Services** (Refer to Substance Abuse section of this SPD).

62. **Surgery and Assistant Surgeon Services** (See Modifiers or Reducing Modifiers above).

63. **Taxes.**

64. **Temporomandibular Joint Disorder (TMJ) Services** includes:

- Diagnostic services.

   This does not cover orthodontic services.

65. **Therapy Services:**  Therapy must be ordered by a Physician and provided as part of the Covered Person's treatment plan.  Services include:

- **Occupational therapy** by a Qualified occupational therapist.
- **Physical therapy** by a Qualified physical therapist.
- **Respiratory therapy** by a Qualified respiratory therapist.
- **Aquatic therapy** by a Qualified physical therapist, doctor of medicine, Qualified occupational therapist and chiropractor.
- **Speech therapy** by a Qualified speech therapist including therapy for stuttering due to a neurological disorder.

66. **Transplant Services** (Refer to Transplant section of this SPD).

67. **Urgent Care Facility** as shown in the Schedule of Benefits of this SPD.

68. **Walk-In Retail Health Clinics.**  Charges associated with medical services provided at a Walk-In Retail Health Clinic.

69. **Wigs, Toupees, Hairpieces** for hair loss due to cancer treatment.

70. **X-ray Services** for Covered Benefits.

## TELADOC SERVICES

This Plan has a special benefit allowing Covered Persons of all ages to receive a telephone or web-based video consultation with a Physician for routine primary medical diagnosis.

TelaDoc can be used to treat these common issues such as:

- Respiratory infections.
- Allergies.
- Urinary tract infections.
- Skeletal muscle pain.
- Minor joint trauma (sprains and strains).
- Minor back problems.
- Gastroenteritis.
- Arthritic pain.
- Consultation for international and domestic travel.
- Immunization planning.

To obtain this benefit, Covered Persons must complete a medical history disclosure form that will service as an electronic medical record for consulting Physicians.  This form can be completed via the TelaDoc website, via the call center, or via paper forms.  (Note: There is an additional cost for completion of the disclosure form via the call center.)  Once enrolled, Covered Persons can phone 1-800-TelaDoc and request a consultation with a Physician.  A Physician will then return the Covered Person's phone call.  If a Covered Person requests a web-based video consultation, it will be scheduled and an appointment reminder notification will be sent prior to the appointed time.  If necessary, the Physician will write a Prescription.  The Prescription will be called into a pharmacy of the Covered Person's choice.  Benefits for this service are shown in the Schedule of Benefits.

TelaDoc may not be used for:

- Drug Enforcement Agency controlled Prescriptions.
- Charges for telephone or online consultations with a Physician and/or other providers that are not contracted through TelaDoc.
- Residents of Oklahoma or Covered Persons traveling in Oklahoma.
- Web-based video consultations are not provided in:  Idaho, Iowa, Louisiana, Massachusetts, Minnesota, Ohio, Oklahoma and Texas.

## HOME HEALTH CARE BENEFITS

Home Health Care services are provided for patients who are unable to leave their home, as determined by the Utilization Review Organization.  Covered Persons must give notification in advance before receiving services.  Please refer to the Utilization Management section of this SPD for more details. Covered services can include:

- Home visits instead of visits to the provider's office that do not exceed the Usual and Customary charge to perform the same service in a provider's office.
- Intermittent nurse services.  Benefits are paid for only one nurse at any one time, not to exceed four hours per 24-hour period.
- Nutrition counseling provided by or under the supervision of a registered dietitian.
- Physical, occupational, respiratory and speech therapy provided by or under the supervision of a licensed therapist.
- Medical supplies, drugs, or medication prescribed by a Physician, and laboratory services to the extent that the Plan would have covered them under this Plan if the Covered Person had been in a Hospital.

A Home Health Care Visit is defined as:  A visit by a nurse providing intermittent nurse services (each visit includes up to a four-hour consecutive visit in a 24-hour period if Clinical Eligibility for Coverage is met) or a single visit by a therapist or a registered dietician.

## EXCLUSIONS

In addition to the items listed in the General Exclusions section, benefits will NOT be provided for any of the following:

- Homemaker or housekeeping services.
- Supportive environment materials such as handrails, ramps, air conditioners and telephones.
- Services performed by family members or volunteer workers.
- "Meals on Wheels" or similar food service.
- Separate charges for records, reports or transportation.
- Expenses for the normal necessities of living such as food, clothing and household supplies.
- Legal and financial counseling services, unless otherwise covered under this Plan.

# TRANSPLANT BENEFITS

**Refer To Utilization Management section of this SPD for notification requirements**

## DEFINITIONS

The following terms are used for the purpose of the Transplant Benefits section of this SPD.  Refer to the Glossary of Terms section of this SPD for additional definitions.

**Approved Transplant Services** means services and supplies for certified transplants when ordered by a Physician.  Such services include, but are not limited to, Hospital charges, Physician's charges, organ and tissue procurement, tissue typing and Ancillary Services.

**Designated Transplant Facility** means a facility which has agreed to provide Approved Transplant Services to Covered Persons pursuant to an agreement with a transplant provider network or rental network with which the Plan has a contract.

**Organ and Tissue Acquisition/Procurement** means the harvesting, preparation, transportation and the storage of human organ and tissue which is transplanted to a Covered Person.  This includes related medical expenses of a living donor.

**Stem Cell Transplant** includes autologous, allogeneic and syngeneic transplant of bone marrow, peripheral and cord blood stem cells.

## BENEFITS

The Plan will pay for Covered Expenses Incurred by a Covered Person at a Designated Transplant Facility for an Illness or Injury, subject to any Deductibles, Plan Participation amounts, maximums or limits shown on the Schedule of Benefits.  Benefits are based on the Usual and Customary charge or the Plan's Negotiated Rate.

It will be the Covered Person's responsibility to obtain prior notification for all transplant related services.  If prior notification is not obtained, benefits may not be payable for such services.  Benefits may also be subject to reduced levels as outlined in individual Plan provisions.  The approved transplant and medical criteria for such transplant must meet Clinical Eligibility for Coverage for the medical condition for which the transplant is recommended.  The medical condition must not be included on individual Plan exclusions.

## COVERED EXPENSES

The Plan will pay for Approved Transplant Services at a Designated Transplant Facility for Organ and Tissue Acquisition/Procurement and transplantation, if a Covered Person is the recipient.

If a Covered Person requires a transplant, including bone marrow or Stem Cell Transplant, the cost of Organ and Tissue Acquisition/Procurement from a living human or cadaver will be included as part of the Covered Person's Covered Expenses when the donor's own plan does not provide coverage for Organ and Tissue Acquisition/Procurement.  This includes the cost of donor testing, blood typing and evaluation to determine if the donor is a suitable match.

The Plan will provide donor services for donor related complications during the transplant period, as per the transplant contract, if the recipient is a Covered Person under this Plan.

Benefits are payable for the following transplants:

- Kidney.
- Kidney/Pancreas.
- Pancreas, which meets the criteria as determined by the Utilization Management.

- Liver.
- Heart.
- Heart/Lung.
- Lung.
- Bone Marrow or Stem Cell transplant (allogeneic and autologous) for certain conditions.
- Small Bowel.

**SECOND OPINION**

The Plan will notify the Covered Person if a second opinion is required at any time during the determination of benefits period.  If a Covered Person is denied a transplant procedure by transplant facility, the Plan will allow them to go to a second Designated Transplant Facility for evaluation.  If the second facility determines, for any reason, that the Covered Person is an unacceptable candidate for the transplant procedure, benefits will not be paid for further transplant related services and supplies, even if a third Designated Transplant Facility accepts the Covered Person for the procedure.

**ADDITIONAL PROVISIONS** (Applies to a Designated Transplant Facility Only)

**TRAVEL EXPENSES** (Applies to a Covered Person who is a recipient or to a covered or non-covered donor if the recipient is a Covered Person under this Plan)

If the Covered Person or non-covered living donor lives more than 50 miles from the transplant facility, the Plan will pay for travel and housing, up to the maximum listed on the Schedule of Benefits.  Expenses will be paid for the Covered Person and:

- One or two parents of the Covered Person (if the Covered Person is a Dependent Child, as defined in this Plan); or
- An adult to accompany the Covered Person.

Covered travel and housing expenses include the following:

- Transportation to and from the transplant facility including:

  ➢ Airfare.
  ➢ Tolls and parking fees.
  ➢ Gas/Mileage.

- Lodging at or near the transplant facility including:

  ➢ Apartment rental.
  ➢ Hotel rental.
  ➢ Applicable tax.

  Lodging for purposes of this Plan does not include private residences.

  Lodging reimbursement that is greater than $50 per person per day, may be subject to IRS codes for taxable income.

Benefits shall be payable for up to one year from the date of the transplant while the Covered Person is receiving services at the transplant facility.

Note:  This Plan will only pay travel and housing benefits for a non-covered living donor after any other coverage that the living donor has is exhausted.

**TRANSPLANT EXCLUSIONS**

In addition to the items listed in the General Exclusions section of this SPD, benefits will NOT be provided for any of the following:

- Expenses if a Covered Person donates an organ and/or tissue and the recipient is not a Covered Person under this Plan.

- Expenses for Organ and Tissue Acquisition/Procurement and storage of cord blood, stem cells or bone marrow, unless the Covered Person has been diagnosed with a condition for which there would be Approved Transplant Services.

- Expenses for any post-transplant complications of the donor, if the donor is not a Covered Person under this Plan.

- Transplants considered Experimental, Investigational or Unproven.

- Solid organ transplant in patients with carcinoma unless the carcinoma is in complete remission for five (5) years or considered cured.  Exceptions, which will require additional review for Clinical Eligibility for Coverage, include:  diagnoses of squamous cell and basal cell carcinoma of the skin and hepatocellular carcinoma.

- Solid organ transplantation, autologous transplant (bone marrow or peripheral stem cell) or allogeneic transplant (bone marrow or peripheral stem cell), for conditions that are not considered to meet Clinical Eligibility for Coverage and/or are not appropriate, as determined by the Plan.

- Expenses related to, or for, the purchase of any organ.

## PRESCRIPTION BENEFITS

**The Pharmacy Benefits Administrator for this Plan is:  Prescription Solutions**

Note:  The Medicare Prescription Drug Improvement and Modernization Act of 2003 provides all Medicare eligible individuals the opportunity to obtain Prescription Drug coverage through Medicare.  Medicare eligible individuals generally must pay an additional monthly premium for this coverage.  In addition, electing Medicare Part D may affect Your ability to get prescription coverage under this Plan.  Individuals may be able to postpone enrollment in the Medicare Prescription Drug coverage if their current drug coverage is at least as good as Medicare Prescription Drug coverage.  If individuals decline Medicare Prescription Drug coverage and do not have coverage at least as good as Medicare Prescription Drug coverage, they may have to pay an additional monthly penalty if they change their mind and sign up later. Medicare eligible individuals should have received a Notice informing them whether their current Prescription Drug coverage provides benefits that are at least as good as benefits provided by the Medicare Prescription Drug coverage and explaining whether election of Medicare Part D will affect coverage available under this Plan.  For a copy of this notice, please contact the Plan Administrator.

### DEFINITIONS

The following terms are used for the purpose of the Prescription Benefits section of this SPD.  Refer to the Glossary of Terms section of this SPD for additional definitions.

**Brand Product** means a brand name or trademark name which is typically the originator of the product. A brand status is determined by First Data Bank or any other industry source.  Brand status may change depending on the cost of the product as issued by the manufacturer.

**Contracted Amount** means the discounted amount negotiated by the Pharmacy Benefits Administrator with the Plan that is providing the Prescription benefit.  This amount may include applicable sales tax and pharmacy dispensing fees associated with the dispensing of any Prescription.

**Generic Product** means a non-Brand Product, which is a pharmaceutical equivalent to a Brand Product, but is typically sold at a lower cost.  The generic status is determined by First Data Bank or any other industry source.  Generic status often changes depending on the cost of the product as issued by the manufacturer.

**Medical Professional** means any person licensed under the laws of any state to prescribe and administer Medicines and supplies.

**Medicine or Medication** means a substance or preparation that alleviates or treats a sickness, disease, or Injury and may be available by Prescription only or over-the-counter (OTC).  Medicine includes only substances and preparations that qualify as a medical care under the Internal Revenue Code §213.  In general, medical care means care for the diagnosis, cure, mitigation, treatment or prevention of disease or for the purpose of affecting any structure or function of the body.

**Non-Participating Pharmacy** means any retail or mail order pharmacy that is not contracted by the Pharmacy Benefits Administrator and is excluded from the network of pharmacies.

**Non-Prescription Drugs** means an over-the-counter (OTC) Medication or supply, normally purchased without a Prescription and which are prepackaged for use by the consumer and labeled in accordance with the requirements and statutes and regulations of any state and the federal government.

**Participating Pharmacy** means any retail or mail order pharmacy that is contracted by Pharmacy Benefits Administrator to be included in a network of pharmacies at a contracted amount.

**Pharmacy and Therapeutics Committee** is a committee comprised of independent Physicians and pharmacists, organized by the Pharmacy Benefits Administrator that meets on a quarterly basis to review Medications and supplies.

**Pharmacy Benefits Administrator** is an organization that manages payment for Prescriptions and services under the Plan.

**Preferred Products List** means a list of products that have been determined by the Pharmacy and Therapeutics Committee to be clinically appropriate for reimbursement at the "Preferred" level of benefits as indicated in the Prescription Benefits Summary.  The Pharmacy and Therapeutics Committee will review and modify this list periodically as new information becomes available.  The Pharmacy Benefits Administrator will make available a copy of the Preferred Products List to the Plan, providers, Covered Persons and pharmacists.

**Prescription** means any order authorized by a Medical Professional for a Prescription or Non-Prescription Drug, that could be a Medication or supply for the person for whom prescribed.  The Prescription must be compliant with applicable laws and regulations and identify the name of the Medical Professional and the name of the person for whom prescribed.  It must also identify the name, strength, quantity and the directions for use of the Medication or supply prescribed.

**Prescription Drug** means licensed Medicine that is regulated by legislation to require a Prescription before it can be obtained.

**Prior Authorization** means if a Medical Professional believes that the Covered Person needs a Prescription product that is on the Prior Authorization List, or is not covered for other reasons, he or she may contact the Pharmacy Benefits Administrator to request the Plan's review of the situation.  A Medical Professional will provide the Pharmacy Benefits Administrator required information on the Covered Person's medical condition so the Plan can properly evaluate the Covered Person's need for the requested products.  Upon review by a licensed pharmacist, the Pharmacy Benefits Administrator may do one of the following:

- Approve the Medical Professional's request and authorize coverage of this Medication for a certain period of time at the appropriate Co-pay.
- Recommend an alternate Medication for consideration by the Medical Professional.
- Deny the request to cover the requested Medication.

If the Prescription Medication that the Covered Person needs requires Prior Authorization but the Covered Person cannot wait for the Prior Authorization review to take place, request a drug sample from the Medical Professional.  If a sample is not available, the pharmacy may provide the Covered Person with a short-term supply (such as a 5-day supply) while the Prior Authorization review is taking place.  The Covered Person will be responsible for the Co-pay at this time.  This Co-pay will not be credited toward this Prescription if dispensed on a later date.

## PROGRAM INFORMATION

**Brands for Generic Program** provides access to certain branded diabetic products at generic Co-pays in order to encourage the use of the most cost effective products.

**DACON, or D**aily **A**llowable **Con**sumption (also referred to as Dose Over Time) means limiting the quantity of certain Medications that are available in multiple dosage strengths and are routinely intended for once daily administration.  In cases where the daily prescribed dose may be dispensed using one dosage unit in place of two or more units, the quantity allowed will be limited to one dosage unit per day.

**Quantity Limits** means limiting the dispensing quantities applied to Medications that are appropriate for acute use.  Quantity Limits are designed to provide sufficient amounts for the treatment of one or more acute episodes.  Quantity Limits are established based on FDA (Food and Drug Administration) guidelines, clinical recommendations published in peer review journals, as well as manufacturer packaging and labeling instructions.  Some Quantity Limits are based on the number of units per dispensing while others are specified as a per month limit.  The Pharmacy and Therapeutics Committee or the Pharmacy Benefits Administrator will review and modify this list periodically as new information becomes available.

**Prior Authorization List** means a list of Prescription products that are FDA (Food and Drug Administration) approved for a specific diagnosis or as second line therapy, identified by the Pharmacy and Therapeutics Committee for which the Pharmacy Benefits Administrator requires information from the Medical Professional to determine the appropriate level of coverage.  The Pharmacy and Therapeutics Committee or Pharmacy Benefits Administrator will review and modify this list periodically as new information becomes available.

**Specialty Pharmacy Program** except injectable contraceptives and injectable vitamins means a program that has been determined by the Pharmacy Benefits Administrator to require reimbursement only through the approved specialty pharmacy vendor(s) at the "specialty pharmacy program" level of benefits as indicated in the Prescription Benefits Summary for Medications determined to be part of the Specialty Pharmacy Program.  The Pharmacy and Therapeutics Committee or Pharmacy Benefit Administrator will review and modify the list of products included in the Specialty Pharmacy Program periodically as new information becomes available.

**Half Tab Rx** (Tablet Splitting) is a program for a defined list of Medications.  When a Prescription is written for a Medication in a tablet splitting program, and the prescribed directions for use allow the Covered Person to obtain the prescribed dose by using one-half tablet, Prescription Solutions will reduce the Covered Person's fixed Co-pay by one-half.  Co-pay reductions will be applied only to Medications defined for inclusion in the tablet-splitting program.

## COVERED EXPENSES

The Plan will pay for Covered Expenses (including dispensing fees) for Prescription products Incurred by a Covered Person, in accordance with the Prescription Schedule of Benefits and at the Contracted Amount minus the Co-pays, if applicable.

Expenses will not be paid for Prescription products purchased before coverage with this Plan begins, or after coverage under this Plan or this provision terminates.

## COVERED BENEFITS

The following are considered Covered Benefits:

- **Prescription products which are:**

  ➢ Necessary for the care and treatment of an Illness or Injury and are prescribed by a duly licensed Medical Professional; and
  ➢ Can be obtained only by Prescription and are dispensed in a container labeled "Rx only"; and
  ➢ The following Non-Prescription products prescribed by a duly licensed Medical Professional:

    – Compounded Medications of which at least one ingredient is a Prescription drug;

    – Any other Medications which due to state law may only be dispensed when prescribed by a duly licensed Medical Professional; and

    – In an amount not to exceed the day's supply outlined in the Prescription Schedule of Benefits.

- **Injectable insulin and the following diabetic supplies** as prescribed by a duly licensed Medical Professional:

  ➢ Lancets, alcohol swabs, reaction treating tablets, blood glucose monitors, urine test strips, blood test strips, insulin syringes and needles and anti-diabetic products.

- **Non-combination Prescription** requiring products containing folic acid or vitamins A, D, E or K.

- **Prescription prenatal vitamins.**

- **Vitamins with fluoride.**

- **Prescription Drugs obtained in a foreign country** when a Foreign Claim Form is signed.  Retail brand discounts and preferred brand Co-pays will apply.

- **Prescription smoking deterrent products with a lifetime limit of a 3-month supply per Covered Person.**

- **Contraceptive products,** which are self administered and limited to oral tablets, and patches, self-insertable vaginal devices containing contraceptive hormones regardless of the purpose.

- **Prescription Drugs lost as a direct result of a natural disaster.**  Covered Persons will be given the opportunity to prove that Prescriptions otherwise considered Covered Benefits under this Plan were lost due to a natural disaster.  Acceptable proof could include, but not necessarily be limited to, proof of other filed claims of loss (homeowner's, property, etc.).

- **Mail Order Prescriptions.**  The Plan will pay for Covered Expenses Incurred by a Covered Person for Prescription products dispensed through the Mail Order pharmacy identified by the Pharmacy Benefit Administrator.  Prescription products may be ordered by mail with a Co-pay from the Covered Person for each Prescription or refill.  The Co-pay is shown on the Prescription Benefits Summary.  By law, Prescription products cannot be mailed to a Covered Person outside the United States.

- **Specialty Pharmacy Program.**  The Plan will pay for Covered Expenses Incurred by a Covered Person through the Specialty Pharmacy Program vendor identified by the Pharmacy Benefit Administrator.  Prescription products included in the Specialty Pharmacy Program shall be ordered from the specialty pharmacy vendor with a Co-pay from the Covered Person for each Prescription or refill.  The Co-pay is shown on the Prescription Benefits Summary.

**PRESCRIPTION PRODUCT EXCLUSIONS**

In addition to the items listed in the General Exclusions section in this SPD, benefits will NOT be provided for any of the following:

- Charges which are in excess of the Contracted Amount.
- Therapeutic devices or appliances, including hypodermic needles, syringes (except as stated above), support garments and other non-medical substances, without regard to their intended use.
- Immunization agents, biological sera, blood or blood plasma.
- Products labeled:  "Caution-limited by federal law to Investigational use", or Experimental drugs even though a charge is made to the Covered Person.  Approved Prescription products which are prescribed for Experimental or Investigational purposes or in Experimental or Investigational dosages.
- Any charge for the administration of Prescription products.
- Any Medication, Prescription or Non-Prescription other than Prescriptions ordered through the Specialty Pharmacy Program which is taken or administered at the place where it is dispensed.
- Any Medication which is meant to be taken by or administered to the Covered Person, in whole or in part, while the Covered Person is treated at a Hospital, a Physician's office or Extended Care Facility (but is instead self-administered or administered elsewhere), unless expressly designated by the Pharmacy Benefits Administrator.
- Refilling a Prescription in excess of the number specified on the Prescription or any refill dispensed after one year from the order of the Medical Professional.
- Prescription products which are not dispensed by a licensed pharmacist or Medical Professional.
- Prescription products dispensed in a foreign country if the Covered Person traveled solely for the purpose of re-importing Prescription Drugs into the United States and/or used other means to ship or bring Prescription products from a foreign country into the United States.

- Prescriptions that are cosmetic in nature, unless the Prescription is necessary to ameliorate a deformity arising from, or directly related to a congenital abnormality, a personal Injury resulting from an Accident or trauma, or disfiguring disease.
- Prescription products which may be received without charge under local, state or federal programs, including worker's compensation.
- Replacement Prescription products resulting from loss, theft, or damage, except in the case of loss due directly to a natural disaster.
- Rogaine, or any other cosmetic hair growth Prescription products.
- Prescription products, if a prior authorization was needed but not requested; and Prescription products, if prior authorization was requested but denied.
- Anabolic steroids.
- Prescription products available over-the-counter that do not require a Prescription order by federal or state law and any Medication that is equivalent to an over-the-counter Medication.
- Anorectics or any other products used for the purpose of weight control, unless determined by the Plan to meet the definition of a Covered Benefit.
- Prescription topical acne products for a Covered Person who is over age 26.
- Approved Prescription products with no approved Food and Drug Administration (FDA) indications for the purpose for which prescribed, unless the Plan determines the use to be appropriate based on generally accepted medical practice.
- Oral medications for cosmetic management of onychomycosis.
- Prescription products used to enhance sexual function or satisfaction.
- Infertility products, unless used to sustain a Covered Person's pregnancy.
- Prescription products that are determined by the Pharmaceutical and Therapeutics Committee to be either marginally effective and/or are excessive in cost when compared to alternative Medication for the same condition.
- Growth hormone products, unless determined by the Plan to meet the definition of a Covered Benefit.
- All illegal Medications or supplies, even if prescribed by a duly licensed Medical Professional.
- The difference in cost between a Generic Product and Brand Product when the Medical Professional has not specified a Brand Product or has not indicated that the Brand is necessary.

The Covered Person still has a right to purchase that product, even if the requested Medication or supply is not covered, however the entire cost of the product will be the Covered Person's responsibility.

**Review of Medications and Supplies by the Pharmacy and Therapeutics Committee**

The Pharmacy and Therapeutics Committee may, in its professional judgment modify Medications and supplies on the Preferred Products List as follows:

- Place products on the Preferred Products List and remove products from the Preferred Products List.
- Place certain products on the Prior Authorization List and remove products from the Prior Authorization List.
- Categorize certain Non-Prescription Products (over-the-counter products) as a Covered Expense.
- Place Medications into and remove Medications from the Specialty Pharmacy Program.

Actions by the Pharmacy and Therapeutics Committee take place quarterly, as medical technology evolves, as indications, or FDA (Food and Drug Administration) guidelines change.

The Pharmacy Benefits Administrator will inform Covered Persons of the actions taken by the Pharmacy and Therapeutics Committee as appropriate, including when benefits under this Plan are affected.

**Coordination of Benefits**

This Plan does not coordinate Prescription Benefits.

**Appeal Procedures**

Refer to the Claims and Appeal section of this SPD for additional details.

**FOR MORE INFORMATION ON PRESCRIPTION BENEFITS**

For more information about these Prescription benefits, please call the Pharmacy Benefits Administrator at 877-559-2955, or visit the website at www.UMR.com.

## MENTAL HEALTH BENEFITS

The Plan will pay the following Covered Expenses for services authorized by a Physician and deemed to meet the Clinical Eligibility for Coverage for the treatment of a Mental Health Disorder, subject to any Deductibles, Co-pays if applicable, Participation amounts, maximum or limits shown on the Schedule of Benefits of this SPD.  Benefits are based on the Usual and Customary amount, maximum fee schedule or the Negotiated Rate.

## COVERED BENEFITS

**Inpatient Services** are payable subject to all of the following:

- The Hospital or facility must be accredited by The Joint Commission (formerly known as JCAHO), or other recognized accrediting body or licensed by the state as an acute care psychiatric, chemical dependency or dual diagnosis facility for the treatment of Mental Health Disorders.  If outside of the United States, the Hospital or facility must be licensed or approved by the foreign government or an accreditation or licensing body working in that foreign country.

- The Covered Person must have the ability to accept treatment.

- The Covered Person must be ill in more than one area of daily living to such an extent that they are rendered dysfunctional and require the intensity of an Inpatient setting for treatment.  Without such Inpatient treatment, the Covered Person's condition would deteriorate.

- The Covered Person's Mental Health Disorder must be treatable in an Inpatient facility.

- The Covered Person's Mental Health Disorder must meet diagnostic criteria as described in the most recent edition of the American Psychiatric Association Diagnostic and Statistical Manual (DSM).  If outside of the United States, the Covered Person's Mental Health Disorder must meet diagnostic criteria established and commonly recognized by the medical community in that region.

- The attending Physician must be a psychiatrist.  If the admitting Physician is not a psychiatrist, a psychiatrist must be attending to the Covered Person within 24 hours of admittance.  Such psychiatrist must be United States board eligible or board certified.  If outside of the United States, Inpatient Services must be provided by an individual who has received a diploma from a medical school recognized by the government agency in the country where the medical school is located. The attending Physician must meet the requirements, if any, set out by the foreign government or regionally recognized licensing body for treatment of Mental Health Disorders.

**Day Treatment (Partial Hospitalization)** means a day treatment program that offers intensive, multidisciplinary services not otherwise offered in an Outpatient setting.  The treatment program is generally a minimum of 20 hours of scheduled programming extended over a minimum of five days per week.  The program is designed to treat patients with serious mental or nervous disorders and offers major diagnostic, psychosocial and prevocational modalities.  Such programs must be a less restrictive alternative to Inpatient treatment.

**Outpatient Services** are payable subject to all of the following:

- Must be in person at a therapeutic medical facility; and

- Include measurable goals and continued progress toward functional behavior and termination of treatment.  Continued coverage may be denied when positive response to treatment is not evident; and

- Must be provided by one of the following:

  ➢ A United States board eligible or board certified psychiatrist licensed in the state where the treatment is provided.
  ➢ A therapist with a Ph.D. or master's degree that denotes a specialty in psychiatry (Psy.D.).
  ➢ A state licensed psychologist.
  ➢ A state licensed or certified Social Worker practicing within the scope of his or her license or certification.
  ➢ Licensed Professional Counselor.
  ➢ If outside of the United States, Outpatient Services must be provided by an individual who has received a diploma from a medical school recognized by the government agency in the country where the medical school is located.  The attending Physician must meet the requirements, if any, set out by the foreign government or regionally recognized licensing body for treatment of Mental Health Disorders.

## ADDITIONAL PROVISIONS AND BENEFITS

- A medication evaluation by a psychiatrist may be required before a Physician can prescribe medication for psychiatric conditions.  Periodic evaluations may be requested by the Plan.

- Any diagnosis change after a payment denial will not be considered for benefits unless the Plan is provided with all pertinent records along with the request for change that justifies the revised diagnosis.  Such records must include the history and initial assessment and must reflect the criteria listed in the most recent American Psychiatric Association Diagnostic and Statistical Manual (DSM) for the new diagnosis, or, if in a foreign country, must meet diagnostic criteria established and commonly recognized by the medical community in that region.

## MENTAL HEALTH EXCLUSIONS

In addition to the items listed in the General Exclusions section, benefits will NOT be provided for any of the following:

- Inpatient charges for the period of time when full, active treatment meeting the Clinical Eligibility for Coverage for the Covered Person's condition is not being provided.

- Bereavement counseling, unless specifically listed as a Covered Benefit elsewhere in this SPD.

- Services provided for conflict between the Covered Person and society which is solely related to criminal activity.

- Conditions listed in the most recent American Psychiatric Association Diagnostic and Statistical Manual (DSM) or the International Classification of Diseases - Clinical Modification manual (most recent revision) (ICD-CM) in the following categories:

  ➢ Personality disorders; or
  ➢ Sexual/gender identity disorders; or
  ➢ Behavior and impulse control disorders; or
  ➢ "V" codes (including marriage counseling).

- Services for biofeedback.

- Residential treatment services.

## SUBSTANCE ABUSE AND CHEMICAL DEPENDENCY BENEFITS

The Plan will pay the following Covered Expenses for a Covered Person subject to any Deductibles, Co-pays if applicable, Participation amounts, maximum or limits shown on the Schedule of Benefits. Benefits are based on the maximum fee schedule, Usual and Customary amount or the Negotiated Rate as applicable.

### COVERED BENEFITS

**Inpatient Services** are payable subject to all of the following:

- The Hospital or facility must be accredited by The Joint Commission (formerly known as JCAHO), or other recognized accrediting body or licensed by the state as an acute care psychiatric, chemical dependency or dual diagnosis facility for the treatment of substance abuse and chemical dependency.  If outside of the United States, the Hospital or facility must be licensed or approved by the foreign government or an accreditation or licensing body working in that foreign country.

- The Covered Person must have the ability to accept treatment.

- The Covered Person must be ill to such an extent that they are rendered dysfunctional and require the intensity of an Inpatient setting for treatment.  Without such Inpatient treatment, the Covered Person's condition would deteriorate.

- The Covered Person's condition must be treatable in an Inpatient facility.

- The Covered Person's condition must meet diagnostic criteria as described in the most recent edition of the American Psychiatric Association Diagnostic and Statistical Manual (DSM).  If outside of the United States, the Covered Person's condition must meet diagnostic criteria established and commonly recognized by the psychiatric community in that region.

**Day Treatment (Partial Hospitalization)** means a day treatment program that offers intensive, multidisciplinary services not otherwise offered in an Outpatient setting.  The treatment program is generally a minimum of 20 hours of scheduled programming extended over a minimum of five days per week.  Such programs must be a less restrictive alternative to Inpatient treatment.

**Outpatient Services** are payable subject to all of the following:

- Must be in person at a therapeutic medical facility; and

- Include measurable goals and continued progress toward functional behavior and termination of treatment.  Continued coverage may be denied when positive response to treatment is not evident; and

- Must be provided by one of the following:

  - A United States board eligible or board certified psychiatrist licensed in the state where the treatment is provided.
  - A therapist with a Ph.D. or master's degree that denotes a specialty in psychiatry (Psy.D.).
  - A state licensed psychologist.
  - A certified addiction counselor.
  - A state licensed or certified social worker practicing within the scope of his or her license or certification.

> ➢ If outside of the United States, Outpatient Services must be provided by an individual who has received a diploma from a medical school recognized by the government agency in the country where the medical school is located, or a therapist with a Ph.D., or master's degree that denotes a specialty in psychiatry.  The attending Physician, psychiatrist, or a counselor must meet the requirements, if any, set out by the foreign government or regionally recognized licensing body for treatment of substance abuse and chemical dependency disorders.

**ADDITIONAL PROVISIONS AND BENEFITS**

- Any claim re-submitted on the basis of a change in diagnosis after a benefit denial will not be considered for benefits unless the Plan is provided with all records along with the request for change.  Such records must include: the history, initial assessment and all counseling or therapy notes, and must reflect the criteria listed in the most recent American Psychiatric Association Diagnostic and Statistical Manual (DSM) for the new diagnosis.

**SUBSTANCE ABUSE EXCLUSIONS**

In addition to the items listed in the General Exclusions section, benefits will NOT be provided for any of the following:

The Plan will not pay for:

- Treatment or care considered inappropriate or substandard as determined by the Plan.

- Inpatient charges for the period of time when full, active treatment meeting the Clinical Eligibility for Coverage for the Covered Person's condition is not being provided.

- Residential treatment services.

## UTILIZATION MANAGEMENT
### And Other Medical Management Services

Utilization Management is the process of evaluating whether services, supplies or treatment meet Clinical Eligibility for Coverage and are appropriate to help ensure cost-effective care.  Utilization Management can determine Clinical Eligibility for coverage, shorten Hospital stays, improve the quality of care, and reduce costs to the Covered Person and the Plan.  The Utilization Management procedures include certain Notification requirements.

The benefit amounts payable under the Schedule of Benefits of this SPD may be affected if the requirements described for Utilization Management are not satisfied.  Covered Persons should call the phone number on the back of the Plan identification card to request Notification at least two weeks prior to a scheduled procedure in order to allow for fact gathering and independent medical review, if necessary.

**Special Note:  The Covered Person will not be penalized for failure to obtain Notification if a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect that the absence of immediate medical attention would jeopardize the life or long-term health of the individual.**  However, Covered Persons who received care on this basis must contact the Utilization Review Organization (see below) as soon as possible within 24 hours of the first business day after receiving care or Hospital admittance.  The Utilization Review Organization will then review services provided within 48 hours of being contacted.

This Plan complies with the Newborns and Mothers Health Protection Act.  The Notification requirement is not required for Hospital or Birthing Center stays of 48 hours or less following a normal vaginal delivery or 96 hours or less following a Cesarean section.  Notification may be required for stays beyond 48 hours following a vaginal delivery or 96 hours following a Cesarean section.

### UTILIZATION REVIEW ORGANIZATION

The Utilization Review Organization is:  **UMR CARE MANAGEMENT**

### DEFINITIONS

The following terms are used for the purpose of the Utilization Management section of this SPD.  Refer to the Glossary of Terms section of this SPD for additional definitions.

**Notified or Notification** means a determination by the Utilization Review Organization on behalf of the Plan, with respect to whether a service, treatment, supply or facility is the most appropriate and cost-effective treatment for the care and treatment of an Illness or Injury and meets Clinical Eligibility for Coverage.

**Utilization Management** means an assessment of the facility in which the treatment is being provided.  It also includes a formal assessment of the effectiveness and appropriateness of health care services and treatment plans.  Such assessment can be conducted on a prospective basis (prior to treatment), concurrent basis (during treatment), or retrospective basis (following treatment).

### SERVICES REQUIRING NOTIFICATION

Call the Utilization Management Organization **before** receiving services for the following:

- Inpatient stay in a Hospital or Extended Care Facility.
- Organ and tissue transplants.
- Home Health Care.
- Durable Medical Equipment over $1,500 or any Durable Medical Equipment rentals over $500/month.
- Prosthetics over $1,000.

- All Inpatient stays for Mental Health Disorders, substance abuse and chemical dependency.
- Inpatient stay in a Hospital or Birthing Center that is longer than 48 hours following a normal vaginal delivery or 96 hours following a Cesarean section.
- Dialysis.
- Outpatient surgeries not performed in a Physician's office.
- Injectable medications over $1,500.

**Note that if a Covered Person receives Notification for one facility, but then the person is transferred to another facility, Notification is also needed before going to the new facility, except in the case of an Emergency (see Special Notes above).**

**PENALTIES FOR NOT OBTAINING NOTIFICATION**

A non-Notification penalty is the amount that must be paid by a Covered Person who does not call for Notification prior to receiving certain services. A penalty of $500 will be applied to applicable claims if a Covered Person receives services but did not obtain the required Notification for:

- Inpatient stay in a Hospital or Extended Care Facility.
- Organ and tissue transplants.
- Home Health Care.
- Durable Medical Equipment over $1500 or any Durable Medical Equipment rentals over $500/month.
- Prosthetics over $1,000.
- All Inpatient stays for Mental Health Disorders, substance abuse and chemical dependency.
- Inpatient stay in a Hospital or Birthing Center that is longer than 48 hours following a normal vaginal delivery or 96 hours following a Cesarean section.
- Dialysis.
- Outpatient surgeries not performed in a Physician's office.
- Injectable medications over $1,500.

**The phone number to call for Notification is listed on the back of the Plan identification card.**

Even though a Covered Person provides Notification to the Utilization Review Organization, that does not guarantee that this Plan will pay for the medical care. The Covered Person still needs to be eligible for coverage on the date services are provided. Coverage is also subject to all of the provisions described in this SPD.

**Medical Director Oversight**. A UMR Care Management medical director oversees the concurrent review process. Should a case have unique circumstances that raise questions for the Utilization Management specialist handling the case, the medical director will review the case to determine medical appropriateness using evidence-based clinical criteria.

**Case Management Referrals**. During the Notification review process, cases are analyzed for a number of criteria used to trigger case to case management for review. These triggers include ICD-9 diagnosis codes, CPT codes and length-of-stay criteria, as well as specific criteria requested by the Plan Administrator. Information is easily passed from Utilization Management to case management through our fully-integrated care management software system.

All Notification requests are used to identify the member's needs. Our goal is to intervene in the process as early as possible to determine the resources necessary to deliver clinical care in the most appropriate care setting.

**Retrospective Review**. Retrospective review is conducted by Plan Administrator request as long as the request is received within 30 days of the original determination. Retrospective reviews are performed according to our standard Notification policies and procedures.

**Other Medical Management Services**

**Disease Management Program** identifies those individuals who have a certain chronic disease and would benefit from this program.  Nurse case managers telephonically work with Covered Persons to help them improve their chronic disease and maintain quality of life.  Our unique approach to Disease Management identifies individuals with one or more of the seven targeted chronic conditions (asthma, coronary artery disease, congestive heart failure, Chronic Obstructive Pulmonary Disease (COPD), depression, diabetes and hypertension).  Built within our system is a predictive modeling tool, Clinical Analytics and Clinical Intelligence Rules that takes up to two years' worth of medical and pharmacy claims data and then identifies those Covered Persons who are eligible to participate in the coaching program.  If claims history is not available, Disease Management candidates are initially identified using a Health Condition Survey.  The survey is a general screening questionnaire sent to all Covered Persons age 18 and over that asks a few questions about each of the conditions managed in the program.  Once claims data is available, the predictive modeling tool is used to identify candidates for the program.  Program participants can also be identified through referrals from the Notification process, Covered Person self-referral, NurseLine referrals, the employer or the Covered Person's Physician.

In addition to the telephonic services, UMR case management also provides Targeted Member Messages (TMMs).  The TMM provides an annual, personalized evaluation of a member's current health care utilization and related spending.  It is sent to each member's home via U.S. Mail.  Members most likely to benefit from TMM/HealtheNotes are targeted to receive the report.  The report provides health claims-based information and suggestions, and encourages members to take an active role in their health care and related spending choices.  Members can review the informative report to help them understand their health care needs, take it with them to their medical appointments to discuss with their providers, and refer to it when making benefit plan elections.

HealtheNotes provides useful, personalized information based on the individual Plan member's health care utilization, including provider visits, prescriptions and health screenings.

The TMM/HealtheNotes is a vital educational tool in the Disease Management Program for managing a Covered Person's chronic condition(s).  It assists in our efforts to significantly improve the quality of life for Covered Persons while simultaneously reducing the overall healthcare costs.

**Maternity Management** provides prenatal education and high-risk pregnancy identification to help mothers carry their babies to term.  This program increases the number of healthy, full term deliveries and decreases the cost of a long term hospital stay for both the mother and/or baby.  Program members are contacted via telephone at least once each trimester and once postpartum.  A comprehensive assessment to determine the member's risk level and educational need is done at that time.  To increase participation, the program uses incentives to participate.  The standard incentive is a gift card.  Covered Persons who enroll via the web receive a special edition pregnancy information guide.  UMR's pre-pregnancy coaching program helps women learn about risks and take action to prevent serious and costly medical complications before they become pregnant.  Women with pre-existing health conditions, such as diabetes and high blood pressure, not only face risks to their babies, but also to themselves while they're pregnant.  Members self-enroll in the pre-pregnancy coaching program by calling our toll-free number.  They are then contacted by a nurse case manager who has extensive clinical background in obstetrics/gynecology.  The nurse completes a pre-pregnancy assessment to determine risk level, if any, and provides them with education and materials based on their needs.  The nurse also helps members understand their Plan's benefit information.

**Case Management Services** are designed to identify catastrophic and complex Illnesses, transplants and trauma cases.  UMR Care Management's case management specialists identify, coordinate and negotiate rates for out-of-network services (where appropriate and allowed under the Plan) and help manage related costs by finding alternatives to costly Inpatient stays.  Opportunities are identified from the Notification review process, national criteria and system flags based on ICD-9 diagnosis, CPT procedure code and potential high dollar claim criteria.  UMR Care Management works directly with the patient, family members, treating Physician and facility to mobilize appropriate resources for the Covered Person's care.  Our philosophy is that quality care from the beginning of the serious Illness helps avoid major complications in the future.  The Covered Person can request that the Plan provide services and the Plan may also contact the Covered Person if the Plan believes case management services may be beneficial.

**NurseLine** service is a 24/7 health information line that assists Covered Persons with medical-related questions and concerns.  NurseLine gives Covered Persons access to highly trained registered nurses so they can receive guidance and support when making decisions about their health and/or the health of their Dependents.

## COORDINATION OF BENEFITS

Coordination of Benefits (COB) applies whenever a Covered Person has health coverage under more than one Plan, as defined below.  The purpose of coordinating benefits is to help Covered Persons pay for Covered Expenses, but not to result in total benefits that are greater than the Covered Expenses Incurred.

The order of benefit determination rules determine which plan will pay first (Primary Plan).  The Primary Plan pays without regard to the possibility that another plan may cover some expenses.  A Secondary Plan pays for Covered Expenses after the Primary Plan has processed the claim, and will reduce the benefits it pays so that the total payment between the Primary Plan and Secondary Plan does not exceed the Covered Expenses Incurred.  Up to 100% of charges Incurred may be paid between both plans.

The Plan will coordinate benefits with the following types of medical or dental plans:

- Group health plans, whether insured or self-insured.
- Hospital indemnity benefits in excess of $200 per day.
- Specified disease policies.
- Foreign health care coverage.
- Medical care components of group long-term care contracts such as skilled nursing care.
- Medical benefits under group or individual motor vehicle policies.  See order of benefit determination rules (below) for details.
- Medical benefits under homeowner's insurance policies.
- Medicare or other governmental benefits, as permitted by law.  See below.  This does not include Medicaid.

Each contract for coverage is considered a separate plan.  If a plan has two parts and COB rules apply to only one of the two parts, each of the parts is treated as a separate plan.  If a plan provides benefits in the form of services rather than cash payments, the reasonable cash value of each service rendered will be considered an allowable expense and a benefit paid.

When this Plan is secondary, and when not in conflict with a network contract requiring otherwise, covered charges shall not include any amount that is not payable under the primary plan as a result of a contract between the primary plan and a provider of service in which such provider agrees to accept a reduced payment and not to bill the Covered Person for the difference between the provider's contracted amount and the provider's regular billed charge.

## ORDER OF BENEFIT DETERMINATION RULES

The first of the following rules that apply to a Covered Person's situation is the rule to use:

- The plan that has no coordination of benefits provision is considered primary.

- When medical payments are available under motor vehicle insurance (including no-fault policies), this Plan shall always be considered secondary regardless of the individual's election under PIP (Personal Injury Protection) coverage with the auto carrier.

- Where an individual is covered under one plan as a Dependent and another plan as an Employee, member or subscriber, the plan that covers the person as an Employee, member or subscriber (that is, other than as a Dependent) is considered primary.  The Primary Plan must pay benefits without regard to the possibility that another plan may cover some expenses.  This Plan will deem any Employee plan beneficiary to be eligible for primary benefits from their employer's benefit plan.

- The plan that covers a person as a Dependent (or beneficiary under ERISA) is generally secondary.  The plan that covers a person as a Dependent is primary only when both plans agree that COBRA or state continuation coverage should always pay secondary when the person who elected COBRA is covered by another plan as a Dependent (see continuation coverage below). (Also see the section on Medicare, below, for exceptions).

- When an individual is covered under a spouse's Plan and also under his or her parent's plan, the Primary Plan is the plan of the individual's spouse.  The plan of the individual's parent(s) is the Secondary Plan.

- If one or more plans cover the same person as a Dependent Child:

  - ➢ The Primary Plan is the plan of the parent whose birthday is earlier in the year if:

    - The parents are married; or
    - The parents are not separated (whether or not they have been married); or
    - A court decree awards joint custody without specifying that one party has the responsibility to provide health care coverage.
    - If both parents have the same birthday, the plan that covered either of the parents longer is primary.

  - ➢ If the specific terms of a court decree state that one of the parents is responsible for the Child's health care expenses or health care coverage and the plan of that parent has actual knowledge of those terms, that plan is primary.  This rule applies to claim determination periods or plan years starting after the plan is given notice of the court decree.

  - ➢ If the parents are not married and reside separately, or are divorced or legally separated, the order of benefits is:

    - The plan of the custodial parent;
    - The plan of the spouse of the custodial parent;
    - The plan of the non-custodial parent; and then
    - The plan of the spouse of the non-custodial parent.

- Active or Inactive Employee:  If an individual is covered under one plan as an active employee (or Dependent of an active employee), and is also covered under another plan as a retired or laid off employee (or Dependent of a retired or laid off employee), the plan that covers the person as an active employee (or Dependent of an active employee) will be primary.  This rule does not apply if the rule in paragraph 3 (above) can determine the order of benefits.  If the other plan does not have this rule, this rule is ignored.

- Continuation coverage under COBRA or state law:  If a person has elected continuation of coverage under COBRA or state law and also has coverage under another plan, the continuation coverage is secondary.  This is true even if the person is enrolled in another plan as a Dependent. If the two plans do not agree on the order of benefits, this rule is ignored.  This rule does not apply if one of the first four bullets above applies.  (See exception in the Medicare section.)

- Longer or Shorter Length of Coverage:  The plan that covered the person as an employee, member, subscriber or retiree longer is primary.

- If the above rules do not determine the Primary Plan, the Covered Expenses can be shared equally between the plans.  This Plan will not pay more than it would have paid, had it been primary.

**MEDICARE**

If You or Your covered spouse or Dependent is also receiving benefits under Medicare, including Medicare Prescription drug coverage, federal law may require this Plan to be primary over Medicare. When this Plan is not primary, the Plan will coordinate benefits with Medicare.

The order of benefit determination rules determine which plan will pay first (Primary Plan).  The Primary Plan pays without regard to the possibility that another plan may cover some expenses.  A Secondary Plan pays for Covered Expenses after the Primary Plan has processed the claim, and will reduce the benefits it pays so that the total payment between the Primary Plan and Secondary Plan does not exceed the Covered Expenses Incurred.  Up to 100% of charges Incurred may be paid between both plans.

When this Plan is not Primary and a Covered Person is receiving Part A Medicare but has chosen not to elect Part B, this Plan will reduce its payments on Part B services as though Part B Medicare was actually in effect.

**ORDER OF BENEFIT DETERMINATION RULES FOR MEDICARE**

This Plan complies with the Medicare Secondary Payer regulations.  Examples of these regulations are as follows:

- This Plan generally pays first under the following circumstances:

    ➤ You continue to be actively employed by the employer and You or Your covered spouse becomes eligible for and enrolls in Medicare because of age or disability.

    ➤ You continue to be actively employed by the employer, Your covered spouse becomes eligible for and enrolls in Medicare, and is also covered under a retiree plan through Your spouse's former employer.  In this case, this Plan will be primary for You and Your covered spouse, Medicare pays second, and the retiree plan would pay last.

    ➤ For a Covered Person with End-Stage Renal Disease (ESRD), this Plan usually has primary responsibility for the claims of a Covered Person for 30 months from the date of Medicare eligibility based on ESRD.  The 30-month period can also include COBRA continuation coverage or another source of coverage.  At the end of the 30 months, Medicare becomes the primary payer.

- Medicare generally pays first under the following circumstances:

    ➤ You are no longer actively employed by an employer; and

    ➤ You or Your spouse has Medicare coverage due to age, plus You or Your spouse also have COBRA continuation coverage through the Plan; or

    ➤ You or a covered family member has Medicare coverage based on a disability, plus You also have COBRA continuation coverage through the Plan.  Medicare normally pays first, however an exception is that COBRA may pay first for Covered Persons with ESRD until the end of the 30-month period; or

    ➤ You or Your covered spouse have retiree coverage plus Medicare coverage; or

    ➤ Upon completion of 30 months of Medicare eligibility for an individual with ESRD, Medicare becomes the primary payer.  (Note that if a person with ESRD was eligible for Medicare based on age or other disability *before* being diagnosed with ESRD and Medicare was previously paying primary, then the person can continue to receive Medicare benefits on a primary basis).

- Medicare is the secondary payer when no-fault insurance, worker's compensation, or liability insurance is available as primary payer.

Note:  If a Covered Person is eligible for Medicare as the primary plan, all benefits from this Plan will be reduced by the amount Medicare would pay, regardless of whether the Covered Person is enrolled in Medicare.

## TRICARE

In all instances where an eligible Employee is also a TRICARE beneficiary, TRICARE will pay secondary to this employer-provided Plan.

## RIGHT TO RECEIVE AND RELEASE NEEDED INFORMATION

Certain facts about health care coverage and services are needed to apply these COB rules and to determine benefits payable under this Plan and other plans.  The Plan may obtain the information it needs from or provide such information to other organizations or persons for the purpose of applying those rules and determining benefits payable under this Plan and other plans covering the person claiming benefits.  The Plan need not tell, or obtain the consent of, any person to do this.  However, if the Plan needs assistance in obtaining the necessary information, each person claiming benefits under this Plan must provide the Plan any information it needs to apply those rules and determine benefits payable.

## REIMBURSEMENT TO THIRD PARTY ORGANIZATION

A payment made under another plan may include an amount which should have been paid under this Plan.  If it does, the Plan may pay that amount to the organization which made that payment.  That amount will then be treated as though it were a benefit paid under this Plan.  The Plan will not have to pay that amount again.

## RIGHT OF RECOVERY

If the amount of the payments made by the Plan is more than it should have paid under this COB provision, the Plan may recover the excess from one or more of the persons it paid or for whom the Plan has paid; or any other person or organization that may be responsible for the benefits or services provided for the Covered Person.

## RIGHT OF SUBROGATION, REIMBURSEMENT AND OFFSET

This Plan is designed to cover You and Your Dependent(s) with health benefits.  This Plan is not intended to serve as a supplement to, or replacement for, any payments or benefits You or Your Dependent(s) have or may recover when charges are Incurred as the result of an Accident, Illness, Injury or other medical condition caused by an act or omission of any Other Party.  Benefits under this Plan are reduced or excluded subject to the terms and conditions of this Subrogation, Reimbursement and Offset Provision anytime there is an Other Party who is liable or responsible (legally or voluntarily) to make payments in relation to the Accident, Illness or Injury.

For purposes of this section, **Other Party** is defined to include, but is not limited to, the following:

- The party or parties that caused the Accident, Illness, Injury or other medical condition;
- The insurer or other indemnifier of the party or parties who caused the Accident, Illness, Injury or other medical condition;
- The Covered Person's own insurer including, but not limited to, uninsured motorist, underinsured motorist, medical payment, no-fault insurers or home-owner's insurance;
- A worker's compensation or school insurer;
- Any other person, entity, policy or plan that is liable or legally responsible to make payments in relation to the Accident, Illness, Injury or other medical condition.

For purposes of this section, **Recovery** is defined to include, but is not limited to, any amount paid or payable by an Other Party through a settlement, judgment, mediation, arbitration, or other means in connection with an Accident, Injury or Illness.

If the Covered Person and/or his or her Dependent(s) have the legal right to seek a Recovery from such Other Party, benefits will only be payable if You and Your Dependents agree to the following:

- That the Plan is subrogated to all rights the Covered Person may have, and You and Your Dependents acknowledge that the Plan will have a first priority lien and right of recovery, on any Recovery received from any Other Party as a result of an Accident, Illness, Injury or other medical condition caused by an act or omission of the Other Party.  Any Covered Person accepting benefits from the Plan assigns from any such Recovery an amount equal to the benefits paid by the Plan.  A Covered Person further agrees that notice of this assignment presented to the Covered Person's attorney and/or insurance company or Other Party responsible for payment of the damages is binding on the party receiving such notice.

- That the Covered Person, or their legal representative, shall notify the Plan of any claim or potential claim the Covered Person and/or their Dependent(s) have against any Other Party within 30 days of the act which gives rise to such claim.  That, if requested, the Covered Person or his or her Dependent(s) or legal representative shall supply the Plan with any information that is reasonably necessary to protect the Plan's subrogation interests.

- If an act or omission of an Other Party causing an Accident, Illness or Injury results in payments being made under the Plan, that neither the Covered Person nor their Dependent(s) do anything that would prejudice the Plan's rights to recover payments.

- That, if requested, the Covered Person shall execute documents (including a lien agreement) and deliver instruments and papers and do whatever else is necessary to protect the Plan's rights. Such documents may require the Covered Person to direct their attorney (and other representatives) in writing to retain separately from any Recovery that the attorney or representative receive on the Covered Person's behalf an amount of money sufficient to reimburse the Plan as required by such agreement and to pay such money to the Plan. Failure or refusal to execute such documents or agreements or to furnish information does not preclude the Plan from exercising its right to Subrogation or obtaining full reimbursement. In the event the Covered Person does not sign or refuses to sign such an agreement, the Plan has no obligation to make any payment for any treatment required as a result of the act or omission of any Other Party, such agreement is expressly incorporated in this Plan and will be provided to the Covered Person at anytime upon request.

- The Plan is also granted a right of reimbursement from the proceeds of any Recovery obtained or that may be obtained by the Covered Person. This right of reimbursement runs concurrent with and is not necessarily exclusive of the Plan's subrogation and lien rights described above. A Covered Person shall promptly convey to the Plan any amounts received from any Recovery for the reasonable value of the medical benefits advanced by the Plan or provided by the Plan to the Covered Person.

- In the event that the Covered Person fails to cooperate with the Plan or fails to comply with the terms of this provision, the Plan may offset or otherwise reduce present or future benefits otherwise payable to the Covered Person or their Spouse or Dependent under the terms of the Plan. Moreover, in the event that a Covered Person fails to cooperate with the Plan, the Covered Person shall be responsible for any and all costs Incurred by the Plan in enforcing its rights, including but not limited to attorney's fees.

- That the Plan has a right to recover, through subrogation, reimbursement, offset or through any other available means, the following:

  ➢ Any amount from the first dollar, that the Covered Person or any other person or organization on behalf of the Covered Person is entitled to receive as a result of the Accident, Illness, Injury or other medical condition, to the full extent of benefits paid or provided by the Plan; and
  ➢ Any overpayments made directly to providers on behalf of the Covered Person for the Accident, Illness, Injury or other medical condition.

- That the Plan's rights under this section shall be in first priority, to the full extent of any and all benefits paid or payable under the Plan, and will not be reduced due to the Covered Person's own negligence or due to the Covered Person not being made whole.

- That the Covered Person shall be solely responsible for all expenses of recovery from any Other Party, including but not limited to all attorney's fees and costs, which amounts will not reduce the amount of reimbursement payable to the Plan under the operation of any common fund doctrines.

- That the Plan will not pay any fees or costs associated with any claim or lawsuit without the Plan's express written consent in advance.

- That the Covered Person or their legal representative or Legal Guardian, shall be considered a constructive trustee with respect to any Recovery received or that may be received from any Other Party in consideration of an Accident, Illness, Injury or other medical condition for which they have received benefits. Any such funds will be held in trust until the Plan's lien is satisfied.

- The Plan's rights apply to the Covered Person, to the spouse and Dependent(s) of a Covered Person, COBRA beneficiaries, and any other person who may recover on behalf of a participant, including the Covered Person's estate.

- That the Plan reserves the right to independently pursue and recover paid benefits.

- The Plan's Subrogation, Reimbursement and Offset provisions apply to a Recovery obtained by the Covered Person in connection with an Accident, Injury or Illness without regard to the description, name or label applied to the Recovery.

# GENERAL EXCLUSIONS

Exclusions, including complications from excluded items are not considered Covered Benefits under this Plan and will not be considered for payment as determined by the Plan, except complications from a non-covered abortion.

The Plan does not pay for Expenses Incurred for the following, unless otherwise stated below.  The Plan does not apply exclusions based upon the source of the Injury to treatment listed in the Covered Medical Benefits section when the Plan has information that the Injury is due to a medical condition (including both physical and mental health conditions) or domestic violence.

1.  **Abortions:**  Unless a Physician states in writing that:
    - The mother's life would be in danger if the fetus were to be carried to term, or
    - Abortion is medically indicated due to complications with the pregnancy;
    - The pregnancy is the result of rape or incest.

2.  **Acts Of War:**  Injury or Illness caused or contributed to by international armed conflict, hostile acts of foreign enemies, invasion, or war or acts of war, whether declared or undeclared.

3.  **Acupuncture Treatment.**

4.  **Alternative / Complementary Treatment** includes:  Treatment, services or supplies for holistic or homeopathic medicine, hypnosis or other alternate treatment that is not accepted medical practice as determined by the Plan.

5.  **Appointments Missed:**  An appointment the Covered Person did not attend.

6.  **Aquatic Therapy** unless provided by a Qualified physical therapist, doctor of medicine, Qualified occupational therapist or chiropractor.

7.  **Assistance With Activities of Daily Living.**

8.  **Assistant Surgeon Services**, unless determined to meet the Clinical Eligibility for Coverage by the Plan.

9.  **Auto Limitations:**  When medical payments are available under vehicle insurance, the Plan shall pay excess benefits only, without reimbursement for vehicle plan deductibles.  This Plan shall always be considered the secondary carrier regardless of the individual's election under PIP (personal Injury protection) coverage with the auto carrier.

10.  **Before Enrollment and After Termination:**  Services, supplies or treatment rendered before coverage begins under this Plan, or after coverage ends, are not covered.

11.  **Biofeedback Services**.

12.  **Blood:**  Blood donor expenses.

13.  **Blood Pressure Cuffs / Monitors.**

14.  **Cardiac Rehabilitation** beyond Phase II including self-regulated physical activity that the Covered Person performs to maintain health that is not considered to be a treatment program.

15.  **Chelation Therapy,** except in the treatment of conditions considered to meet the Clinical Eligibility for Coverage, medically appropriate and not Experimental or Investigational for the medical condition for which the treatment is recognized.

16.  **Claims** received later than 12 months from the date of service.

17. **Cosmetic Treatment**, **Cosmetic Surgery,** or any portion thereof, unless the procedure is otherwise listed as a Covered Benefit.

18. **Counseling Services** in connection with financial or marriage counseling.

19. **Court-Ordered:**  Any treatment or therapy which is court-ordered, ordered as a condition of parole, probation, or custody or visitation evaluation, unless such treatment or therapy is normally covered by this Plan.  This Plan does not cover the cost of classes ordered after a driving while intoxicated conviction or other classes ordered by the court.

20. **Criminal Activity:**  Illness or Injury resulting from taking part in the commission of an assault or battery (or a similar crime against a person) or a felony.  The Plan shall enforce this exclusion based upon reasonable information showing that this criminal activity took place.  This exclusion will apply whether or not the Covered Person is charged or convicted.  The Plan language states "committing or attempting to commit".  This exclusion will apply for services received as a result of Injury or Illness caused by or contributed to by participating in a riot or public disturbance.

21. **Custodial Care** as defined in the Glossary of Terms of this SPD.

22. **Dental Services:**

- The care and treatment of teeth, gums or alveolar process or for dentures, appliances or supplies used in such care or treatment, or drugs prescribed in connection with dental care.  This exclusion does not apply to Hospital charges including professional charges for x-ray, lab and anesthesia, or for charges for treatment of injuries to natural teeth, including replacement of such teeth with dentures, or for setting of a jaw which was fractured or dislocated in an Accident.
- Injuries or damage to teeth, sound natural or otherwise, as a result of or caused by the chewing of food or similar substances.
- Dental implants including preparation for implants.

23. **Developmental Delays:**  Occupational, physical, and speech therapy services related to Developmental Delays, mental retardation or behavioral therapy that do not meet Clinical Eligibility for Coverage and are not considered by the Plan to be medical treatment.  If another medical condition is identified through the course of diagnostic testing, any coverage of that condition will be subject to Plan provisions.

24. **Duplicate Services and Charges or Inappropriate Billing** including the preparation of medical reports and itemized bills.

25. **Education:**  Charges for education, special education, job training, music therapy and recreational therapy, whether or not given in a facility providing medical or psychiatric care.  This exclusion does not apply to self-management education programs for diabetics.

26. **Environmental Devices:**  Environmental items such as but not limited to, air conditioners, air purifiers, humidifiers, dehumidifiers, furnace filters, heaters, vaporizers, or vacuum devices.

27. **Examinations:**  Examinations for employment, insurance, licensing or litigation purposes.

28. **Excess Charges:**  Charges or the portion thereof which are in excess of the Usual and Customary charge, the Negotiated Rate or fee schedule.

29. **Experimental, Investigational or Unproven:**  Services, supplies, medicines, treatment, facilities or equipment which the Plan determines are Experimental, Investigational or Unproven, including administrative services associated with Experimental, Investigational or Unproven treatment.

30. **Extended Care:**  Any Extended Care Facility Services which exceed the appropriate level of skill required for treatment as determined by the Plan.

31. **Family Planning:** Consultation for family planning.

32. **Fitness Programs:** General fitness programs, exercise programs, exercise equipment and health club memberships, or other utilization of services, supplies, equipment or facilities in connection with weight control or body building.

33. **Foot Care (Podiatry):** Routine foot care.

34. **Genetic Counseling** other than based on Clinical Eligibility for Coverage.

35. **Genetic Testing** other than based on Clinical Eligibility for Coverage.

36. **Hazardous Recreational Activity:** Injuries or Illness related to hazardous recreational activities, unless the Injuries or Illness are caused primarily as a result of other medical conditions not related to the hazardous recreational activities, or to domestic violence.

37. **Hearing Services:**

   • Purchase or fitting of hearing aids.

38. **Home Births** and associated costs.

39. **Home Modifications:** Modifications to Your home or property such as but not limited to, escalator(s), elevators, saunas, steambaths, pools, hot tubs, whirlpools, or tanning equipment, wheelchair lifts, stair lifts or ramps.

40. **Infant Formula** not administered through a tube as the sole source of nutrition for the Covered Person.

41. **Infertility Treatment:**

   • Fertility tests.
   • Surgical reversal of a sterilized state which was a result of a previous surgery.
   • Direct attempts to cause pregnancy by any means including, but not limited to hormone therapy or drugs.
   • Artificial insemination; In vitro fertilization; Gamete Intrafallopian Transfer (GIFT), or Zygote Intrafallopian Transfer (ZIFT).
   • Embryo transfer.
   • Freezing or storage of embryo, eggs, or semen.
   • Genetic testing.

   This exclusion does not apply to services required to treat or correct underlying causes of infertility where such services cure the condition, slow the harm to, alleviate the symptoms, or maintain the current health status of the Covered person.

42. **Intoxication:** Injury that occurs while the Covered Person is driving under the influence of an intoxicant or has a blood alcohol level that would meet or exceed the definition of intoxication as set forth in the state where the Injury or Accident occurred. The Plan shall enforce this exclusion based upon available reasonable information. This exclusion does not apply if the Injury resulted from an act of domestic violence or a medical (including both physical and mental health) condition.

43. **Lamaze Classes** or other child birth classes.

44. **Learning Disability:** Non-medical treatment, including but not limited to special education, remedial reading, school system testing and other rehabilitation treatment for a Learning Disability. If another medical condition is identified through the course of diagnostic testing, any coverage of that condition will be subject to Plan provisions.

45. **Liposuction** regardless of purpose.

46. **Maintenance Therapy:** Such services are excluded if, based on medical evidence, treatment or continued treatment could not be expected to resolve or improve the condition, or that clinical evidence indicates that a plateau has been reached in terms of improvement from such services.

47. **Mammoplasty or Breast Augmentation** unless covered elsewhere in this SPD.

48. **Massage Therapy.**

49. **Maternity Costs** for Covered Persons other than the Employee or spouse.

50. **Maximum Benefit.** Charges in excess of the Maximum Benefit allowed by the Plan.

51. **Military:** A military related Illness or Injury to a Covered Person on active military duty, unless payment is legally required.

52. **Nocturnal Enuresis Alarm** (Bed wetting).

53. **Non-Custom-Molded Shoe Inserts.**

54. **Non-Professional Care:** Medical or surgical care that is not performed according to generally accepted professional standards, or that is provided by a provider acting outside the scope of his or her license.

55. **Not Determined to Meet the Clinical Eligibility for Coverage:** Services, supplies, treatment, facilities or equipment which the Plan determines do not meet the guidelines for Clinical Eligibility for Coverage. Furthermore, this Plan excludes services, supplies, treatment, facilities or equipment which reliable scientific evidence has shown does not cure the condition, slow the degeneration/deterioration or harm attributable to the condition, alleviate the symptoms of the condition, or maintain the current health status of the Covered Person. See also Maintenance Therapy, above.

56. **Nursery and Newborn Expenses** for grandchildren of a covered Employee or spouse.

57. **Nutritional Supplements, Vitamins and Electrolytes** except as listed under the Covered Benefits.

58. **Orthognathic, Prognathic and Maxillofacial Surgery.**

59. **Over-The-Counter Medication, Products, Supplies or Devices** unless covered elsewhere in this SPD.

60. **Panniculectomy / Abdominoplasty** unless determined by the Plan to meet Clinical Eligibility for Coverage.

61. **Personal Comfort:** Services or supplies for personal comfort or convenience, such as but not limited to private room, television, telephone and guest trays.

62. **Pharmacy Consultations.** Charges for or relating to consultative information provided by a pharmacist regarding a prescription order, including but not limited to information relating to dosage instruction, drug interactions, side effects, and the like.

63. **Pre-Existing Conditions** exclusions, as specified in the Pre-Existing Conditions Exclusion section.

64. **Prescription Medication**, which is administered or dispensed as take home drugs as part of treatment while in the Hospital or at a medical facility and that require a Physician's Prescription.

(Covered Persons with a written Physician's Prescription who obtain medication from a pharmacy should refer to the Prescription Benefits section of this SPD for coverage).

65. **Private Duty Nursing Services** for Inpatient care.

66. **Reconstructive Surgery** when performed only to achieve a normal or nearly normal appearance, and not to correct an underlying medical condition or impairment, as determined by the Plan, unless covered elsewhere in this SPD.

67. **Return to Work / School:**  Telephone or Internet consultations or completion of claim forms or forms necessary for the return to work or school.

68. **Reversal of Sterilization:**  Procedures or treatments to reverse prior voluntary sterilization.

69. **Room and Board Fees** when surgery is performed other than at a Hospital or Surgical Center.

70. **Self-Administered Services** or procedures that can be done by the Covered Person without the presence of medical supervision.

71. **Self-Inflicted** unless due to a medical condition (physical or mental) or domestic violence.

72. **Services at no Charge or Cost:**  Services which the Covered Person would not be obligated to pay in the absence of this Plan or which are available to the Covered Person at no cost, or which the Plan has no legal obligation to pay, except for care provided in a facility of the uniformed services as per Title 32 of the National Defense Code, or as required by law.

73. **Services** that should legally be provided by a school.

74. **Services Provided by a Close Relative.**  See Glossary of Terms of this SPD for definition of Close Relative.

75. **Sex Therapy.**

76. **Sexual Function:**  Diagnostic Services, non-surgical and surgical procedures and Prescription drugs (unless covered under the Prescription Benefits Section in this SPD) in connection with treatment for male or female impotence.

77. **Sex Transformation:**  Treatment, drugs, medicines, services and supplies for, or leading to, sex transformation surgery.

78. **Standby Surgeon Charges.**

79. **Subrogation.**  Charges for Illness or Injuries suffered by a Covered Person due to the action or inaction of any third party if the Covered Person fails to provide information as specified in the Subrogation section.  See the Subrogation section for more information.

80. **Surrogate Parenting and Gestational Carrier Services,** including any services or supplies provided in connection with a surrogate parent, including pregnancy and maternity charges Incurred by a Covered Person acting as a surrogate parent.

81. **Temporomandibular Joint Disorder (TMJ) Services:**

   - Surgical treatment.
   - Non-surgical treatment (includes intraoral devices or any other non-surgical method to alter the occlusion and/or vertical dimension).

   This does not cover orthodontic services.

82. **Tobacco Addiction:**  Diagnoses, services, treatment or supplies related to addiction to or dependency on nicotine.

83. **Transportation:**  Transportation services which are solely for the convenience of the Covered Person, the Covered Person's Close Relative, or the Covered Person's Physician.

84. **Travel:**  Travel costs, whether or not recommended or prescribed by a Physician, unless authorized in advance by the Plan.

85. **Vision Care** unless covered elsewhere in this SPD.

86. **Vitamins, Minerals and Supplements,** even if prescribed by a Physician, except for Vitamin B-12 injections and IV iron therapy that are prescribed by a Physician and meet Clinical Eligibility for Coverage.

87. **Vocational Services:**  Vocational and educational services rendered primarily for training or education purposes.  This Plan also excludes work hardening, work conditioning and industrial rehabilitation services rendered for Injury prevention education or return-to-work programs.

88. **Weekend Admissions** to Hospital confinement (admission taking place after 3:00 p.m. on Friday or before noon on Sunday) are not eligible for reimbursement under the Plan, unless the admission is deemed an Emergency, or for care related to pregnancy that is expected to result in childbirth.

89. **Weight Control:**  Treatment, services or surgery for weight control**,** whether or not prescribed by a Physician or associated with an Illness, except as specifically stated for preventive counseling.

90. **Wigs, Toupees, Hairpieces, Hair Implants or Transplants or Hair Weaving,** or any similar item for replacement of hair regardless of the cause of hair loss unless covered elsewhere in this SPD.

91. **Worker's Compensation:**  An Illness or Injury arising out of or in the course of any employment for wage or profit including self-employment, for which the Covered Person was or could have been entitled to benefits under any Worker's Compensation, U.S. Longshoremen and Harbor Worker's or other occupational disease legislation, policy or contract, whether or not such policy or contract is actually in force.

---

**The Plan does not limit a Covered Person's right to choose his or her own medical care.**  If a medical expense is not a Covered Benefit, or is subject to a limitation or exclusion, a Covered Person still has the right and privilege to receive such medical service or supply at the Covered Person's own personal expense.

---

# CLAIMS AND APPEAL PROCEDURES

**REASONABLE AND CONSISTENT CLAIMS PROCEDURES**

The Plan's claims procedures are designed to ensure and verify that claim determinations are made in accordance with the Plan documents.  The Plan provisions will be applied consistently with respect to similarly situated individuals.

**Pre-Determination**

A Pre-Determination is a determination of benefits by the Claims Administrator, on behalf of the Plan, prior to services being provided.  Although not required by the Plan, a Covered Person or provider may voluntarily request a Pre-Determination.  A Pre-Determination informs individuals whether, and under which circumstances, a procedure or service is generally a Covered Benefit under the Plan.  Covered Persons or providers may wish to request a Pre-Determination before Incurring medical expenses.  A Pre-Determination is not a claim and therefore cannot be appealed.  A Pre-Determination that a procedure or service may be covered under the Plan does not guarantee the Plan will ultimately pay the claim.  All Plan terms and conditions will still be applied when determining whether a claim is payable under the Plan.

**TYPE OF CLAIMS AND DEFINITIONS**

- **Pre-Service Claim needing notification as <u>required</u> by the Plan and stated in this SPD.**  This is a claim for a benefit where the Covered Person is required to get approval from the Plan *before* obtaining the medical care such as in the case of notification of health care items or service that the Plan requires.  If a Covered Person or provider calls the Plan just to find out if a claim will be covered, that is not a Pre-Service Claim, unless the Plan and this SPD specifically require the person to call for notification (See Pre-Determination above).  Giving notification does not guarantee that the Plan will ultimately pay the claim.

  **Note that this Plan does not require notification for urgent or Emergency care claims,** however Covered Persons may be required to notify the Plan following stabilization.  Please refer to the Utilization Management section of this SPD for more details.  A condition is considered to be an urgent or Emergency care situation when a sudden and serious condition such that a Prudent Layperson could expect the patient's life would be jeopardized, the patient would suffer severe pain, or serious impairment of his or her bodily functions would result unless immediate medical care is rendered.  Examples of an urgent or Emergency care situation may include, but are not limited to:  chest pain; hemorrhaging; syncope; fever equal to or greater than 103° F; presence of a foreign body in the throat, eye, or internal cavity; or a severe allergic reaction.

- **Post-Service Claim** means a claim that involves payment for the cost of health care that has already been provided.

- **Concurrent Care Claim** means that an ongoing course of treatment to be provided over a period of time or for a specified number of treatments has been approved by the Plan.

**PERSONAL REPRESENTATIVE**

**Personal Representative** means a person (or provider) who can contact the Plan on the Covered Person's behalf to help with claims, appeals or other benefit issues.  Minor Dependents must have the signature of a parent or Legal Guardian in order to appoint a third party as a Personal Representative.

If a Covered Person chooses to use a Personal Representative, the Covered Person must submit a written letter to the Plan stating the following:  The name of the Personal Representative, the date and duration of the appointment and any other pertinent information.  In addition, the Covered Person must agree to grant their Personal Representative access to their Protected Health Information.  This letter must be signed by the Covered Person to be considered official.

**PROCEDURES FOR SUBMITTING CLAIMS**

Most providers will accept assignment and coordinate payment directly with the Plan on the Covered Person's behalf.  If the provider will not accept assignment or coordinate payment directly with the Plan, then the Covered Person will need to send the claim to the Plan within the timelines discussed below in order to receive reimbursement.  The address for submitting medical claims is on the back of the group health identification card.

For Prescription benefits, a claim is considered filed when a Covered Person has submitted the claim for benefits under the Pharmacy benefit terms outlined in this SPD.  The address for submitting Prescription claims is on the back of the identification card.  If the Pharmacy refuses to fill the Covered Person's Prescription at the Pharmacy counter, the Covered Person should contact the number on the back of the Pharmacy drug benefit identification card for further instructions on how to proceed.

Covered Persons who receive services in a country other than the United States are responsible for ensuring the provider is paid.  If the provider will not coordinate payment directly with the Plan, the Covered Person will need to pay the claim up front and then submit the claim to the Plan for reimbursement.  The Plan will reimburse Covered Persons for any covered amount in U.S. currency.  The reimbursed amount will be based on the U.S. equivalency rate that is in effect on the date the Covered Person paid the claim, or on the date of service if paid date is not known.

A complete claim must be submitted in writing and should include the following information:

* Covered Person/patient ID number, name, sex, date of birth, Social Security number, address, and relationship to Employee
* Authorized signature from the Covered Person
* Diagnosis
* Date of service
* Place of service
* Procedures, services or supplies (narrative description)
* Charges for each listed service
* Number of days or units
* Patient account number (if applicable)
* Total billed charges
* Provider billing name, address, telephone number
* Provider Taxpayer Identification Number (TIN)
* Signature of provider
* Billing provider
* Any information on other insurance (if applicable)
* Whether the patient's condition is related to employment, auto accident, or other accident (if applicable)
* Assignment of benefits (if applicable)

**TIMELY FILING**

Covered Persons are responsible for ensuring that complete claims are submitted to the Third Party Administrator as soon as possible after services are received, but no later than 12 months from the date of service.  Where Medicare or Medicaid paid as primary in error, the timely filing requirement may be increased to three years from the date of service.  A Veteran's Administration Hospital has six years from the date of service to submit the claim.  Covered Persons can request a Prescription claim form by writing Prescription Solutions at PO Box 8082, Wausau WI 54402-8082 or by calling the number on the back of the Prescription drug card.  A complete claim means that the Plan has all information that is necessary to process the claim.  Claims received after the timely filing period will not be allowed.

**INCORRECTLY FILED CLAIMS** (Applies to Pre-Service Claims only)

If a Covered Person or Personal Representative attempts to, but does not properly follow the Plan's procedures for requesting notification, the Plan will notify the person to explain proper procedures within five calendar days following receipt of a Pre-Service claim request.  The notice will usually be oral, unless written notice is requested by the Covered Person or Personal Representative.

**HOW HEALTH BENEFITS ARE CALCULATED**

When UMR receives a claim for services that have been provided to a Covered Person, it will determine if the service is a Covered Benefit under this group health Plan.  If it is not a Covered Benefit, the claim will be denied and the Covered Person will be responsible for paying the provider for these costs.  If it is a Covered Benefit, UMR will establish the allowable payment amount for that service, in accordance with the provisions of this SPD.

Claims for Covered Benefits are paid according to an established fee schedule, a Negotiated Rate for certain services, or as a percentage of the Usual and Customary fees.

**Fee Schedule**:  Generally, providers are paid the lesser of the billed amount or the maximum fee schedule for the particular covered service, minus any Deductible, Plan Participation rate, Co-pay or penalties that the Covered Person is responsible for paying.  Where a network contract is in place, the network contract determines the Plan's allowable charge used in the calculation of the payable benefit.

**Negotiated Rate**:  On occasion, UMR will negotiate a payment rate with a provider for a particular covered service such as transplant services, Durable Medical Equipment, Extended Care Facility treatment or other services.  The Negotiated Rate is what the Plan will pay to the provider, minus any Co-pay, Deductible, Plan Participation rate or penalties that the Covered Person is responsible for paying.  Where a network contract is in place, the network contract determines the Plan's Negotiated Rate.

**Usual And Customary (U&C)** is the amount that is usually charged by health care providers in the same geographical area (or greater area, if necessary) for the same services, treatment or materials.  An industry fee file is used to determine U&C fee allowances.  The U&C level is at the 85th percentile, see surgery and assistant surgeon under the Covered Benefits for exceptions related to multiple procedures.  As it relates to charges made by a network provider, the term Usual and Customary means the Negotiated Rate as contractually agreed to by the provider and network (see above).  A global package includes the services that are a necessary part of a procedure.  For individual services that are part of a global package, it is customary for the individual services not to be billed separately.  A separate charge will not be allowed under the Plan.

**NOTIFICATION OF BENEFIT DETERMINATION**

If a claim is submitted by a Covered Person or a provider on behalf of a Covered Person and the Plan does not completely cover the charges, the Covered Person will receive an Explanation of Benefits (EOB) form that will explain how much the Plan paid toward the claim, and how much of the claim is the Covered Person's responsibility due to cost-sharing obligations, non-covered benefits, penalties or other Plan provisions.  Please check the information on each EOB form to make sure the services charged were actually received from the provider and that the information appears correct.  For any questions or concerns about the EOB form, call the Plan at the number listed on the EOB or on the back of the group health identification card.  The provider will receive a similar form on each claim that is submitted.

Note:  For Prescription benefits, Covered Persons will receive an EOB when a Covered Person files a claim directly with Prescription Solutions.  Benefits received or denied at the point of sale in the Pharmacy are not considered claims.  See Procedures For Submitting Claims for more information.

**TIMELINES FOR INITIAL BENEFIT DETERMINATION**

UMR will process claims within the following timelines, although the Covered Person may voluntarily extend these timelines:

- Pre-Service Claim:  A decision will be made within 15 calendar days following receipt of a claim request, but the Plan can have an extra 15-day extension, when necessary for reasons beyond the control of the Plan, if written notice is given to the Covered Person within the original 15-day period.
- Post-Service Claims:  Claims will be processed within 30 calendar days, but the Plan can have an additional 15-day extension, when necessary for reasons beyond the control of the Plan, if written notice is provided to the Covered Person within the original 30-day period.
- Concurrent Care Claims:  If the Plan is reducing or terminating benefits before the end of the previously approved course of treatment, the Plan will notify the Covered Person prior to the coverage for the treatment ending or being reduced.
- Emergency and/or Urgent Care Claim:  The Plan will notify a Covered Person or provider of a benefit determination (whether adverse or not) with respect to a claim involving Emergency or Urgent Care as soon as possible, taking into account the medical necessity, but not later than 24 hours after the receipt of the claim by the Plan.

A claim is considered to be filed when the claim for benefits has been submitted to UMR for formal consideration under the terms of this Plan.

**CIRCUMSTANCES CAUSING LOSS OR DENIAL OF PLAN BENEFITS**

Claims can be denied for any of the following reasons:

- Termination of Your employment.
- Covered Person is no longer eligible for coverage under the health Plan.
- Charges Incurred prior to the Covered Person's Effective Date or following termination of coverage.
- Covered Person reached the Maximum Benefit under this Plan.
- Amendment of group health Plan.
- Termination of the group health Plan.
- Employee, Dependent or provider did not respond to a request for additional information needed to process the claim or appeal.
- Application of Coordination of Benefits.
- Enforcement of subrogation.
- Services are not a Covered Benefit under this Plan.
- Services do not meet Clinical Eligibility for Coverage.
- Failure to comply with notification requirements before receiving services.
- Misuse of the Plan identification card or other fraud.
- Failure to pay premiums if required.
- Employee or Dependent is responsible for charges due to Deductible, Plan Participation obligations or penalties.
- Application of the Usual and Customary fee limits, fee schedule or Negotiated Rates.
- Incomplete or inaccurate claim submission.
- Application of utilization review.
- Experimental or Investigational procedure.
- Other reasons as stated elsewhere in this SPD.

**ADVERSE BENEFIT DETERMINATION (DENIED CLAIMS)**

**Adverse Benefit Determination** means a denial, reduction or termination of a benefit, or a failure to provide or make payment, in whole or in part, for a benefit.  It also includes any such denial, reduction, termination or failure to provide or make payment that is based on a determination that the Covered Person is no longer eligible to participate in the Plan.

If a claim is being denied in whole or in part, and the Covered Person will owe any amount to the provider, the Covered Person will receive an initial claim denial notice, usually referred to as an Explanation of Benefits (EOB) form, within the timelines described above.  The EOB form will:

- Explain the specific reasons for the denial.
- Provide a specific reference to pertinent Plan provisions on which the denial was based.
- Provide a description of any material or information that is necessary for the Covered Person to perfect the claim, along with an explanation of why such material or information is necessary, if applicable.
- Provide appropriate information as to the steps the Covered Person can take to submit the claim for appeal (review).
- If an internal rule or guideline was relied upon, or if the denial was based on not meeting Clinical Eligibility for Coverage or Experimental treatment, the Plan will notify the Covered Person of that fact.  The Covered Person has the right to request a copy of the rule/guideline or clinical criteria that was relied upon, and such information will be provided free of charge.

**APPEALS PROCEDURE FOR ADVERSE BENEFIT DETERMINATIONS**

If a Covered Person disagrees with the denial of a claim or a rescission of coverage determination, the Covered Person or his/her Personal Representative can request that the Plan review its initial determination by submitting a written request to the Plan as described below.  An appeal filed by a provider on the Covered Person's behalf is not considered an appeal under the Plan unless the provider is a Personal Representative.

**First Level of Appeal**:  This is a **mandatory** appeal level.  The Covered Person must exhaust the following internal procedures before any outside action is taken.

- Covered Persons must file the appeal within 180 days of the date they received the EOB form from the Plan showing that the claim was denied.  The Plan will assume that Covered Persons received the EOB form five days after the Plan mailed the EOB form.
- Covered Persons or their Personal Representative will be allowed reasonable access to review or copy pertinent documents, at no charge.
- Covered Persons may submit written comments, documents, records and other information relating to the claim to explain why they believe the denial should be overturned.  This information should be submitted at the same time the written request for a review is submitted.
- Covered Persons have the right to submit evidence that their claim is due to the existence of a physical or mental medical condition or domestic violence, under applicable federal nondiscrimination rules.
- The review will take into account all comments, documents, records and other information submitted that relates to the claim.  This would include comments, documents, records and other information that either were not submitted previously or were not considered in the initial benefit decision.  The review will be conducted by individuals who were not involved in the original denial decision and are not under the supervision of the person who originally denied the claim.
- If the benefit denial was based in whole or in part on a medical judgment, the Plan will consult with a health care professional with training and experience in the relevant medical field.  This health care professional may not have been involved in the original denial decision, nor be supervised by the health care professional who was involved.  If the Plan has obtained medical or vocational experts in connection with the claim, they will be identified upon the Covered Person's request, regardless of whether the Plan relies on their advice in making any benefit determinations.
- After the claim has been reviewed, Covered Persons will receive written notification letting them know if the claim is being approved or denied.  The notification will provide Covered Persons with the information outlined under the Adverse Benefit Determination section above.  It will also notify them of their right to file suit under ERISA after they have completed all mandatory appeal levels described in this SPD.

**Appeals should be sent within the prescribed time period as stated above to**:

Send Medical appeals to
UMR
CLAIMS APPEAL UNIT
PO BOX 30546
SALT LAKE CITY UT 84130-0546

Send Pharmacy appeals to:
PRESCRIPTION SOLUTIONS
PO BOX 8082
WAUSAU WI 54402-8082

## TIME PERIODS FOR MAKING DECISION ON APPEALS

After reviewing a claim that has been appealed, the Plan will notify the Covered Person of its decision within the following timeframes, although Covered Persons may voluntarily extend these timelines.  In addition, if any new or additional evidence is relied upon or generated during the determination of the appeal, the Plan will provide it to You free of charge and sufficiently in advance of the due date of the response to the Adverse Benefit Determination.

- Pre-Service Claim:  Within a reasonable period of time appropriate to the medical circumstances but no later than 30 calendar days after the Plan receives the request for review.
- Post-Service Claim:  Within a reasonable period of time but no later than 60 calendar days after the Plan receives the request for review.
- Concurrent Care Claims:  Before treatment ends or is reduced.

## RIGHT TO EXTERNAL REVIEW

Following completion of the internal appeals process, You may be eligible to submit a request for external review, which will be conducted by an independent physician external review group.  Your request for external review will have no effect on other benefits available under Your Plan.  Your request must be submitted within four months of the last adverse determination.

If you wish to pursue an external review, please send a written request to the following address:

UMR
EXTERNAL REVIEW
APPEAL UNIT
PO BOX 8048
WAUSAU WI 54402-8048

Your written request should include:  (1) Your specific request for an external review; (2) the Employee's name, address, and member ID number; (3) Your designated representative's name and address, when applicable; (4) the service that was denied; and (5) any new, relevant information that was not provided during the internal appeal.  You will be provided more information about the external review process at the time we receive Your request.

## LEGAL ACTIONS FOLLOWING APPEALS

After completing all mandatory appeal levels through this Plan, Covered Persons have the right to further appeal Adverse Benefit Determinations by bringing a civil action under the Employee Retirement Income Security Act (ERISA).  Please refer to the ERISA Statement of Rights section of this SPD for more details.  **No such action may be filed against the Plan after three years from the date the Plan gives the Covered Person a final determination on their appeal.**

**PHYSICAL EXAMINATION AND AUTOPSY**

The Plan may require that a Covered Person have a physical examination, at the Plan's expense, as often as is necessary to settle a claim.  In the case of death, the Plan may require an autopsy unless forbidden by law.

**RIGHT TO REQUEST OVERPAYMENTS**

The Plan reserves the right to recover any payments made by the Plan that were:

- Made in error; or
- Made after the date the person should have been terminated under this Plan; or
- Made to any Covered Person or any party on a Covered Person's behalf where the Plan Sponsor determines the payment to the Covered Person or any party is greater than the amount payable under this Plan.

The Plan has the right to recover against Covered Persons if the Plan has paid them or any other party on their behalf.

# FRAUD

Fraud is a crime that can be prosecuted.  Any Covered Person who willfully and knowingly engages in an activity intended to defraud the Plan is guilty of fraud.  The Plan will utilize all means necessary to support fraud detection and investigation.  It is a crime for a Covered Person to file a claim containing any false, incomplete or misleading information with intent to injure, defraud or deceive the Plan.  In addition, it is a fraudulent act when a Covered Person willfully and knowingly fails to notify the Plan regarding an event that affects eligibility for a Covered Person.  Notification requirements are outlined in this SPD and other Plan materials.  Please read them carefully and refer to all Plan materials that You receive (i.e., COBRA notices).  A few examples of events that require Plan notification would be divorce, Dependent aging out of the Plan, and enrollment in other group health coverage while on COBRA (please note that the examples listed are not all inclusive).

These actions will result in denial of the Covered Person's claim or termination from the Plan, and are subject to prosecution and punishment to the full extent under state and/or federal law.

Covered Persons must:

- File accurate claims.  If someone else - such as Your spouse or another family member - files claims on the Covered Person's behalf, the Covered Person should review the form before signing it;
- Review the Explanation of Benefits (EOB) form.  Make certain that benefits have been paid correctly based on Your knowledge of the expenses Incurred and the services rendered;
- Never allow another person to seek medical treatment under Your identity.  If Your Plan identification card is lost, report the loss to the Plan immediately; and
- Provide complete and accurate information on claim forms and any other forms.  Answer all questions to the best of Your knowledge.
- Notify the Plan when an event occurs that affects a Covered Person's eligibility.

To maintain the integrity of this Plan, Covered Persons are encouraged to notify the Plan whenever a provider:

- Bills for services or treatment that have never been received; or
- Asks a Covered Person to sign a blank claim form; or
- Asks a Covered Person to undergo tests that the Covered Person feels are not needed.

Covered Persons concerned about any of the charges that appear on a bill or EOB form, or who know of or suspect any illegal activity, should call the toll-free hotline 1-800-356-5803.  All calls are strictly confidential.

## OTHER FEDERAL PROVISIONS

**FAMILY AND MEDICAL LEAVE ACT (FMLA)**

If an Employee is on a family or medical leave of absence that meets the eligibility requirements under FMLA, Your employer will continue coverage under this Plan in accordance with state and federal FMLA regulations, provided that the following conditions are met:

- Contribution is paid; and
- The Employee has written approved leave from the employer.

Coverage will be continued for up to the greater of:

- The leave period required by the federal Family and Medical Leave Act of 1993 and any amendment; or
- The leave period required by applicable state law.

An Employee can choose not to retain group health coverage during an FMLA leave.  When the Employee returns to work following the FMLA leave, the Employee's coverage will usually be restored to the level the Employee would have had if the FMLA leave had not been taken, and no new pre-existing requirements will be imposed.  For more information, please contact Your Human Resources or Personnel office.

**QUALIFIED MEDICAL CHILD SUPPORT ORDERS PROVISION**

A Dependent Child will become covered as of the date specified in a judgment, decree or order issued by a court of competent jurisdiction or through a state administrative process.

The order must clearly identify all of the following:

- The name and last known mailing address of the participant;
- The name and last known mailing address of each alternate recipient (or official state or political designee for the alternate recipient);
- A reasonable description of the type of coverage to be provided to the Child or the manner in which such coverage is to be determined; and
- The period to which the order applies.

Please contact the Plan Administrator to request a copy of the written procedures, at no charge, that the Plan uses when administering Qualified Medical Child Support Orders.

**NEWBORNS AND MOTHERS HEALTH PROTECTION ACT**

Group health plans and health insurance issuers generally may not, under federal law, restrict benefits for a Hospital length of stay in connection with childbirth for the mother or newborn Child to less than 48 hours following a vaginal delivery, or less than 96 hours following a Cesarean section.  However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable).  In any case, plans and issuers may not, under federal law, require that a provider obtain authorization from the Plan or the issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours).

**This group health Plan also complies with the provisions of the:**

- Mental Health Parity Act.
- The Americans with Disabilities Act, as amended.
- Women's Health and Cancer Rights Act of 1998 regarding breast reconstruction following a mastectomy.

- Pediatric Vaccines regulation, whereby an employer will not reduce its coverage for pediatric vaccines below the coverage it provided as of May 1, 1993.
- Coverage of Dependent Children in cases of adoption or Placement for Adoption as required by ERISA.
- Health Insurance Portability provisions of the Health Insurance Portability and Accountability Act (HIPAA).
- Medicare Secondary Payer regulations, as amended.
- TRICARE Prohibition Against Incentives and Nondiscrimination Requirements amendments.
- The Genetic Information Non-discrimination Act (GINA).

## HIPAA ADMINISTRATIVE SIMPLIFICATION
## MEDICAL PRIVACY AND SECURITY PROVISION

**USE AND DISCLOSURE OF PROTECTED HEALTH INFORMATION UNDER HIPAA PRIVACY AND SECURITY REGULATIONS**

This Plan will Use a Covered Person's Protected Health Information (PHI) to the extent of and in accordance with the Uses and Disclosures permitted by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Specifically, this Plan will Use and Disclose a Covered Person's PHI for purposes related to health care Treatment, Payment for health care and Health Care Operations. Additionally, this Plan will Use and Disclose a Covered Person's PHI as required by law and as permitted by authorization. This section establishes the terms under which the Plan may share a Covered Person's PHI with the Plan Sponsor, and limits the Uses and Disclosures that the Plan Sponsor may make of a Covered Person's PHI.

This Plan shall Disclose a Covered Person's PHI to the Plan Sponsor only to the extent necessary for the purposes of the administrative functions of Treatment, Payment for health care or Health Care Operations.

The Plan Sponsor shall Use and/or Disclose a Covered Person's PHI only to the extent necessary for the administrative functions of Treatment, Payment for health care or Health Care Operations which it performs on behalf of this Plan.

This Plan agrees that it will only Disclose a Covered Person's PHI to the Plan Sponsor upon receipt of a certification from the Plan Sponsor that the terms of this section have been adopted and that the Plan Sponsor agrees to abide by these terms.

The Plan Sponsor is subject to all of the following restrictions that apply to the Use and Disclosure of a Covered Person's PHI:

- The Plan Sponsor will only Use and Disclose a Covered Person's PHI (including Electronic PHI) for Plan Administrative Functions, as required by law or as permitted under the HIPAA regulations. This Plan's Notice of Privacy Practices also contains more information about permitted Uses and Disclosures of PHI under HIPAA;

- The Plan Sponsor will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the Electronic PHI that it creates, receives, maintains, or transmits on behalf of the Plan;

- The Plan Sponsor will require each of its subcontractors or agents to whom the Plan Sponsor may provide a Covered Person's PHI to agree to the same restrictions and conditions imposed on the Plan Sponsor with regard to a Covered Person's PHI;

- The Plan Sponsor will ensure that each of its subcontractors or agents to whom the Plan Sponsor may provide Electronic PHI to agree to implement reasonable and appropriate security measures to protect Electronic PHI;

- The Plan Sponsor will not Use or Disclose PHI for employment-related actions and decisions or in connection with any other of the Plan Sponsor's benefits or Employee benefit plans;

- The Plan Sponsor will promptly report to this Plan any impermissible or improper Use or Disclosure of PHI not authorized by the Plan documents;

- The Plan Sponsor will report to the Plan any security incident with respect to Electronic PHI of which Plan Sponsor becomes aware;

- The Plan Sponsor will allow a Covered Person or this Plan to inspect and copy any PHI about the Covered Person contained in the Designated Record Set that is in the Plan Sponsor's custody or control.  The HIPAA Privacy Regulations set forth the rules that the Covered Person and the Plan must follow and also sets forth exceptions;

- The Plan Sponsor will amend or correct, or make available to the Plan to amend or correct, any portion of the Covered Person's PHI contained in the Designated Record Set to the extent permitted or required under the HIPAA Privacy Regulations;

- The Plan Sponsor will keep a Disclosure log for certain types of Disclosures set forth in the HIPAA Regulations.  Covered Persons have a right to see the Disclosure log.  The Plan Sponsor does not have to maintain a log if Disclosures are for certain Plan-related purposes such as Payment of benefits or Health Care Operations;

- The Plan Sponsor will make its internal practices, books and records relating to the Use and Disclosure of a Covered Person's PHI available to this Plan and to the Department of Health and Human Services or its designee for the purpose of determining this Plan's compliance with HIPAA;

- The Plan Sponsor must, if feasible, return to this Plan or destroy all of a Covered Person's PHI that the Plan Sponsor received from or on behalf of this Plan when the Plan Sponsor no longer needs the Covered Person's PHI to administer this Plan.  This includes all copies in any form, including any compilations derived from the PHI.  If return or destruction is not feasible, the Plan Sponsor agrees to restrict and limit further Uses and Disclosures to the purposes that make the return or destruction infeasible;

- The Plan Sponsor will provide that adequate separation exists between this Plan and the Plan Sponsor so that a Covered Person's PHI (including Electronic PHI) will be used only for the purpose of plan administration; and

- The Plan Sponsor will use reasonable efforts to request only the minimum necessary type and amount of a Covered Person's PHI to carry out functions for which the information is requested.

The following Employees, classes of Employees or other workforce members under the control of the Plan Sponsor may be given access to a Covered Person's PHI for Plan Administrative Functions that the Plan Sponsor performs on behalf of the Plan as set forth in this section:

Human Resources

This list includes every Employee, class of Employees or other workforce members under the control of the Plan Sponsor who may receive a Covered Person's PHI.  If any of these Employees or workforce members Use or Disclose a Covered Person's PHI in violation of the terms set forth in this section, the Employees or workforce members will be subject to disciplinary action and sanctions, including the possibility of termination of employment.  If the Plan Sponsor becomes aware of any such violations, the Plan Sponsor will promptly report the violation to this Plan and will cooperate with the Plan to correct the violation, to impose the appropriate sanctions and to mitigate any harmful effects to the Covered Person.

## DEFINITIONS

**Administrative Simplification** is the section of the law that addresses electronic transactions, privacy and security.  The goals are to:

- Improve efficiency and effectiveness of the health care system;
- Standardize electronic data interchange of certain administrative transactions;
- Safeguard security and privacy of Protected Health Information;
- Improve efficiency to compile/analyze data, audit, and detect fraud; and
- Improve the Medicare and Medicaid programs.

**Business Associate (BA) in relationship to a Covered Entity (CE)** means a BA is a person to whom the CE discloses Protected Health Information (PHI) so that a person can carry out, assist with the performance of, or perform on behalf of, a function or activity for the CE.  This includes contractors or other persons who receive PHI from the CE (or from another business partner of the CE) for the purposes described in the previous sentence, including lawyers, auditors, consultants, Third Party Administrators, health care clearinghouses, data processing firms, billing firms and other Covered Entities.  This excludes persons who are within the CE's workforce.

**Covered Entity (CE)** is one of the following:  a health plan, a health care clearinghouse or a health care provider who transmits any health information in connection with a transaction covered by this law.

**Designated Record Set** means a set of records maintained by or for a Covered Entity that includes a Covered Persons' PHI.  This includes medical records, billing records, enrollment, Payment, claims adjudication and case management record systems maintained by or for this Plan.  This also includes records used to make decisions about Covered Persons.  This record set must be maintained for a minimum of 6 years.

**Disclose or Disclosure** is the release or divulgence of information by an entity to persons or organizations outside that entity.

**Electronic Protected Health Information (Electronic PHI)** is Individually Identifiable Health Information that is transmitted by electronic media or maintained in electronic media.  It is a subset of Protected Health Information.

**Health Care Operations** are general administrative and business functions necessary for the CE to remain a viable business.  These activities include:

- Conducting quality assessment and improvement activities;
- Reviewing the competence or qualifications and accrediting/licensing of health care professional plans;
- Evaluating health care professional and health plan performance;
- Training future health care professionals;
- Insurance activities relating to the renewal of a contract for insurance;
- Conducting or arranging for medical review and auditing services;
- Compiling and analyzing information in anticipation of or for use in a civil or criminal legal proceeding;
- Population-based activities related to improving health or reducing health care costs, protocol development, case management and care coordination;
- Contacting of health care providers and patients with information about Treatment alternatives and related functions that do not entail direct patient care; and
- Activities related to the creation, renewal or replacement of a contract for health insurance or health benefits, as well as ceding, securing, or placing a contract for reinsurance of risk relating to claims for health care (including stop-loss and excess of loss insurance).

**Individually Identifiable Health Information** is information that is a subset of health information, including demographic information collected from a Covered Person, and that:

- Is created by or received from a Covered Entity;
- Relates to the past, present or future physical or mental health or condition of a Covered Person, the provision of health care or the past, present or future Payment for the provision of health care; and
- Identifies the Covered Person or with respect to which there is reasonable basis to believe the information can be used to identify the Covered Person.

**Payment** means the activities of the health plan or a Business Associate, including the actual Payment under the policy or contract; and a health care provider or its Business Associate that obtains reimbursement for the provision of health care.

**Plan Sponsor** means Your employer.

**Plan Administrative Functions** means administrative functions of Payment or Health Care Operations performed by the Plan Sponsor on behalf of the Plan including quality assurance, claims processing, auditing and monitoring.

**Privacy Official** is the individual who provides oversight of compliance with all policies and procedures related to the protection of PHI and federal and state regulations related to a Covered Person's privacy.

**Protected Health Information (PHI)** is Individually Identifiable Health Information transmitted or maintained by a Covered Entity in written, electronic or oral form.  PHI includes Electronic PHI.

**Treatment** is the provision of health care by, or the coordination of health care (including health care management of the individual through risk assessment, case management and disease management) among, health care providers; the referral of a patient from one provider to another; or the coordination of health care or other services among health care providers and third parties authorized by the health plan or the individual.

**Use** means, with respect to Individually Identifiable Health Information, the sharing, employment, application, utilization, examination or analysis of such information within an entity that maintains such information.

# STATEMENT OF ERISA RIGHTS

Under the Employee Retirement Income Security Act of 1974 (ERISA), all Covered Persons shall have the right to:

## RECEIVE INFORMATION ABOUT PLAN AND BENEFITS

- Examine, without charge, at the Plan Administrator's office and at other specified locations (such as at work sites) all documents governing the Plan, including insurance contracts, collective bargaining agreements if applicable, and a copy of the latest annual report (Form 5500 series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.  No charge will be made for examining the documents at the Plan Administrator's principal office.

- Obtain, upon written request to the Plan Administrator, copies of documents that govern the operation of the Plan, including insurance contracts and collective bargaining agreements if applicable, and copies of the latest annual report and updated summary plan description.  The Plan Administrator may make a reasonable charge for the copies.

## CONTINUE GROUP HEALTH COVERAGE

Covered Persons have the right to continue health care coverage if there is a loss of coverage under the Plan as a result of a COBRA qualifying event.  You or Your Dependents may have to pay for such coverage.  Review this SPD and the documents governing the Plan on the rules governing COBRA continuation coverage rights.

## PRE-EXISTING CONDITIONS EXCLUSION PERIOD

There will be a reduction or elimination of exclusionary periods of coverage for Pre-Existing Conditions under this group health Plan if a Covered Person has Creditable Coverage from another plan.  Covered Persons with Creditable Coverage from another plan should be provided a Certificate of Creditable Coverage free of charge, from the prior group health plan or health insurance issuer when coverage under the plan is lost, upon entitlement to elect COBRA continuation coverage, when COBRA continuation coverage ceases, if requested by the Covered Person before losing coverage, or if requested by the Covered Person up to 24 months after losing coverage.  Without evidence of Creditable Coverage, Covered Persons may be subject to a Pre-Existing Condition exclusion for up to 12 months if application is made when first eligible, or up to 18 months for Late Enrollees, after a Covered Person's Enrollment Date in coverage.

## PRUDENT ACTIONS BY PLAN FIDUCIARIES

In addition to creating rights for Covered Persons, ERISA imposes duties upon the people who are responsible for the operation of this Plan.  The people who operate this Plan, called "Fiduciaries" of this Plan, have a duty to do so prudently and in the interest of all Plan participants.

## NO DISCRIMINATION

No one may terminate Your employment or otherwise discriminate against You or Your covered Dependents in any way to prevent You or Your Dependents from obtaining a benefit or exercising rights provided to Covered Persons under ERISA.

**ENFORCING COVERED PERSONS' RIGHTS**

If a claim for a benefit is denied or ignored, in whole or in part, Covered Persons have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps an Employee can take to enforce the above rights.  For instance, if a Covered Person requests a copy of the Plan documents or the latest annual report from the Plan and does not receive them within thirty (30) days, the Covered Person may file suit in a federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay the Covered Person up to $110 a day until the materials are received, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If a claim for benefits is denied or ignored, in whole or in part, the Covered Person may file suit in a state or federal court.  In addition, if a Covered Person disagrees with the Plan's decision or lack thereof concerning the qualified status of a medical Child support order, the Covered Person may file suit in federal court.  If it should happen that the Plan fiduciaries misuse the Plan's money or if a Covered Person is discriminated against for asserting his or her rights, the Covered Person may seek assistance from the U.S. Department of Labor, or may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If the Covered Person is successful, the court may order the person sued to pay these costs and fees.  If the Covered Person loses, the court may order the Covered Person to pay these costs and fees (for example, if it finds the claim to be frivolous).

**ASSISTANCE WITH QUESTIONS**

If there are any questions about this Plan, contact the Plan Administrator.  For any questions about this statement or about a Covered Person's rights under ERISA, or for assistance in obtaining documents from the Plan Administrator, Covered Persons should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.  Covered Persons may also obtain certain publications about their rights and responsibilities under ERISA by calling the publication hotline of the Employee Benefits Security Administration.

## PLAN AMENDMENT AND TERMINATION INFORMATION

The Plan Sponsor fully intends to maintain this Plan indefinitely; however, the employer reserves the right to terminate, suspend or amend this Plan at any time, in whole or in part, including making modifications to the benefits under this Plan.  No person or entity has any authority to make any oral change or amendments to this Plan.  No agent or representative of this Plan will have the authority to legally change the Plan terms or SPD or waive any of its provisions, either purposefully or inadvertently.  If a misstatement affects the existence of coverage, the true facts will be used in determining whether coverage is in force under the terms of this Plan and in what amount.  The Plan Administrator will provide written notice to Covered Persons within 60 days following the adopted formal action that makes material reduction of benefits to the Plan, or may, in the alternative, furnish such notification through communications maintained by the Plan Sponsor or Plan Administrator at regular intervals no greater than 90 days.

### COVERED PERSON'S RIGHTS IF PLAN IS AMENDED OR TERMINATED

If this Plan is amended, a Covered Person's rights are limited to Plan benefits in force at the time expenses are Incurred, whether or not the Covered Person has received written notification from the Plan Administrator that the Plan has been amended.

If this Plan is terminated, the rights of a Covered Person are limited to Covered Expenses Incurred before the Covered Person receives notice of termination.  All claims Incurred prior to termination, but not submitted to either the Plan Sponsor or Third Party Administrator within 75 days of the Effective Date of termination of this Plan due to bankruptcy will be excluded from any benefit consideration.

The Plan will assume that the Covered Person received the written amendment or termination letter from the Plan Administrator five days after the letter is mailed.

No person will become entitled to any vested rights under this Plan.

### DISTRIBUTION OF ASSETS UPON TERMINATION OF PLAN

Post tax contributions paid by COBRA beneficiaries and/or Retirees, if applicable, will be used for the exclusive purpose of providing benefits and defraying reasonable expenses related to Plan administration, and will not inure to the benefit of the employer.

### NO CONTRACT OF EMPLOYMENT

This Plan is not intended to be, and may not be construed as a contract of employment between any Covered Person and the employer.

## GLOSSARY OF TERMS

**Accident** means an unexpected, unforeseen and unintended event that causes bodily harm or damage to the body.

**Activities of Daily Living (ADL)** means the following, with or without assistance:  Bathing, dressing, toileting and associated personal hygiene; transferring (which is to move in and out of a bed, chair, wheelchair, tub or shower); mobility, eating (which is getting nourishment into the body by any means other than intravenous), and continence (which is voluntarily maintaining control of bowel and/or bladder function; in the event of incontinence, maintaining a reasonable level of personal hygiene).

**Acupuncture** means a technique used to deliver anesthesia or analgesia, or for treating condition of the body (when clinical efficacy has been established for treatment of such conditions) by passing long, thin needles through the skin.

**Adverse Benefit Determination** means a denial, reduction or termination of a benefit or a failure to provide or make payment, in whole or in part, for a benefit.  It also includes any such denial, reduction, termination or failure to provide or make payment that is based on a determination that the Covered Person is no longer eligible to participate in the Plan.

**Ambulance Transportation** means professional ground or air Ambulance Transportation in an Emergency situation or when deemed to meet Clinical Eligibility for Coverage, which is:

- To the closest facility most able to provide the specialized treatment required; and
- The most appropriate mode of transportation consistent with the well being of You or Your Dependent.

**Ancillary Services** means services rendered in connection with Inpatient or Outpatient care in a Hospital or in connection with a medical Emergency including the following:  ambulance, anesthesiology, assistant surgeon, pathology and radiology.  This term also includes services of the attending Physician or primary surgeon in the event of a medical Emergency.

**Birthing Center** means a legally operating institution or facility which is licensed and equipped to provide immediate prenatal care, delivery and postpartum care to the pregnant individual under the direction and supervision of one or more Physicians specializing in obstetrics or gynecology or a certified nurse midwife.  It must provide for 24 hour nursing care provided by registered nurses or certified nurse midwives.

**Certificate of Creditable Coverage** means a certificate or other documentation that is provided to a person upon losing health care coverage.  The certificate or other documentation specifies how much Creditable Coverage a person has and is used to reduce the length of a Pre-Existing Condition exclusion period under a Plan.

**Child (Children)** means any of the following individuals with respect to an Employee:  a natural biological Child; a step Child; a legally adopted Child or a Child legally Placed for Adoption; a Child under the Employee's or spouse's Legal Guardianship; or a Child who is considered an alternate recipient under a Qualified Medical Child Support Order (even if the Child does not meet the definition of "Dependent").

**Clinical Eligibility for Coverage** – Refer to Covered Benefits below.

**Close Relative** means a member of the immediate family.  Immediate family includes You, Your spouse, mother, father, grandmother, grandfather, step parents, step grandparents, siblings, step siblings, half siblings, Children, step Children and grandchildren.

**COBRA** means Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended from time to time, and applicable regulations.  This law gives Covered Persons the right, under certain circumstances, to elect continuation coverage under the Plan when active coverage ends due to a Qualifying Event.

**Co-pay** is the amount a Covered Person must pay each time certain covered services are provided, as outlined on the Schedule of Benefits.

**Cosmetic Treatment** means medical or surgical procedures which are primarily used to improve, alter or enhance appearance, whether or not for psychological or emotional reasons.

**Covered Benefit** or **Clinical Eligibility for Coverage** means treatment, services, supplies, medicines or facilities necessary and appropriate for the diagnosis, care or treatment of an Illness or Injury and that meet Clinical Eligibility for Coverage as determined by the Plan.  Covered Benefits do not include those listed under the Exclusions section but include services, supplies, medicines or facilities that are:

- Generally provided in accordance with accepted medical practice and professionally recognized standards; and
- Provided safely at the appropriate level of care or services; and
- Not provided solely for the convenience of the Covered Person, his or her family, or any provider; and
- Known to be effective in improving health outcomes.  For new interventions, effectiveness is determined by scientific evidence, then by professional standards, and finally by expert opinions; and
- Cost-effective for the condition, compared to alternative interventions, including no intervention.  Cost-effective does not necessarily mean the lowest price.

In determining Covered Benefits, consideration is given to the customary practice of providers in the community or field of specialty.  However, the fact that a provider may prescribe, order, recommend or approve a service, supply, medicine or facility does not, of itself, make the service a Covered Benefit.

**Covered Expenses** means any expense, or portion thereof, which is Incurred as a result of receiving a Covered Benefit under this Plan.

**Covered Person** means an Employee or Dependent who is enrolled under this Plan.

**Creditable Coverage** means coverage an individual has under the following as defined by federal law and applicable regulations:

- A group health plan;
- Health insurance coverage (through a group or individual policy);
- Medicare;
- Medicaid;
- A medical care program of the Uniformed Services;
- A medical care program of the Indian Health Services or of a tribal organization;
- A State health benefits risk pool;
- A State Children's Health Insurance Program;
- A health plan offered under the Federal Employee Health Benefits Program;
- A public health plan, including any plan established or maintained by a State, the US government, a foreign country or any political subdivision of the same; or
- A health benefit plan under Section 5(e) of the Peace Corps Act.

Creditable Coverage shall not include coverages for liability, disability income, limited scope dental or vision benefits, specified disease, supplemental benefits and other excepted benefits as defined by federal law and applicable regulations.  A period of Creditable Coverage shall not be counted, with respect to enrollment under a group health plan, if there is a 63-day lapse in coverage between the end of the prior coverage and the beginning of the person's enrollment under this Plan.

**Custodial Care** means nonmedical care given to a Covered Person to administer medication and to assist with personal hygiene or other Activities of Daily Living rather than providing therapeutic treatment and services. Custodial Care services can be safely and adequately provided by persons who do not have the technical skills of a covered healthcare provider. Custodial Care also includes care when active medical treatment cannot be reasonably expected to reduce the disability or condition.

**Deductible** is the amount of Covered Expenses which must be paid by the Covered Person or the covered family before benefits are payable. The Schedule of Benefits shows the amount of the applicable Deductible (if any) and the health care benefits to which it applies.

**Dependent** – see Eligibility and Enrollment section of this SPD.

**Developmental Delays** are characterized by impairment in various areas of development such as social interaction skills, adaptive behavior and communication skills. Developmental Delays may not always have a history of birth trauma or other Illness that could be causing the impairment such as a hearing problem, mental Illness or other neurological symptoms or Illness.

**Durable Medical Equipment** means equipment which meets all of the following criteria:

- Can withstand repeated use.
- Is primarily used to serve a medical purpose with respect to an Illness or Injury.
- Generally is not useful to a person in the absence of an Illness or Injury.
- Is appropriate for use in the Covered Person's home.

**Effective Date** means the first day of coverage under this Plan as defined in this SPD. The Covered Person's Effective Date may or may not be the same as their Enrollment Date, as Enrollment Date is defined in the Plan.

**Emergency** means a serious medical condition, with acute symptoms that require immediate care and treatment in order to avoid jeopardy to the life and health of the person.

**Employee** – see Eligibility and Enrollment section of this SPD.

**Enrollment Date** means:

- For anyone who applies for coverage when first eligible, the first day of the Waiting Period, whichever is earlier.
- For anyone who enrolls under the Special Enrollment Provision, or for Late Enrollees, the Enrollment Date is the first day coverage begins.

**ERISA** means the Employee Retirement Income Security Act of 1974, as amended from time to time and the applicable regulations.

**Essential Health Benefits** means any medical expense that falls under the following categories, as defined under the Patient Protection and Affordable Care Act; ambulatory patient services; emergency services; hospitalization; maternity and newborn care; mental health and substance use disorder services, including behavioral health treatment; prescription drugs; rehabilitative and habilitative services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care, etc.

**Experimental, Investigational or Unproven** means any drug, service, supply, care and/or treatment that, at the time provided or sought to be provided, is not recognized as conforming to accepted medical practice or to be a safe, effective standard of medical practice for a particular condition. This includes, but is not limited to:

- Items within the research, Investigational or Experimental stage of development or performed within or restricted to use in Phase I, II, or III clinical trials (unless identified as a covered service elsewhere);

- Items that do not have strong research-based evidence to permit conclusions and/or clearly define long-term effects and impact on health outcomes (have not yet shown to be consistently effective for the diagnosis or treatment of the specific condition for which it is sought).  Strong research-based evidence is identified as peer-reviewed published data derived from multiple, large, human randomized controlled clinical trials OR at least one or more large controlled national multi-center population-based studies;

- Items based on anecdotal and Unproven evidence (literature consists only of case studies or uncontrolled trials), i.e., lacks scientific validity, but may be common practice within select practitioner groups even though safety and efficacy is not clearly established;

- Items which have been identified through research-based evidence to not be effective for a medical condition and/or to not have a beneficial effect on health outcomes.

Note:  FDA and/or Medicare approval does not guarantee that a drug, supply, care and/or treatment is accepted medical practice, however, lack of such approval will be a consideration in determining whether a drug, service, supply, care and/or treatment is considered Experimental, Investigational or Unproven.  In assessing cancer care claims, sources such as the National Comprehensive Cancer Network (NCCN) Compendium, Clinical Practice Guidelines in Oncology$^{TM}$ or National Cancer Institute (NCI) standard of care compendium guidelines, or similar material from other or successor organizations will be considered along with benefits provided under the Plan and any benefits required by law.  Furthermore, off-label drug or device use (sought for outside FDA-approved indications) is subject to medical review for appropriateness based on prevailing peer-reviewed medical literature, published opinions and evaluations by national medical associations, consensus panels, technology evaluation bodies, and/or independent review organizations to evaluate the scientific quality of supporting evidence.

**Extended Care Facility** includes, but is not limited to a skilled nursing, rehabilitation, convalescent or subacute facility.  It is an institution or a designated part of one that is operating pursuant to the law for such an institution and is under the full time supervision of a Physician or registered nurse.  In addition, the Plan requires that the facility:  Provide 24 hour-a-day service to include skilled nursing care and therapies deemed to meet Clinical Eligibility for Coverage for the recovery of health or physical strength; is not a place primarily for Custodial Care; requires compensation from its patients; admits patients only upon Physician orders; has an agreement to have a Physician's services available when needed; maintains adequate medical records for all patients; has a written transfer agreement with at least one Hospital and is licensed by the state in which it operates and provides the services under which the licensure applies.

**FMLA** means the Family and Medical Leave Act of 1993, as amended.

**Hazardous Recreational Activity** means the following:

- Competitive boxing
- Bungie-cord jumping
- Flight in ultra-light or experimental aircraft
- Handling or use of illegal explosives
- Handling of poisonous insects, reptiles or maphibians
- Hang-gliding
- Competitive martial arts
- Parachuting
- Competitive racing of any motorized vehicle
- Sky-diving

**HIPAA** means the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, and the applicable regulations.  This law gives special enrollment rights, prohibits discrimination, and protects privacy of protected health information among other things.

**Home Health Care** means a formal program of care and intermittent treatment that is:  Performed in the home; and prescribed by a Physician; and intermittent care and treatment for the recovery of health or physical strength under an established plan of care; and prescribed in place of a Hospital or an Extended Care Facility or results in a shorter Hospital or Extended Care Facility stay; and organized, administered, and supervised by a Hospital or Qualified licensed providers under the medical direction of a Physician; and appropriate when it is not reasonable to expect the Covered Person to obtain medically indicated services or supplies outside the home.

For purposes of Home Health Care, nurse services means intermittent home nursing care by professional registered nurses or by licensed practical nurses.  Intermittent means occasional or segmented care, i.e., care that is not provided on a continuous, non-interrupted basis.

**Home Health Care Plan** means a formal, written plan made by the Covered Person's attending Physician which is evaluated on a regular basis.  It must state the diagnosis, certify that the Home Health Care is in place of Hospital confinement, and specify the type and extent of Home Health Care required for the treatment of the Covered Person.

**Hospice Care** means a health care program providing a coordinated set of services rendered at home, in Outpatient settings, or in Inpatient settings for Covered Persons suffering from a condition that has a terminal prognosis.  Non-curative supportive care is provided through an interdisciplinary group of personnel.  A hospice must meet the standards of the National Hospice Organization and applicable state licensing.

**Hospice Care Provider** means an agency or organization that has Hospice Care available 24 hours a day, seven days a week; is certified by Medicare as a Hospice Care Agency, and, if required, is licensed as such by the jurisdiction in which it is located.  The provider may offer skilled nursing services; medical social worker services; psychological and dietary counseling; services of a Physician; physical or occupational therapist; home health aide services; pharmacy services; and Durable Medical Equipment.

**Hospital** means:

- A facility that is licensed as an acute Hospital; and
- Provides diagnostic and therapeutic facilities for the surgical or medical diagnosis, treatment, and care of injured and sick persons as Inpatients at the patient's expense; and
- Has a staff of licensed Physicians available at all times; and
- It is accredited by The Joint Commission (formerly known as JCAHO), or is recognized by the American Hospital Association (AHA) and is Qualified to receive payments under the Medicare program, or, if outside of the United States, is licensed or approved by the foreign government or an accreditation or licensing body working in that foreign country; and
- Always provides 24 hour nursing services by registered graduate nurses; and
- Is not a place primarily for maintenance or Custodial Care.

For purposes of this Plan, Hospital also includes Surgical Centers and Birthing Centers licensed by the state in which it operates.  Hospital does not include services provided in facilities operating as residential treatment centers.

**Illness** means a bodily disorder, disease, physical or mental sickness, functional nervous disorder, pregnancy or complication of pregnancy.  The term "Illness" when used in connection with a newborn Child includes, but is not limited to, congenital defects and birth abnormalities, including premature birth.

**Incurred** means the date the service or treatment is given, the supply is received or the facility is used, without regard to when the service, treatment, supply or facility is billed, charged or paid.

**Independent Contractor** means someone who signs an agreement with the employer as and Independent Contractor or an entity or individual who performs services to or on behalf of the employer who is not an Employee or an officer of the employer and who retains control over how the work gets done.  The employer who hires the Independent Contractor controls only the outcome of the work and not the performance of the hired service.  Determination as to whether an individual or entity is an Independent Contractor shall be made consistent with Section § 530 of the Internal Revenue Code.

**Infertility Treatment** means services, tests, supplies, devices, or drugs which are intended to promote fertility, achieve a condition of pregnancy, or treat an Illness causing an infertility condition when such treatment is done in an attempt to bring about a pregnancy.

For purposes of this definition, Infertility Treatment includes, but is not limited to fertility tests and drugs; tests and exams done to prepare for induced conception; surgical reversal of a sterilized state which was a result of a previous surgery; sperm enhancement procedures; direct attempts to cause pregnancy by any means including, but not limited to:  hormone therapy or drugs; artificial insemination; In vitro fertilization; Gamete Intrafallopian Transfer (GIFT), or Zygote Intrafallopian Transfer (ZIFT); embryo transfer; and freezing or storage of embryo, eggs, or semen.

**Injury** means a physical harm or disability to the body which is the result of a specific incident caused by external means.  The physical harm or disability must have occurred at an identifiable time and place. Injury does not include Illness or infection of a cut or wound.

**Inpatient** means a registered bed patient using and being charged for room and board at the Hospital or in a Hospital for 24 hours or more.  A person is not an Inpatient on any day on which he or she is on leave or otherwise gone from the Hospital, whether or not a room and board charge is made.

**Late Enrollee** means a person who enrolls under this Plan other than on:

- The earliest date on which coverage can become effective under the terms of this Plan; or
- A special Enrollment Date for the person as defined by HIPAA.

**Learning Disability** means a group of disorders that results in significant difficulties in one or more of seven areas including:  Basic reading skills, reading comprehension, oral expression, listening comprehension, written expression, mathematical calculation and mathematical reasoning.  Specific learning disabilities are diagnosed when the individual's achievement on standardized tests in a given area is substantially below that expected for age, schooling and level of intelligence.

**Legal Guardianship/Guardian** means the individual is recognized by a court of law as having the duty of taking care of a person and managing the individual's property and rights.

**Maximum Benefit** means the maximum amount or the maximum number or days or treatments that are considered a Covered Expense by the Plan.

**Medicare** means the program of medical care benefits provided under Title XVIII of the Social Security Act as amended.

**Mental Health Disorder** means disorders that are clinically significant psychological syndromes associated with distress, dysfunction or Illness.  The syndrome must represent a dysfunctional response to a situation or event that exposes the Covered Person to an increased risk of pain, suffering, conflict, Illness or death.

**Multiple Surgical Procedures** means when more than one surgical procedure is performed during the same period of anesthesia.

**Negotiated Rate** means the amount that providers have contracted to accept a payment in full for Covered Expenses of the Plan.

**Non-Essential Health Benefits** means any medical benefit that is not an Essential Health Benefit. Please refer to the Essential Health Benefits definition.

**Orthognathic Condition** means a skeletal mismatch of the jaw (such as when one jaw is too large or too small, too far forward or too far back).  An Orthognathic Condition may cause overbite, underbite, or open bite.  Orthognathic surgery may be performed to correct skeletal mismatches of the jaw.

**Orthotic Appliances** means braces, splints, casts and other appliances used to support or restrain a weak or deformed part of the body and is designed for repeated use, intended to treat or stabilize a Covered Person's Illness or Injury or improve function; and generally is not useful to a person in the absence of an Illness or Injury.

**Outpatient** means medical care, treatment, services or supplies in a facility in which a patient is not registered as a bed patient and room and board charges are not Incurred.

**Palliative Foot Care** means the cutting or removal of corns or calluses unless at least part of the nail root is removed or unless needed to treat a metabolic or peripheral vascular disease; the trimming of nails; other hygienic and preventative maintenance care or debridement, such as cleaning and soaking of the feet, and the use of skin creams to maintain the skin tone of both ambulatory and non-ambulatory Covered Persons; and any services performed in the absence of localized Illness, Injury, or symptoms involving the foot.

**Participating Pharmacy** means a licensed entity, acting within the scope of their license in the state in which they dispense, that has entered into a written agreement with Prescription Solutions and has agreed to provide services to covered individuals for the fees negotiated in the agreement.

**Physician** means any of the following licensed practitioners, acting within the scope of their license in the state in which they practice, who perform services payable under this Plan:  a doctor of medicine (MD), doctor of dental medicine including oral surgeons (DMD), osteopathy (DO), podiatry (DPM), dentistry (DDS), chiropractic (DC), optometry (OPT), a physician's assistant (PA), a nurse practitioner (NP), a certified nurse midwife (CNM), or a certified registered nurse anesthetist (CRNA).  The term Physician also may include, at the Plan Sponsor's discretion, other licensed practitioners who are regulated by a state or federal agency, who perform services payable under this Plan, and who are acting within the scope of their license, unless specifically excluded by this Plan.

**Placed or Placement for Adoption** means the assumption and retention of a legal obligation for total or partial support of a Child in anticipation of adoption of such Child.  The Child's placement with the person terminates upon the termination of such legal obligation.

**Plan** means WAYNE AUTOMATIC FIRE SPRINKLERS INC Group Health Benefit Plan.

**Plan Participation** means that the Covered Person and the Plan each pay a percentage of the Covered Expenses as listed on the Schedule of Benefits, after the Covered Person pays the Deductible(s).

**Plan Sponsor** means an employer who sponsors a group health plan.

**Pre-Existing Condition** means an Illness or Injury for which medical advice, diagnosis, care or treatment was recommended or received within the timeframe specified in the Pre-Existing Condition Provision section of this document.

**Prescription** means any order authorized by a medical professional for a Prescription or non-prescription drug, that could be a medication or supply for the person for whom prescribed.  The Prescription must be compliant with applicable laws and regulations and identify the name of the medical professional and the name of the person for whom prescribed.  It must also identify the name, strength, quantity and the directions for use of the medication or supply prescribed.

**Preventive / Routine Care** means a prescribed standard procedure that is ordered by a Physician to evaluate or assess the Covered Person's health and well being, screen for possible detection of unrevealed Illness or Injury, improve the Covered Person's health, or extend the Covered Person's life expectancy.  Generally, a procedure is routine if there is no personal history of the Illness or Injury for which the Covered Person is being screened.  Benefits included as Preventive/Routine Care are listed in the Schedule of Benefits and will be paid subject to any listed limits or maximums.  Whether an immunization is considered Preventive/Routine is based upon the recommendations of the Center for Disease Control and Prevention.  Preventive/Routine Care does not include benefits specifically excluded by this Plan, or treatment after the diagnosis of an Illness or Injury.

**Primary Care Physician** means a family practitioner, general practitioner, non-specializing internist (i.e., those that work out of a family practice clinic), pediatrician or obstetrician/gynecologist, nurse practitioner and Physicians assistant.  Generally, these Physicians provide a broad range of services.  For instance, family practitioners treat a wide variety of conditions for all family members; general practitioners give routine medical care; internist treat routine and complex conditions in adults; and pediatricians treat Children.

**Prudent Layperson** means a person with average knowledge of health and medicine who is not formally educated or specialized in the field of medicine.

**QMCSO** means a Qualified Medical Child Support Order in accordance with applicable law.

**Qualified** means licensed, registered or certified by the state in which the provider practices.

**Reconstructive Surgery** means surgical procedures performed on abnormal structures of the body caused by congenital Illness or anomaly, Accident, or Illness.  The fact that physical appearance may change or improve as a result of Reconstructive Surgery does not classify surgery as Cosmetic when a physical impairment exists and the surgery restores or improves function.

**Significant Break in Coverage** means a period of 63 consecutive days during which a person does not have any Creditable Coverage.  Waiting Periods are not included in the calculation of Significant Break in Coverage.

**Specialist** means a provider who treats specific medical conditions.  For instance, a neurologist treats nervous disorders, a gastroenterologist treats digestive problems, and an oncologist treats cancer patients.  Providers that are not considered a Specialist include, but are not limited to, family practitioners, non-specializing internists, pediatricians, or obstetricians/gynecologists.

**Surgical Center** means a licensed facility that is under the direction of an organized medical staff of Physicians; has facilities that are equipped and operated primarily for the purpose of performing surgical procedures; has continuous Physician services and registered professional nursing services available whenever a patient is in the facility; generally does not provide Inpatient services or other accommodations; and offers the following services whenever the patient is in the center:

- Provides drug services as needed for medical operations and procedures performed;
- Provides for the physical and emotional well being of the patients;
- Provides Emergency services;
- Has organized administration structure and maintains statistical and medical records.

**Telemedicine** means the practice of health care delivery, diagnosis, consultation, treatment, transfer of medical data and education using interactive audio, video, or data communications.

**Temporomandibular Joint Disorder (TMJ)** shall mean a disorder of the jaw joint(s) and/or associated parts resulting in pain or inability of the jaw to function properly.

**Terminal Illness or Terminally Ill** means a life expectancy of about six months.

**Third Party Administrator (TPA)** is a service provider hired by the Plan to process claims and perform other administrative services.  The TPA does not assume liability for payment of benefits under this Plan.

**Totally Disabled** is determined by the Plan in its sole discretion and generally means:

- That an Employee is prevented from engaging in any job or occupation for wage or profit for which the Employee is Qualified by education, training or experience; or
- That a covered Dependent has been diagnosed with a physical, psychiatric, or developmental disorder, or some combination thereof, and as a result cannot engage in Activities of Daily Living and/or substantial gainful activities that a person of like age and sex in good health can perform, preventing an individual from attaining self-sufficiency.
- Diagnosis of one or more of the following conditions is not considered proof of Total Disability. Conditions are listed in the most recent American Psychiatric Association Diagnostic and Statistical Manual (DSM) or the International Classification of Disease – Clinical Modification manual (most recent revision) (ICD-CM) in the following categories:

  - Personality disorders; or
  - Sexual/gender identity disorders; or
  - Behavior and impulse control disorders; or
  - "V" codes.

**Urgent Care** is the delivery of ambulatory care in a facility dedicated to the delivery of care outside of a Hospital Emergency department, usually on an unscheduled, walk-in basis.  Urgent Care centers are primarily used to treat patients who have an Injury or Illness that requires immediate care but is not serious enough to warrant a visit to an Emergency room.  Often Urgent Care centers are not open on a continuous basis, unlike a Hospital Emergency room that would be open at all times.

**Usual and Customary** means the amount the Plan determines to be the reasonable charge for comparable services, treatment, or materials in a Geographical Area.  In determining whether charges are Usual and Customary, due consideration will be given to the nature and severity of the condition being treated and any medical complications or unusual or extenuating circumstances.  **Geographical Area** means a zip code area, or a greater area if the Plan determines it is needed to find an appropriate cross section of accurate data.

**Waiting Period** means the period of time that must pass before coverage can become effective for an Employee or Dependent who is otherwise eligible to enroll under the terms of this Plan.

**Walk-In Retail Health Clinics** means health clinics located in retail stores, supermarkets, or pharmacies that provide a limited scope of preventive and/or clinical services to treat routine family Illnesses.  Such clinics must be operating under applicable state and local regulations and overseen by a Physician where required by law.

**You, Your** means the Employee.

**ADMINISTRATIVE SERVICES AGREEMENT**

**WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

**222 CAPITOL COURT**
**OCOEE, FL  34761**

**EXHIBIT "B"**

# TABLE OF CONTENTS

**Page**

**Section 1 - Definitions**........................................................................................................................ 1

**Section 2 - Term and Termination** .................................................................................................... 2

**Section 3 - Scope of Relationship** .................................................................................................... 3

**Section 4 - Service Fees** ..................................................................................................................... 4

**Section 5 - General Responsibilities of the Employer**................................................................... 5

**Section 6 - General Responsibilities of UMR** .................................................................................. 7

**Section 7 - Claims Appeal Services**................................................................................................ 14

**Section 8 - Independent Consulting Organizations**..................................................................... 14

**Section 9 - Summary Plan Description (SPD)** ............................................................................... 14

**Section 10 - Subrogation, Reimbursement or Third Party Services** ................................ 15

**Section 11 - Limitation of Liability and Indemnification**............................................................... 16

**Section 12 - Litigation Related to Covered Services** .................................................................... 17

**Section 13 - Mediation**....................................................................................................................... 17

**Section 14 - General Provisions and Signatures** .......................................................................... 17

**ADDENDUM #1  FEE SCHEDULE** .................................................................................................... 20

**ADDENDUM #2  PROVIDER RENTAL NETWORK SERVICES MEDICAL PLAN(S)** ............................ 23

**ADDENDUM #3  CUSTODIAL BANKING PROCEDURES**................................................................. 24

**ADDENDUM #4  COBRA** ................................................................................................................... 25

**ADDENDUM #5  PHARMACY SERVICES** ....................................................................................... 27

**ADDENDUM #6  NETWORK DISCOUNT GUARANTEE**.................................................................... 28

**ADDENDUM #7  BUSINESS ASSOCIATE AGREEMENT** ................................................................. 29

# ADMINISTRATIVE SERVICES AGREEMENT

This Administrative Services Agreement ("Agreement") is entered into by and between UMR, Inc. ("UMR") and WAYNE AUTOMATIC FIRE SPRINKLERS, INC., ("Employer").  The main body of this Agreement pertains to all products that are covered under this Agreement unless otherwise stated.  Addendums are attached to this Agreement and incorporated herein, to set forth any unique product issues.

## RECITALS

WHEREAS, the Employer has established one or more self-funded employee benefit plans for certain employees of the Employer and for certain dependents of such employees ("Covered Persons"); and

WHEREAS, UMR is in the business of providing third party administrative services in conjunction with self-funded employee benefit plans; and

WHEREAS, the Employer has requested that UMR provide certain administrative services in connection with the operation and administration of such Plan(s), and UMR is willing to provide such services in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the parties intending to be legally bound hereby agree as follows:

**Section 1 - Definitions.**
Defined terms may be used in the singular or plural.

1.1    "Adverse Benefit Determination" means a denial, reduction or termination of a Covered Service, or a failure to provide or make payment, in whole or in part, for a Covered Service. This also includes any such denial, reduction, termination or failure to provide or make payment that is based on a determination that the Covered Person is no longer eligible to participate in the Plan. If applicable to the Plan, an Adverse Benefit Determination may also include the rescission of a person's eligibility for the Plan, whether or not there is an adverse effect on a particular Covered Service at the time.

1.2    "Catastrophic Event" means a high-risk or high cost event including a diagnosis such as serious head injury, multiple trauma, cancer, organ transplant, cardiovascular disease, stroke, severe burn, spinal cord injury, prematurity in an infant, or high risk pregnancy.

1.3    "Certificate of Creditable Coverage" means the certificate as defined by and containing the information required by HIPAA.

1.4    "Chronic Care Professional" means a designation that UMR's disease management registered nurses attain following successful completion of the required interdisciplinary studies including psychology, social sciences, and community resources in addition to the medical expertise necessary to effectively coach individuals with chronic care issues.

1.5    "Claim" means every written or electronic request received by UMR for the payment of Covered Services under the applicable Plan.

1.6    "Covered Person" means all eligible employees and others who are covered under the applicable Plan.

1.7    "Covered Services" means any amount payable under the terms and conditions of the Plan, and as stated in the Summary Plan Description.

1.8    "ERISA" means the Employee Retirement Income Security Act of 1974 as amended and any successor thereto.

1

**1.9** "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, current amendments, and all rules and regulations promulgated thereunder.

**1.10** "Independent Contractor" means one who renders service in the course of self employment or occupation, pursuant to Internal Revenue Code.

**1.11** "Internal Revenue Code" means the Internal Revenue Code of 1986 as amended and any successor thereto.

**1.12** "Plan" means the self-funded benefit plan(s) sponsored by the Employer for Covered Persons.

**1.13** "Protected Health Information" means information that is created or received by UMR on behalf of the health Plan that relates to the past, present or future physical or mental health condition of a Covered Person, as defined under the HIPAA privacy regulations.

**1.14** "Shell" means the written document in draft form that UMR can make available to Employer, if so requested, for Employer to use as a starting point when preparing the Employer's Summary Plan Description or other plan documents.

**1.15** "Summary Plan Description (SPD)" means a written document that provides information regarding the terms of the Employer sponsored benefit Plan for Covered Persons.

**1.16** "URAC" means the Utilization Review Accreditation Commission.  URAC is a health accreditation agency that promotes health care quality through its certification and accreditation programs.

**Section 2 - Term and Termination**

**2.1** This Agreement shall be effective July 1, 2011, and shall continue in effect for twelve consecutive months from the effective date.  This Agreement shall automatically renew each year thereafter ("Renewal Date") for successive one-year terms, unless terminated as hereinafter provided.

**2.2** UMR may terminate this Agreement or certain services under this Agreement by giving written notice thereof to the Employer at least ninety (90) calendar days prior to the Renewal Date of this Agreement.  The Employer may terminate this Agreement or certain services under this Agreement by giving written notice thereof to UMR at least thirty (30) calendar days prior to the Renewal Date.  The decision to terminate this Agreement can be rescinded by mutual written agreement of both parties.

**2.3** In the event of a material breach of a party's obligations under this Agreement (other than a breach relating to payment of Covered Services or payment of service fees), the non-breaching party shall give the breaching party written notice of any breach in accordance with the Notice provision of this Agreement, and allow breaching party thirty (30) calendar days to cure said breach from the date of said notice.  In the event the breaching party fails to cure the breach within the thirty (30) calendar day period, this Agreement may be terminated by the non-breaching party at the expiration of such thirty (30) day period upon written notice.

**2.4** This Agreement may be automatically terminated by UMR as provided below, by providing written notice to Employer in the event that:

    a.    All of the Employer's Plans covered under this Agreement are discontinued; or

    b.    The Employer fails to maintain the bank account as required hereunder or fails to provide sufficient funds within which to pay Claims under the Plan, after being provided with a notice of default and fifteen (15) calendar days right to cure; or

    c.    The Employer fails to pay UMR the service fee as required when due, after being provided with a notice of default and fifteen (15) calendar days right to cure.  If any part of the service fee is disputed, the Employer shall pay UMR the undisputed portion of the service

fee as provided herein, and shall provide written details to UMR prior to the date payment of such fee is due, explaining the Employer's good faith basis for disputing such fee.  The Employer may withhold the disputed portion during pendency of such dispute, during which time both parties agree to use commercially reasonable efforts to resolve the dispute.

2.5     Notwithstanding any other provision of this Agreement, in the event of the filing by or against the Employer of a petition for relief under the Federal Bankruptcy Code, UMR shall have the right to suspend the provision of Covered Services unless and until an order is obtained from the bankruptcy court, in form and substance acceptable to UMR, authorizing such payment, and the Employer has deposited the funds necessary to pay such Covered Services in full.

2.6     In the event this Agreement is terminated, each party will promptly pay to the other any money due under this Agreement.

2.7     Any right to recover payment of any amounts due UMR or the Employer under this Agreement shall survive termination of this Agreement.

**Section 3 - Scope of Relationship**

3.1     **Contract for Services Only:**  UMR does not represent, nor has it represented, this Agreement to be an insurance policy or an indemnity agreement.  It is the intent of both parties that this Agreement is a contract for the sale of services only, and not a contract of indemnity or a policy of insurance.

3.2     **Communications:**  UMR shall be entitled to rely upon any written or oral communication from the Employer, its designated employees, agents or authorized representatives.  UMR shall assign a Strategic Account Executive to work directly with the Employer on issues related to the Plan and this Agreement.  The Employer shall designate a contact person or persons that UMR can work with on issues related to the administration of the Plan and this Agreement.

3.3     **Fiduciary:**  It is understood and agreed that Employer is the named Plan Administrator within the meaning of the Internal Revenue Code and ERISA, and UMR is not and shall not be deemed to be a fiduciary with respect to the Plan, except to the extent that it is deciding an appeal of an Adverse Benefit Determination as provided for under the Department of Labor regulations 29 CFR Part 2560.503.  UMR shall not be named or considered to be the "Plan Administrator" for purposes of ERISA.  UMR is retained under this Agreement to perform ministerial functions, not discretionary functions as clarified in the Department of Labor regulations under ERISA at 29 CFR S2509.75-8, D(2), except as stated above.

3.4     **Independent Contractors:**  It is understood and agreed that UMR is retained by the Employer only for the purposes and to the extent set forth in this Agreement, and the relationship of UMR to Employer for purposes of this Agreement shall be that of an Independent Contractor.

3.5     **Liability for Payment of Covered Services:**  It is understood and agreed that the Employer is responsible for paying for Covered Services under the Plan and that UMR shall not have any duty to use any of its funds for the payment of such Covered Services.  UMR will have no obligation to arrange for payment of Covered Services under the Plan if the Employer has not made the requisite funds available to UMR in accordance with this Agreement.

3.6     **Corporate Group Members:**  Employer acknowledges that  UMR is a member of a corporate group which includes its affiliated companies involved in the following:

- AIM Healthcare Services and Ingenix for the sale of subrogation and overpayment recovery services;
- Prescription Solutions for the sale of pharmacy benefit management services;
- BP, Inc. for the sale and risk underwriting of a stop loss policy for the purpose of insuring a portion of the funding risk assumed by Employer under the Plan.

3

To the extent the Employer chooses to purchase any of the above services from one of the listed companies, these companies will receive payment to compensate them for performing such services as stated on the Fee Schedule, elsewhere in this Agreement, or in the stop loss contract. Part of these fees may include administrative fees or other compensation for UMR in connection with the provision of such services, or stop loss commissions.

3.7    **Disclosure of Third Party Revenue:**  UMR may receive direct or indirect compensation from third parties in the course of administering Employer's employee benefit Plan.  Sources of third party compensation may include commissions paid to UMR for the placement of stop loss policies.  Third party compensation may also include interest credits and other forms of compensation such as reduced banking fees provided by financial institutions to UMR.  UMR may earn interest credits by temporarily depositing insurance premiums and other contribution amounts such as COBRA payments, before they are transmitted to the issuer or Plan.  Payments and credits may also be generated when UMR receives refund payments from providers, and deposits these amounts in a bank account while it investigates which customer the refund belongs to.  All third party compensation received is taken into account by UMR when it prices the administrative fees that it charges Employer for services under this Agreement to the extent reasonably possible, it being understood that certain compensation relates to UMR's total book of business rather than to any single customer.  UMR agrees to use commercially reasonable efforts to disclose to Employer any third party revenue directly related to Employer's Plan that UMR received during the prior twelve (12) month period.  Such information will be included in the annual 5500 report that UMR provides Employer.

## Section 4 - Service Fees

4.1    **Monthly Service Fee:**  The service fees paid by the Employer pursuant to this Agreement are intended to compensate UMR for the services specifically enumerated in the body of this Agreement.

4.2    **Due Date:**  The Employer agrees to pay the service fees to UMR in a timely manner to ensure that UMR receives the service fees on or before the last day of each calendar month for which services are being rendered.

4.3    **Fee Adjustments:**  Adjustments to monthly billing statements for retroactive enrollment or eligibility changes will be performed based on information provided by the Employer to UMR. Request for fee adjustment must be made in a timely manner but no more than three (3) months following the date of the change.

4.4    **Billing procedures:**  Employer agrees to pay service fees to UMR based on the monthly invoice that UMR provides, subject to the Fee Adjustment section of this Agreement.  UMR reserves the right to give the Employer an estimated invoice for the first month following the effective date of this Agreement.

4.5    **Change to Service Fee:**  UMR reserves the right to change the service fees applicable to this Agreement every twelve (12) months following the effective date of this Agreement unless otherwise stated on the attached Fee Schedule, subject to Employer receiving renewal information from UMR at least ninety (90) calendar days prior to the effective date.  The 90-day notice of fee change does not apply to network access fees or to stop loss rates from the stop loss vendor if UMR places Employer's stop loss coverage.  In the event that Employer needs more than a 90-day notice of fee changes prior to the renewal date, Employer is responsible for sending a written request to the UMR Strategic Account Executive at least 45 days prior to the date Employer needs the renewal information each year.  The Strategic Account Executive will then submit a request for an early renewal to the UMR pricing department. UMR also reserves the right to change the service fees sooner if additional services are being purchased by the Employer, or if one of the following conditions occur:

- The number of covered employees changes by fifteen percent (15%) or more from the average number of covered employees upon which the original quotation for this Agreement or renewal was based; or

- A division, subsidiary, or affiliated company is added to the Plan and that division, subsidiary or affiliated company requires new procedures, additional programming or implementation costs from UMR; or

- Changes are made to the Plan(s) which increase the complexity of administering the Plan(s); or

- Significant regulatory changes are made by the State or Federal government that require new procedures, additional programming or implementation costs from UMR to provide agreed upon services under the Agreement.

**4.6**   In the event Employer has at any time failed to make funds available to pay Claims for Covered Services or undisputed fees to UMR, UMR shall have the right to offset any unpaid amounts against any amounts owed to Employer by UMR, or any entity affiliated with UMR.

**4.7**   It is the intent of both parties to this Agreement that the funds utilized in accordance with this Agreement are not insurance premiums and shall in no event be construed to be insurance premiums.

**Section 5 - General Responsibilities of the Employer**

**5.1**   **Access to Protected Health Information:**  The Employer agrees to provide UMR with the names and titles of employees who are designated as individuals who are permitted to access Protected Health Information, and to notify UMR as soon as reasonably possible when this list of designated employees changes.  It is understood that UMR will not release Protected Health Information to any employee of the Employer who is not on the Employer's list of designated employees for Protected Health Information.

**5.2**   **Bank Account:**  UMR shall establish a special bank account on behalf of the Employer, in the Employer's name and tax identification number, designated for the purpose of paying Claims for Covered Services under this Agreement.  The custodial account is set up in a manner that offsets assessment of banking fees for the Employer in lieu of earning interest.  It is understood that UMR is solely the Claims paying agent for the Employer.  UMR shall be given the necessary nonexclusive authority to utilize any funds in said account for payment of Covered Services under the Plan.  UMR shall be responsible for the performance of account reconciliation. The Employer agrees to follow the Custodial Banking Procedures as attached in the Addendum section of this Agreement.

**5.3**   **Uncashed Checks:**  UMR agrees to send search letters to payees of uncashed checks that are greater than one year old. If the check remains unclaimed after thirty (30) days, the uncashed funds are returned to the Employer.  Any record keeping, reporting, or payment responsibilities set forth under any state's unclaimed property law shall be those of the Employer, to the extent such laws apply.  In no event shall UMR become a "holder" of unclaimed property, as defined in any applicable unclaimed property law, due to the failure of a Covered Person to negotiate any check issued from the account.

**5.4**   **Control of Plan Assets:**  In the event that the Plan is found to have Plan assets, the Employer shall have absolute authority with respect to such Plan assets, and UMR shall neither have nor be deemed to exercise any discretion, control or authority with respect to the disposition of Plan assets.

**5.5**   **Covered Service Information:**  The Employer is responsible for incorporating sufficient Covered Service and other Plan details into its Summary Plan Description including information on any applicable federal, state, international and local laws and/or regulations to facilitate proper

administration of the Plan(s) by UMR.  Such information should be given to UMR before UMR begins processing Claims.  In the event that the Employer amends or modifies Covered Services, the effective date of such changes shall be on the date selected by the Employer after notification to UMR, or the date reasonably possible for UMR to make needed systems or procedural changes to accommodate the change, whichever is later.

**5.6**  **Enrollment:**  The Employer agrees to determine eligibility for the Plan(s), and furnish UMR with such information as may be necessary or reasonably required by UMR to maintain adequate eligibility of Employer's Covered Persons.  Such information must be provided by the Employer in a timely manner that will allow UMR to provide services in accordance with this Agreement.  The Employer shall submit enrollment data to UMR electronically via the FTP File Transfer with PGP Encryption method, or by using the Web Based File Exchange method, Internet, diskette, or other mutually agreed upon method.

**5.7**  **Establishment of Plan:**  The Employer shall establish, maintain and appropriately finance the Plan and shall be solely responsible for the operation and administration of the Plan, except as expressly delegated to UMR in this Agreement.

**5.8**  **Interpretation of the Plan:**  The Employer shall be the final decision maker as to the interpretation of the Plan and as to the payment of Covered Services thereunder.  In the event the Employer wants UMR to make an exception to the Employer's Summary Plan Description, the Employer must notify UMR in writing of such exception using a form designated by UMR.  The Employer is fully and solely responsible for any stop loss problems that may occur as a result of making an exception to its Summary Plan Description.  The Employer is also responsible for meeting the Department of Labor's Claim's consistency regulations and other applicable regulations when exceptions are made to the SPD.  UMR shall not be liable to any degree when following directions from the Employer, its employees or agents, and Employer agrees to indemnify UMR and hold it harmless from and against any and all claims arising from the Employer's decision to make an exception to the Summary Plan Description.

**5.9**  **Legal Advice:**  It is understood and agreed that UMR is not engaged in the practice of rendering legal advice.  If the Employer requires legal or other expert advice, the Employer should consult its own legal counsel.  UMR will provide compliance assistance on applicable federal regulations to the extent reasonably possible.

**5.10**  **Medicare Coordination of Benefits and Secondary Payer Rules:**  In the event that Employer receives correspondence from Medicare relative to a Claim processed by UMR, including but not limited to a Medicare recovery demand letter or debt recovery letter, Employer is responsible for sending UMR a copy of all applicable correspondence and letters as soon as reasonably possible after receiving the documents from Medicare.  UMR will use commercially reasonable efforts to investigate whether the Employer's Plan should have paid the Claim primary to Medicare rather than secondary, and to respond to the Medicare demand or debt recovery letters.  Employer is responsible for paying applicable interest charges from Medicare, except as stated in the Limitation of Liability and Indemnification section of the Agreement.  Employer is also responsible for reimbursing Medicare for benefits if it is determined that the Plan should have paid the Claim primary to Medicare.

**5.11**  **Multiple Employer Plan:** The Employer warrants that the Plan(s) to which this Agreement applies are not intended to provide benefits to employees of two or more unrelated employers not in the same control group or under common ownership (including self-employed individuals) or their beneficiaries, and that the Plans do not constitute multiple employer welfare arrangements under federal or state law.

**5.12**  **Audit Rights:**  UMR recognizes that from time to time the Employer may wish to perform (or have performed) an audit for performance purposes.  Assistance for an annual audit will be provided by UMR at no cost to the Employer as long as the audit is based on a statistically valid random stratified sampling methodology.  Such audit may encompass any relevant information that the Employer reasonably requires, consistent with professional auditing practices and

procedures applicable to this type of auditing as mutually agreed upon by UMR and the Employer. The records requested by such auditor will be selected and compiled by UMR in the manner requested by such auditor, including, without limitation, computer selected random stratified sampling or specific types of Claims selected through random stratified selection or by stated dollar amount and/or range. The audit must encompass a statistically valid random stratified sampling of the Claims processed during no less than the recent six (6) month period and no more than the recent 18 month period, unless special or severe circumstances exist and are first agreed to by UMR, such agreement by UMR not to be unreasonably withheld. The Employer agrees that all audit costs are the sole responsibility of the Employer. Employer further agrees that any audit firm hired by the Employer will not be compensated based on a percentage of errors found, percentage of recovery or other similar contingency basis. UMR must be informed of the audit intent at least thirty (30) calendar days prior to such audit by written notice and the timing must be mutually agreed upon.  UMR will have the opportunity to review a draft report of the audit and provide responses prior to final issuance.

5.13   **Legal Obligations:** Employer shall possess ultimate responsibility and authority for the design, financing and operation of the Plan and for its compliance with ERISA and all other applicable laws and regulations, including the Internal Revenue Code. Employer shall not name UMR, or represent that UMR is, the Employer or a named fiduciary of the Plan as those terms are defined by ERISA.

**Section 6 - General Responsibilities of UMR**

6.1   **Administration of Covered Services:**  All services to be provided by UMR hereunder shall be performed pursuant to the provisions of the Employer's Summary Plan Description and subsequent amendments.  UMR shall have systems and procedures in place to comply with applicable federal laws and regulations.

6.2   **Claims Services:**  UMR agrees to perform the following services with respect to the processing and payment of Claims under the Plan:

6.2.1   During the term of this Agreement, UMR will process only those Claims which are incurred on or after the effective date set forth in Section 2.1 of this Agreement.

6.2.2   As part of the base fee, the following general Claims services will be provided:

- UMR will receive and review Claims for Covered Services under the Plan and will use commercially reasonable efforts, consistent with industry standards, to compute the Covered Services payable, if any, in accordance with the terms and conditions of the Plan.
- Correspond with the Covered Persons and providers of services if additional information is deemed necessary by UMR to complete the processing of Claims.
- Coordinate Covered Services payable under the Plan with other benefit plans, if any, according to the Coordination of Benefits provision in the Employer's Summary Plan Description.  It is understood, however, that UMR pays Claims for Medicare-eligible persons as either primary or secondary, based on the determination made by Medicare.
- Prepare the disbursement checks for the amount of Covered Services determined to be payable under the Plan. Claims will be paid in the order processed, to the extent that sufficient funds are available from the Employer's designated bank account.
- Provide an Explanation of Benefits (EOB) notice to Covered Persons each time a Claim is submitted if the Covered Person has a balance due, or as otherwise mutually agreed to in writing by the parties. The EOB will explain how much the Plan has paid towards the Claim, if any, and how much of the Claim is the Covered Person's responsibility due to cost-sharing obligations, non-covered services, penalties or other Plan provisions.  If a Claim is denied in whole or in part, the EOB will list the reason(s) for denial of services, and inform the Covered Person of his or her right to appeal.

- Provide a Remittance Advice (RA) statement to providers of services each time a Claim is submitted. The RA will explain how much the Plan has paid towards the Claim, if any, and how much of the Claim is the Covered Person's responsibility, negotiated rate or other provider discount.
- In the event that the Employer asks UMR to load data from the prior third party administrator regarding Covered Persons' lifetime maximum data or other benefit accumulators, UMR will have no obligation to verify the accuracy of such data.
- Foreign service procedures: Covered Persons who receive services in a country other than the United States will need to pay the Claim upfront and then submit the Claim to UMR for reimbursement. UMR will reimburse the Covered Person for any covered amount in U.S. currency. The reimbursed amount will be based on the U.S. equivalency rate that is in effect on the date the Covered Person paid the Claim, or on the date of service if paid date is not known.
- UMR agrees to prepare and mail 1099's to providers and other vendors, using UMR's name and tax identification number.

**6.2.3   Fraud Services**: UMR's Special Investigation Unit reviews and investigates potentially fraudulent or inappropriate billings submitted by providers and Covered Persons as a cost-containment service for Employer. Claims that are identified as potentially fraudulent or inappropriate are pended in UMR's claims system, and following investigation, the identified Claims are either paid in accordance with the Plan, or are denied for such reasons as are uncovered by the Special Investigation Unit.

**6.2.4   Overpayments**: UMR will be responsible for recovery costs and reimbursement of any unrecovered overpayment to the extent the overpayment was due to UMR's gross negligence. In the event an overpayment is made, UMR or its affiliated company(s) shall make an attempt to recover payments over one hundred dollars ($100) by sending an initial request letter to the provider and/or Covered Person requesting repayment. This will be followed by a second letter and a phone call as needed. In the event the above recovery attempts are unsuccessful, the Employer will receive written communication outlining the legal recovery processes that are available through UMR's affiliated company(s). The legal recovery processes include two options that the Employer can consider: (1) a legal recovery (collections) service, and (2) outside legal counsel who could file suit on behalf of the Plan to recover the overpayment. Based upon the written direction of the Employer, UMR will either direct its affiliated company(s) to pursue the overpayment through its legal recovery (collections) process, forward the overpayment file to outside legal counsel to file suit in a court of competent jurisdiction, or close the overpayment file and take no further action. If Employer wants to utilize its own legal counsel for recovery purposes, UMR will provide applicable information to Employer's designee, subject to HIPAA privacy regulations.

If the Employer approves sending an overpayment file to the legal recovery (collections) process and/or to outside legal counsel for litigation, the Employer will be responsible for paying the applicable commission for legal services, except as otherwise stated above in this provision.

Other third party recovery efforts: UMR has a contract with AIM Healthcare Services, Inc. ("AIM"), a cost containment recovery vendor that routinely reviews credit balances, primarily at large hospitals and providers of service throughout the United States. AIM works with the hospital/provider to identify the credit amount and Plan to which the credit belongs. The applicable credit, less recovery fee, is forwarded to the Employer.

**6.2.5   Claim Reprocessing**: At times, the Employer may want UMR to reprocess certain Claims. At the Employer's request, UMR will reprocess a reasonable number of Claims, unless such reprocessing will cause an undue business hardship to UMR. If the Claim is being reprocessed in connection with an inadvertent error made by UMR, there will be no fee to the Employer for such reprocessing. In the event, however, that certain Claims need to be reprocessed as a result of retroactive benefit or eligibility changes that the

Employer made or in connection with other action by the Employer, its employees or agents, then a Claims reprocessing fee will be charged to the Employer as stated on the Fee Schedule.  A claim reprocessing fee will also be charged to the Employer if the Employer contracts directly with a provider network and that provider network gives UMR incorrect or late fee or other provider information that necessitates adjustment of Claims.

**6.2.6** **Claims Run-Out Services:**  UMR agrees that it will use commercially reasonable efforts to process all Claims received up to the date of termination of this Agreement.  Any unprocessed Claims received near the end of this Agreement or following termination of this Agreement will be denied, unless Employer requests claims run-out services at a mutually agreed upon fee prior to the termination of this Agreement.  In the event that Claims are denied following termination of this Agreement, UMR will send an Explanation of Benefits to the Covered Person, and a Remittance Advice will be sent to the provider notifying them that the Claim cannot be processed following termination of this Agreement.

**6.2.7** **Cost Reduction and Savings Program.**  UMR agrees to provide various cost reduction services on behalf of Employer, aimed at generating savings on Claims when the primary network is not utilized.  Programs may  include but are not limited to, obtaining discounts through travel and secondary networks, fee negotiation with providers, as well as other methods used to determine billing appropriateness and reasonable and customary amounts.  In exchange for this service, UMR will retain a percentage of savings as stated on the Fee Schedule.

**6.3** **Medical Management Services:**  UMR will provide the following services for the fee as stated on the attached Fee Schedule**:**

**6.3.1** **Case Management:**  UMR agrees to provide individual case management services to Covered Persons who meet the criteria for case management which includes complex treatment plans, Catastrophic Events, trauma, transplant and chronic illness.  Case Managers work with the Covered Person and the Covered Person's physician to assist with coordinating care, utilizing in-network services when available (if applicable), and helping to ensure that effective and appropriate treatment is provided.  In the event that Medicare is the primary payer for a Covered Person's Claims, these services will be provided after Medicare funds have been exhausted.

**6.3.2** **Utilization Management:**  UMR will examine medical services for appropriateness prior to the services actually being provided. Independent medical reviews that are initiated as part of a care management function are included in the Utilization Management/Case Management fee shown on the Fee Schedule. UMR will conduct utilization management services in the following areas to the extent it is required in the Employer's Summary Plan Description:  Inpatient hospital or behavioral health services, skilled nursing facility, home health care, rehabilitation services and durable medical equipment.  UMR will provide ongoing reviews for both in-network and out-of-network facilities to determine appropriateness of care, assess discharge needs, and refer to case management as applicable to promote positive patient outcomes.  In the event that Medicare is the primary payer for a Covered Person's Claims, these services will be provided after Medicare funds have been exhausted.

**6.3.3** **Nurse Case Managers:**  UMR uses nurse case managers to conduct utilization review and case management services.  Most registered nurses are also certified case managers, including many nurses with specialty certifications in such areas as transplants, diabetes education, behavioral health, and other relevant fields.  Clinical support for the nurses is provided by UMR's internal medical directors and external clinical advisors.  UMR also has a specialty Behavioral Health team that provides utilization management and case management services according to the Plan design.

**6.3.4**   **Maternity Management:**  UMR will provide Covered Persons who are pregnant with a prenatal education program.  Through an assessment with the Covered Person, high-risk pregnancies will be identified and case management will be offered. Obstetrical nurses will provide trimester and post-partum education and assessments to all Covered Persons who are pregnant, along with a toll free number for any pregnancy-related questions.

**6.3.5**   **Disease Management:**  UMR's Disease Management Program works with Covered Persons who have chronic health conditions including asthma, chronic obstructive pulmonary disease, congestive heart failure, coronary artery disease, diabetes, hypertension and depression.  Certified Chronic Care Professionals work with the Covered Person and family members to improve the management of their conditions. UMR will provide the Employer with information on the participation, clinical and financial outcomes of the interventions.  UMR reserves the right to modify the type of chronic health conditions that are targeted, subject to prior written notice to the Employer.

The disease management program includes the issuance of targeted member messaging (TMM's) to identified Covered Persons.  Targeted messages are mailed directly to Covered Persons to provide health and medical information that may prompt action and/or promote behavior change.

**6.3.6**   **NurseLine:**  UMR provides Covered Persons with access to health information that allows Covered Persons to make good health and lifestyle choices.  Online information is available via UMR's web site.  Covered Persons can use direct links to a number of health information sites that UMR selected for quality, scope, workability and visual appeal. The web site also includes a health risk assessment and view information on topics such as specific conditions, medications, first aid and self-care, wellness, research news, and the quality of health care in the area where the Covered Person lives. Covered Persons can access articles written by UMR's health professionals on general health and wellness topics.  24 hour toll free telephone access to a registered nurse is provided by UMR to Covered Persons on a daily basis. NurseLine gives Covered Persons access to registered nurses so they may receive guidance and support when making decisions about their health and/or the health of their covered dependents. The service is offered in partnership with OptumHealth$_{SM}$.

**6.3.7**   It is understood and agreed that the medical management services provided by UMR do not in any way constitute the practice of medicine.

**6.4**   **Customer Service**:  UMR shall provide customer service to Covered Persons including assisting Covered Persons with routine questions concerning Covered Services, Claims status, appeals process, access to provider network(s), if applicable, and other Plan-related customer service functions.  UMR shall provide a toll-free number for customer service calls Monday through Friday during mutually agreed upon hours. Online services are available seven days a week, 24 hours a day.

**6.5**   **HIPAA Certificates of Creditable Coverage (COC):**  UMR shall utilize the Certificates of Creditable Coverage that a Covered Person gives the Employer or UMR at the time of enrollment, to calculate any remaining pre-existing condition exclusion period that the Covered Person may have under the terms of the Plan.  UMR has the right to rely on the Certificate of Creditable Coverage information that was provided by the issuer without further investigation of the underlying information.

UMR shall also provide a Certificate of Creditable Coverage to Covered Persons within a reasonable period of time after each of the following events occur, as required by HIPAA:

- When coverage terminates under the Plan.
- When COBRA coverage terminates, if UMR administers COBRA services for Employer.

- Upon written request from the Covered Person if such request is made within 24 months after the date coverage ends.

UMR shall mail all Certificates of Creditable Coverage to the last known address of the Covered Person via first class mail.

In the event, however, that the Employer terminates all services with UMR and selects a new Third Party Administrator (TPA), UMR will send a report to the Employer listing pertinent COC information that can be forwarded by the Employer to the new Third Party Administrator.  UMR will not be responsible for sending Covered Persons an individual Certificate of Creditable Coverage when there is no loss of coverage, but merely a transfer to a new TPA.

**6.6    Identification Cards:**  UMR will provide standard ID cards (including replacement cards) for each employee who is covered under the Employer's Plan, and such ID cards will include information applicable to covered dependents.  The Employer may, at its option, order customized ID cards for employees.  If the Employer elects to provide customized ID cards, the Employer agrees that it will be responsible for the additional cost of such ID cards.

**6.7    New York Surcharge Services:**  It is understood that the Employer is solely responsible for completing necessary New York Surcharge election forms and responding to inquiries regarding election.  Upon acceptance from the New York Public Goods Pool, UMR agrees to compile and forward to the State of New York, an electronic report that shows the liability that the Employer has for covered lives, patient services and total amount due from the Employer.  The report is compiled on a monthly or annual basis in accordance with the requirements of the State of New York for the Employer.  UMR agrees to file the report and send the applicable payment to the State of New York via a draw from the Employer's bank account. In the event that a Claim is adjusted after the New York Surcharge fee has been paid and the adjustment affects how much the provider actually receives, UMR will make an adjustment on a future report to the State.  As consideration for such services, Employer agrees to pay UMR the fee as set forth on the attached Fee Schedule.

**6.8    Massachusetts Surcharge Services:**  It is understood that the State of Massachusetts requires medical plans to pay a surcharge when Covered Persons receive medical care in the State of Massachusetts.  As part of the base medical fee, UMR agrees to calculate the amount of surcharge payments due from the Plan, and will draw the applicable amount from the Employer's bank account.  UMR will then send a check to the State of Massachusetts on behalf of the Employer.

**6.9    Maine Surcharge Services:**  It is understood that the State of Maine has enacted a tax or surcharge that must be paid when Covered Persons who reside in the State of Maine receive medical or pharmacy services in the State of Maine.  The tax is also imposed on dental services if those services are paid from the Employer's medical Plan.  As part of the base medical fee, UMR agrees to calculate the amount of surcharge payments due to the State of Maine, and will draw the applicable amount from the Employer's bank account.  UMR will then send a check to the State of Maine for the applicable amount due.

**6.10   Other Surcharges:** Employer will remain responsible for state surcharges, assessments or similar taxes imposed by governmental entities or agencies on the Plan.

**6.11   Recordkeeping:**  UMR will establish and maintain a recordkeeping system pertaining to the services to be performed hereunder.  All such records shall be available for inspection by the Employer at any time during normal business hours, upon reasonable prior notice.  UMR will maintain records and information regarding Claims filed pursuant to this Agreement and determinations made thereon for a period of seven (7) years.  UMR may retain such records or information by scanning or otherwise.

**6.12   Reports:**  As part of the base service fee, UMR will provide the Employer with the following reports:

- Monthly financial reports.
- Monthly cash disbursement reports via UMR's web based check register.
- Ad-hoc reports that the Employer requests are available up to the maximum number of hours listed on the attached Fee Schedule.
- An annual report that the Employer can use to complete the 5500 form or 990 form, including such details as plan period, plan type, beginning and ending employee enrollment counts, revenue, and commission information.

**Additional Online Services:**

UMR will provide the Employer with the following encrypted online service that is compliant with HIPAA privacy and security regulations:

- **Eligibility and Benefits Inquiry:**  Online eligibility inquiry provides the Employer with such information as the Covered Person's group name, employee name, identification number, date of birth, address, effective date and termination date.  Online benefit inquiry provides specific benefit information for each Covered Person such as provider network, description of benefits under the Plan, out-of-pocket maximums and other details that pertain to the Plan.
- **Claims Inquiry:**  Covered employees can review the status of their own Claims online after they register online and obtain a unique ID and password to ensure privacy.  Online Claims inquiry by the Employer is also available, however, the Employer is responsible for ensuring that its employees comply with HIPAA privacy regulations.
- **Monthly Online Reports:** The online system provides Employer with monthly reports containing Plan performance details.  The Employer can also use online data to develop ad-hoc queries such as census information, claim activity and large claim detail.
- **Banking:**  The Employer has online access to the check register and can search for disbursement information at the transaction level.  This could include transaction amounts by type and date, or transaction amounts at the check level (check number, date, payee, amount or check requisition number).
- **ID Cards:**  The Employer and covered employee can order replacement or additional ID cards online.
- **Pharmacy Services (Prescription Solutions):** The Employer and Covered Persons can obtain information on preferred product listings, participating pharmacies, claim reimbursement form, and quarterly newsletters.
- **Medstat Advantage Suite®:**  An interactive web-based application that provides the Employer with access to up to 24 months of Plan performance, claim experience, and prescription drug and cost trend data, in user-modifiable report formats.  This decision-making tool helps the Employer with financial planning and medical plan management.  Employer agrees that UMR is authorized to release claims data to Medstat on behalf of the Employer, for purposes of providing this service.

If additional (Ad-Hoc) reports are needed by the Employer, or customization of the reports is requested, UMR will charge an additional fee for such agreed upon services.

**6.13   Transition to new TPA:**  UMR will cooperate with the Employer's transition to a new Third Party Administrator upon termination of this Agreement and will provide cancellation reports to the Employer upon request.  Employer can obtain a list of the available cancellation reports and applicable fees from the Strategic Account Executive.

**6.14   Stop Loss:**  In the event that Employer has obtained stop loss insurance coverage for funding Plan benefits in excess of certain specified individual and aggregate limits, UMR will use commercially reasonable efforts to identify, track and file all specific stop loss insurance Claims with the stop loss carrier, on behalf of the Employer.  The Employer, however, is responsible for providing UMR with a copy of the stop loss policy by the effective date of this Agreement or as soon thereafter as reasonably possible, if UMR did not place the Employer's stop loss coverage

with the carrier.  Employer shall be responsible for payment of the premium for the stop loss insurance.

If Employer has aggregate stop loss coverage, UMR agrees to notify the stop loss carrier of any potential Claims that exceed the stop loss policy's attachment point, based on preliminary diagnosis or dollar amount of Claims or claim estimates that meet or exceed applicable thresholds.  It is understood that UMR shall not be required to process Claims for Covered Services other than in the order that Claims are received, and no priority will be given to Claims merely because the stop loss year is coming to a close.  In no event shall UMR have any liability for coverage decisions taken or any omissions by any stop loss insurance carrier, and UMR shall not be held liable for any Claims not covered by the stop loss carrier even if such Claims were paid by the Plan.  It is understood that UMR cannot represent or warrant a carrier's stop loss coverage or any terms of a carrier's stop loss coverage.

**6.15  Interruption by Disasters:**  UMR will take commercially reasonable steps to prevent and recover from disruptive events that are beyond its control, and represents that it has in place a disaster recovery plan in an extent reasonably adequate for a business of the size and complexity of UMR.

**6.16  TelaDoc Services:**  UMR contracts with an outside vendor to provide TelaDoc services for Covered Persons on behalf of the Plan, for the fee as stated on the Fee Schedule. The vendor contracts with licensed physicians who consult with Covered Persons via telephone or web-based video regarding a medical condition that the Covered Person is experiencing.  Employer is responsible for notifying Covered Persons that if they choose to utilize TelaDoc services, they will need to complete a comprehensive medical history disclosure form either online, by paper, or by telephone (for an additional fee), pay the applicable fee to TelaDoc, and cooperate with any other reasonable requirements that TelaDoc may require before services can be provided by a physician. Covered Persons will be provided with toll-free access to telephone medical consultation and health information services from a licensed physician 24 hours a day, seven days a week, or, upon request, Covered Persons will be provided with secure web-based video access during available hours seven days a week.  Based on the medical consultation, the provider may direct the Covered Person to the nearest emergency facility if a situation appears to be life-threatening, or if not life-threatening, the physician may prescribe medication as necessary (short-term only) for certain types of ailments, advise the person to contact their own physician, or provide general advice on how to self-treat a condition that does not appear to be life-threatening or urgent.  It is understood that the TelaDoc physicians will not prescribe any DEA controlled substances or narcotics, and that TelaDoc does not guarantee that a prescription will be issued.

**6.17  Medicare Reporting:**  UMR agrees to provide the Centers for Medicare and Medicaid Services (CMS) with a quarterly eligibility file that contains social security numbers and other information on Covered Persons and the Employer, as required by the Medicare Secondary Payer Mandatory Reporting Provisions in Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007. Employer agrees to timely provide UMR with all reasonable data that UMR requests, and in an agreed upon format, to enable both parties to comply with the reporting requirements. To the extent noncompliance penalties result from Employer's actions or inactions, UMR shall not be responsible for the penalties.

**Section 7 - Claims Appeal Services**

UMR will provide Claims appeal services in compliance with current Department of Labor regulations, provided that UMR has received the applicable Summary Plan Description from the Employer prior to receiving the appeal.  Covered Persons who receive an Adverse Benefit Determination can file an appeal with UMR within the timelines established in the Employer's Summary Plan Description.  UMR will allow a seven (7) business day mail time in addition to the maximum appeal timelines listed in the above documents.  It is understood that UMR will provide up to two appeal levels for Claims that it has processed, as mutually agreed to in writing by the parties. In addition, and if applicable to Employer's Plan, UMR agrees to send a voluntary appeal to an external vendor for review in compliance with health care reform regulations.  Any additional appeal options will be the sole responsibility of the Employer.  It is understood that UMR is not responsible for handling appeals on claim-related decisions that were originally made by another vendor of the Employer's.

**Section 8 - Independent Consulting Organizations**

**8.1**    UMR utilizes certain independent organizations for consultation review when needed to determine the medical status of an individual.  UMR selects independent consultants prudently based on quality of the reviews, availability of specialists, timeliness of reviews, and fees associated with those reviews.  UMR makes every effort to utilize independent consultants who are URAC accredited and who charge no more than market rates for the reviews.  The independent consultants used will have appropriate training and experience in the field of medicine involved in the medical judgment.

**8.2**    It is understood that UMR may send a Claim to an independent consultant under any of the following circumstances:

- During an initial Claim review, when there is insufficient information in a Covered Person's medical record to make a decision regarding the Claim, or if there is a question regarding the experimental/investigational nature of a procedure.
- To comply with Department of Labor regulations, when a Claim was denied based on clinical necessity, medical judgment or experimental/investigational reasons, and the denied Claim is later appealed.

**8.3**    In the event that UMR incurs charges from an independent consulting organization to determine the medical status of an individual as outlined above, the Employer understands and agrees that the cost of such independent consulting services shall be the responsibility of the Employer except to the extent covered through the Utilization Management provision in this Agreement.  It is also understood that the cost of each review may vary based on the medical issues being reviewed.

**Section 9 - Summary Plan Description (SPD)**

**9.1**    UMR shall provide a Summary Plan Description Shell to the Employer, if requested, that can be used as a starting point to develop a final document that reflects the Employer's intended benefit design.  It is understood that UMR will make reasonable efforts to update its Shell as is needed to maintain compliance with federal regulations, however compliance with applicable laws and regulations is the responsibility of the Employer.  The Employer is responsible for ensuring that any changes it makes to UMR's Shell will be in compliance with federal and other applicable laws.  Employer is solely responsible for the final content of the Summary Plan Description.  UMR shall not have the power or authority to alter, modify, or waive any terms of the Plan.

**9.2**    The Employer is responsible for incorporating wording in its SPD if the Plan is subject to any state or international regulations or benefit mandates.

**9.3**    UMR will provide Employer with an electronic or paper copy of the Summary Plan Description and one copy of amendments, if any, for each applicable product, and will post the document(s) on UMR's website if requested.  UMR will use its standard format when compiling the documents,

however Employer can request customization of the document at an additional cost. Customization includes but is not limited to such things as colored covers, binders, different formats for the SPD and other non-standard formats.

**9.4**    The Employer understands and agrees that it is responsible for carefully and thoroughly reviewing the Summary Plan Description proof(s) that UMR sends to the Employer, and after determining that the document(s) accurately reflect the intent of the Employer, Employer shall sign and return the Acceptance Page to UMR.  The Acceptance Page is a form that the Employer must sign after reviewing the Summary Plan Description proof, confirming that the proof accurately reflects the intent of the Employer.  UMR agrees to have a completed copy of the document(s) to the Employer within 30 calendar days following receipt of the signed Acceptance Page from the Employer.

**9.5**    If the Employer's Summary Plan Description is not finalized and approved by Employer before UMR begins administering the Plan(s), UMR is not responsible for any conflicts that may occur if changes are made by the Employer.  This does not apply to amendments that the Employer may make at a later date to the extent those changes become effective after UMR has been notified of the change.

**9.6**    The Employer is responsible for complying with any applicable regulations and timelines governing distribution of the Summary Plan Description and amendments to Covered Persons, and furnishing copies of other plan-related documents to Covered Persons and others as may be required by law or otherwise.

## Section 10 - Subrogation, Reimbursement or Third Party Services

**10.1**    UMR and its affiliated company agree to provide the Employer with certain administrative services with respect to the Plan's subrogation provisions.  Such services shall include, but not be limited to: contacting the claimant to determine the applicability of the subrogation provisions; notifying the claimant or his or her representative of the Plan's subrogation provisions; reserving any rights the Plan may have to recover under the subrogation provisions; and requesting repayment under the Plan's subrogation provision.

**10.2**    In providing the above services, UMR does not represent or guarantee that it will discover or pursue each and every subrogation opportunity, nor that its attempt at collection will be successful, however UMR agrees to use commercially reasonable efforts to identify and pursue potential subrogation Claims that are at or above the dollar threshold mutually agreed to in writing by the parties.

**10.3**    If UMR and its affiliated company are unsuccessful in their initial collection attempts, UMR may engage outside services to assist in the recovery efforts.  UMR will manage and oversee these services and the Employer shall not be responsible for payment for such services except as provided for in the attached Fee Schedule of this Agreement.  In no event is this provision to be interpreted to imply that UMR is engaged in the practice of providing legal services or offering legal advice to the Employer.

**10.4**    UMR shall provide subrogation services on a contingency basis.  In the event UMR or its affiliated company is able to effectuate a recovery, whether in full or in part, UMR shall be entitled to the subrogation fee as set forth in the attached Fee Schedule of this Agreement.

**10.5**    In the event that Employer directs UMR to stop working on a particular subrogation Claim because the Employer wants to handle the subrogation Claim itself or for other reasons not related to UMR's negligence, UMR retains the right to charge Employer a reasonable fee for costs incurred prior to receiving such notification from Employer.

**10.6**    UMR will provide monthly online subrogation reports to the Employer.

10.7    UMR shall have authority to accept settlement on subrogation Claims for less than 100% of the original claim without seeking prior written approval from the Employer, provided that the original claim is no more than an amount mutually agreed to in writing by the parties for settlement authority. Settlements would be considered when there is contributory negligence, medical causation issues, or limited money.

**Section 11 - Limitation of Liability and Indemnification**

11.1    **Employer Indemnifies UMR:**  Employer will indemnify UMR and hold UMR harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, that UMR incurs, including reasonable attorneys fees, which arise out of (i) the gross negligence or willful misconduct of Employer or Employer's vendors, subcontractors or authorized agents in the performance of their obligations under this Agreement or any other agreements entered into with such third parties on Employer's behalf  (ii) Employer's material breach of this Agreement, all as determined by a court or other tribunal having jurisdiction of the matter  (iii) a breach of any other agreements UMR enters into with such third parties on Employer's behalf, all as determined by a court or other tribunal having jurisdiction of the matter (iv) third party claims brought against UMR as the claims administrator (e.g. a claim raised by the federal government based on the federal Medicare Secondary Payor laws). This provision shall survive the termination of this Agreement.

11.2    **UMR Indemnifies Employer:**  UMR will indemnify Employer and hold Employer harmless against any and all losses, liabilities, penalties, fines, costs, damages, and expenses, that Employer may incur, including reasonable attorneys fees, which arise out of (i) the gross negligence or willful misconduct of UMR or UMR's vendors, subcontractors or authorized agents in the performance of their obligations under this Agreement or (ii) UMR's material breach of this Agreement, all as determined by a court or other tribunal having jurisdiction of the matter. Notwithstanding the foregoing, Employer will remain responsible for payment of Covered Services and UMR's indemnification will not extend to indemnification of Employer or the Plan against any claims, liabilities, damages, judgments or expenses that constitute payment of Covered Services.  This provision shall survive the termination of this Agreement.

11.3    **Complying with Laws:**  It is understood that UMR is responsible for complying with laws applicable to third party administrators, and for having systems in place to comply with other laws and regulations as described in Employer's Summary Plan Description.  It is further understood that Employer is responsible for complying with applicable state, federal and other laws and regulations with respect to the Plan.  Both parties indemnify and hold harmless the other party for their non-compliance.

11.4    **Loss of Goodwill:**  Notwithstanding any other provision in this Agreement to the contrary, in no event shall either party be liable for the loss of goodwill, or for special, indirect, incidental or consequential damages arising from Employer's receipt or use of services, or UMR's delivery of services hereunder, regardless of whether such claims arise in tort or in contract.  Neither party may assert any claims against the other party more than two (2) years after the termination of this Agreement.

11.5    **Reliance on Data:**  UMR is not responsible or liable for any acts or omissions made pursuant to any direction, consent, or other request reasonably believed by UMR to be genuine and from an authorized representative of Employer.  UMR is not responsible or liable for acts or omissions made in reliance on erroneous data provided by Employer, its employees or agents, or the failure of Employer to perform its obligations under this Agreement.

11.6    **TelaDoc Indemnification:**  Employer understands that TelaDoc is an independent contractor and is not affiliated with UMR in any way.  Employer agrees and understands that UMR does not provide medical advice or warrant the advice provided by TelaDoc.

   **IN NO EVENT SHALL UMR BE FOUND RESPONSIBLE OR LIABLE IN ANY WAY OR TO ANY EXTENT FOR ANY LOSSES, CLAIMS OR DAMAGES, INCLUDING BUT NOT LIMITED TO CONSEQUENTIAL, SPECIAL, PUNITIVE, INCIDENTAL OR DIRECT OR INDIRECT**

**DAMAGES RESULTING FROM THE SERVICES PROVIDED BY TELADOC AND ITS EMPLOYEES, SUBCONTRACTORS AND AGENTS.**

11.7    The Limitation of Liability and Indemnification provisions shall survive the termination of this Agreement.

### Section 12 - Litigation Related to Covered Services

12.1    **Litigation Against UMR:**  In actions against UMR, UMR will select and retain defense counsel to represent UMR's and the Plan's interest if a demand is asserted, or litigation or administrative proceedings are begun by a Covered Person or health care provider against UMR, to recover benefits for Covered Services or otherwise related to UMR's duties under this Agreement.

12.2    **Litigation Against Employer:**  In actions against Employer, Employer will select and retain defense counsel to represent Employer and the Plan's interest if a demand is asserted, or litigation or administrative proceedings are begun by a Covered Person or health care provider against Employer, to recover benefits for Covered Services or otherwise related to Employer's duties under this Agreement.

12.3    **Litigation Against UMR and Employer:**  In actions against both Employer and UMR, and provided no conflict of interest arises between the parties, the parties may agree to joint defense counsel.  If the parties do not agree to joint counsel, then each party will select and retain defense counsel to represent its own interest.

12.4    **Litigation Fees and Costs:**  All reasonable legal fees and costs for the defense related to Covered Services will be paid by Employer (except as provided in Section 11.2), provided UMR gives Employer reasonable advance notice of its intent to charge Employer for such fees and costs, and UMR consults with Employer throughout the case in a manner mutually agreed to by the parties.

### Section 13 - Mediation

In the event that any dispute, claim, or controversy of any kind or nature relating to this Agreement arises between the parties, the parties agree to meet and make a good faith effort to resolve the dispute. If the dispute is not resolved within thirty (30) days after the parties first met to discuss it, and either party wishes to pursue the dispute further, that party will refer the dispute to non-binding mediation under the Commercial Mediation Rules of the American Arbitration Association ("AAA"). In no event may the mediation be initiated more than one year after the date one party first gave written notification of the dispute to the other party. A single mediator engaged in the practice of law, who is knowledgeable about ERISA for non-governmental Plans and employee benefit plan administration, will conduct the mediation under the then current rules of the AAA. The mediation will be held in a mutually agreeable site. Nothing herein is intended to prevent either party from seeking any other remedy available at law including seeking redress in a court of competent jurisdiction.  This provision shall survive the termination of this Agreement.

### Section 14 - General Provisions and Signatures

14.1    **Amendment:**  This Agreement may be amended only by mutual written agreement by an authorized officer of each of the parties, except that this Agreement shall automatically be updated if new federal regulations require modification of one or more of the provisions in this Agreement.  When the Agreement needs to be amended, UMR will send the Employer an electronic or paper copy of the amendment for review and signature.  The authorized officer for the Employer needs to sign each agreed upon amendment with an original signature or an original signature stamp, and return two signed paper copies of the entire document to UMR. The UMR authorized officer will then countersign the amendments with original signature or original signature stamp, and one original will be returned to the Employer.  UMR does not accept faxed signatures on contractual documents.

**14.2**   **Subcontractors:**  Employer agrees that UMR can use its affiliates as subcontractors, or other subcontractors, to perform services under this Agreement. UMR will be responsible for those services to the same extent that UMR would have been responsible had UMR performed those services without the use of an affiliate or subcontractor.

**14.3**   **Waiver/Estoppel:**  Nothing in this Agreement is considered to be waived by any party, unless the party claiming the waiver receives the waiver in writing. No breach of the Agreement is considered to be waived unless the non-breaching party waives it in writing. A waiver of one provision does not constitute a waiver of any other. A failure of either party to enforce at any time any of the provisions of this Agreement, or to exercise any option which is herein provided in this Agreement, will in no way be construed to be a waiver of such provision of this Agreement.

**14.4**   **Entire Agreement:**  This writing, including the body of the Agreement and any addenda attached hereto, shall constitute the entire Agreement of the parties and no agent or employee of either party has authority to change this Agreement or waive any of its provisions except as otherwise expressly provided herein.

**14.5**   **Assignment:**  Neither party may assign any of its rights or obligations under this Agreement without the written consent of the other party.

**14.6**   **Headings:**  The captions and headings throughout this Agreement are for convenience and reference only, and the words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision, or to the scope or intent, of this Agreement.

**14.7**   **Governing Law and Jurisdiction:**  This Agreement shall be governed by and construed in accordance with the laws of the state of Wisconsin, except as to any applicable federal laws, without giving effect to the principles of conflicts of law thereof.

**14.8**   **Savings Clause:**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof is held to be invalid, illegal or unenforceable under any applicable law or rule in any jurisdiction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without invalidating the remainder of this Agreement.  If this is not possible, such provision shall be deemed stricken and deleted from this Agreement, as the case may require, and this Agreement shall then be construed and enforced to the maximum extent permitted by law and to achieve the fundamental intent of the parties.

**14.9**   **Counterparts:**  This Agreement may be executed by the parties hereto in counterparts, and taken together, such counterparts shall constitute the one and same document.

**14.10**  **Force Majeure:**  Neither party shall be liable for any delay or non-performance of any covenant contained herein, nor shall any such delay or non-performance constitute a default hereunder, or give rise to any liability for damages if such delay or non-performance is caused by an event of force majeure.  As used herein, the term "force majeure" means any act or explosion, action of the elements, strike or other labor relations problem, restriction or restraint imposed by law, rule or regulation of any public authority, whether federal, state, or local, and whether civil or military, act of any military authority, interruption of transportation, facilities or any other cause which is beyond the reasonable control of such party and which by the exercise of reasonable diligence such party is unable to prevent.  The existence of any event of force majeure shall extend the term of performance on the part of such party to complete performance in the exercise of reasonable diligence after the event of force majeure has been removed.

**14.11**  **Change in Law:**  If any change in law occurs that materially alters the rights or obligations of either party under this Agreement, the parties shall equitably adjust the terms of this Agreement to take into account such change in law.

**14.12   Use of Name:**  The parties agree not to use each other's name, logo, service marks, trademarks or other identifying information without the written permission of the other; provided, however, Employer grants UMR permission to use Employer's name, logo, service marks, trademarks or other identifying information to the extent necessary for UMR to carry out its obligations under this Agreement (e.g. on SPDs and ID cards).

**14.13   Notices:**  Any notices, demands, or other communications required under this Agreement will be in writing and may be provided via electronic means or by United States Postal Service by certified or registered mail, return receipt requested, postage prepaid, or delivered by a service that provides written receipt of delivery.  All notices will be addressed as follows, or to such other address as a party may identify in a notice to the other party:

| | |
|---|---|
| **UMR, INC** | **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.** |
| **JAY ANLIKER** | **222 CAPITOL CT** |
| **11 SCOTT ST STE 100** | **OCOEE FL  34761** |
| **WAUSAU WI  54403-4808** | |

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates indicated below.

**UMR, Inc.**                                    **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

By _____          By _____
         Signature                                              Signature

         Jay Anliker                                            Jeanne R. Jewett
         Print Name                                           Print Name

Title    President and CEO                    Title    Human Resources Director

Date                                                    Date
Signed    8/23/11                               Signed    August 12, 2011

19

**14.12**  **Use of Name:**  The parties agree not to use each other's name, logo, service marks, trademarks or other identifying information without the written permission of the other; provided, however, Employer grants UMR permission to use Employer's name, logo, service marks, trademarks or other identifying information to the extent necessary for UMR to carry out its obligations under this Agreement (e.g. on SPDs and ID cards).

**14.13**  **Notices:**  Any notices, demands, or other communications required under this Agreement will be in writing and may be provided via electronic means or by United States Postal Service by certified or registered mail, return receipt requested, postage prepaid, or delivered by a service that provides written receipt of delivery.  All notices will be addressed as follows, or to such other address as a party may identify in a notice to the other party:

| UMR, INC | WAYNE AUTOMATIC FIRE SPRINKLERS, INC. |
|---|---|
| **JAY ANLIKER** | **222 CAPITOL CT** |
| **11 SCOTT ST STE 100** | **OCOEE FL  34761** |
| **WAUSAU WI  54403-4808** | |

IN WITNESS WHEREOF, the parties have signed this Agreement on the dates indicated below.

**UMR, Inc.**                                                 **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

By _____          By _____
          Signature                                                        Signature

          Jay Anliker                                            _____
          Print Name                                                      Print Name

Title     President and CEO                       Title  _____

Date
Signed  _____          Date
Signed  _____

19

## ADDENDUM #1

## FEE SCHEDULE

Effective Date:   July 1, 2011

Product Type:   Medical

Plan Number:   7670-00-410975

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| 0001 | Base Medical Service Fee | | |
| | -7-1-2011 through 6-30-2012 | * PEPM | $30.75 |
| | -7-1-2012 through 6-30-2013 | * PEPM | $31.66 |
| | -7-1-2013 through 6-30-2014 | * PEPM | $32.60 |
| 0514 | Broker Commission | * PEPM | $11.30 |
| 1022 | Prescription Solutions Fee Credit to Employer | * PEPM | -$7.00 |
| | **ADDITIONAL SERVICE FEES** | | |
| | **COBRA Services** | | |
| 0528 | COBRA Notification letter to new hire | * PEPM | $.30 |
| 0529 | Standard COBRA Services | * PEPM | $1.05 |
| 0531 | COBRA Administration for Outside carriers (Aetna Dental and Humana Vision) | * PEPM | $.10 |
| | **Enrollment Services** | | |
| 0526 | HIPAA - Certificates of Creditable Coverage | * PEPM | $.25 |
| | **ID Card Services** | | |
| 0200 | Mail ID Cards to Employee's Home - Ongoing | | Included in Base Fee |
| 0233 | ID Cards – Bulk Ship to Employer – Initial group | | No Charge |
| | **Banking Services** | | |
| 0306 | Custodial Banking Setup | | Fee Waived |
| 0307 | Custodial Banking Maintenance Charges | Per Month | $450 |
| | **Reporting/Special Data Services** | | |
| 0417 | Custom Ad-Hoc Reports – Request System | Per Hour | $100/hr after 2 hours per year |
| 0420 | Medstat Reporting (additional fees will apply for history loads) | | Included in Base Fee |
| 1203 | New York Surcharge – Filing and Administration | | Included in Base Fee |
| | **Network/Managed Care** | | |
| 1400 | OptumHealth Care Solutions (URN transplant network). (Effective date is later of date listed above or the date Employer signs and submits paper work to URN). | | Cost per transplant basis |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 1406 | Network Access Fees | | |
| | UnitedHealthcare Choice Plus Network | | Included in Base Fee |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings Retained | 30% |
| | **Medical Management Services** | | |
| 0745 | Maternity Management | *  PEPM | $.65 |
| 0744 | Utilization Management/Case Management (Includes NurseLine) | *  PEPM | $3.25 |
| 0746 | Disease Management | *  PEPM | $3.90 |
| 0740 | Medical Management Bundled Discount | *  PEPM | - $0.75 |
| | **Prescription Solutions Pharmacy Services** | | |
| 1003 | Pharmacy Prior Authorization | Per Review | $20 |
| 1006/ 1024 | Pharmacy Benefit Management- Rebates | Percent of rebates retained | 100% Incentivized Benefits |
| 1007 | Electronic Claim Fee | Per Electronic Claim | $0.00 |
| 1008 | Paper Claim Fee | Per Paper Claim | $1.75 |
| 1009 | Retail Discount Off Average Wholesale Price (AWP). | Brand Claim Net Effective Generic Claim | AWP minus 17.75% AWP minus 55% |
| 1010 | Mail Order Discount off Average Wholesale Price | Brand Claim Net Effective Generic Claim | AWP minus 24% AWP minus 68% |
| 1011 | Dispensing Fee | Per Retail Claim Per Mail Order Claim | $1.50 $0.00 |
| 1013 | Compound Retail Dispensing Fee | Per Claim | $7.50 |
| 1015 | Specialty Pharmacy Program –    Dispensing Fee –    AWP Discount | Per Claim Per Claim | $2.50 Varies in price by individual product, generally ranging from AWP minus 5% to AWP minus 70% per Claim. |
| | **Booklets/SPD Services** | | |
| 0922 | SPD Booklet Printing (if requested) | Per Booklet | $4.40 (Quantity 750) |
| | **Billing** | | |
| 0808 | Vendor Contract Pass Thru (UMR remits revenue back to vendor) - Teledoc | | No Charge |
| | **Claim Services** | | |
| 0105 | Subrogation Services | Percent of Recoveries retained | 25% of recoveries; or 33% if handled by outside legal counsel. |
| 0136 | Stop Loss Interface Fee | | Included in Base Fee through 6-30-2014 |
| 0140 | Claim Reprocessing (in accordance with Claim Reprocessing provision of Agreement) | Per Claim | $25 |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **Miscellaneous Services** | | |
| 9933 | TelaDoc Services | * PEPM | $1.50 |

\*     PEPM – Per Employee Per Month (covered employee)


**NOTE:**  Certain pharmacies may be exempt from the above rates and discounts if they are located in a state that elects to participate at a state fee schedule rate.

**NOTE:**  UMR agrees to use commercially reasonable efforts to ensure that the Plan remains cost neutral when Average Wholesale Pricing (AWP) modifications occur, however it is understood that UMR has no control over changes in federal, state or other applicable law or regulation that requires AWP modifications, or if there is a material change to the AWP as published by the pricing agency that establishes Average Wholesale Prices.

**NOTE:**  Stop loss interface fee surcharge of $2.50 PEPM applies if stop loss coverage is not placed with a UMR preferred market. Consult your UMR representative for a list of preferred markets.

## ADDENDUM #2

## PROVIDER RENTAL NETWORK SERVICES
## MEDICAL PLAN(S)

### Section 1 - Definitions

**1.A**  "Preferred or Participating Provider" means any Provider who is licensed to provide health or dental care services, as applicable, and has contracted with the PPO network to provide services to Covered Persons at discounted rates.

**1.B**  "Preferred Provider Organization (PPO)" means a mode of health care delivery whereby a sponsoring group negotiates price discounts with Providers.

**1.C**  "Provider" means physicians, hospitals, and any other Providers of health care or other allied or related products or services.

**1.D**  "Rental Network (Network)" means a sponsoring group that contracts with Providers under a PPO arrangement.

### Section 2 – General Responsibilities of Employer and UMR

**2.A**  UMR will contract with Provider Rental Networks on behalf of the Employer, as listed on the Fee Schedule, and will make Employer aware of applicable Network rules for the Preferred Provider Organization (PPO). UMR makes no representations or warranties regarding the continued availability to the Plan or Covered Person of any particular Provider.

**2.B**  Employer agrees to provide certain benefit incentives to Covered Persons who utilize the PPO Network if required by the Provider Rental Networks.  In exchange for these incentives, Network Providers have agreed to discounts, per diems, fee schedules or contracted fees for all covered services provided.  It is agreed however that Covered Persons utilizing the PPO Network(s) will remain free to choose any Provider in or out of the Network, subject to provisions of the Employer's Summary Plan Description.

**2.C**  As compensation for the Provider Rental Network services, Employer agrees to pay UMR a monthly access fee as set forth in the attached Fee Schedule.  UMR will, in turn, send the appropriate access fee to the Rental Network.

**2.D**  Employer agrees to have sufficient funds in the established bank account to enable UMR to make timely payments to Providers for Covered Services under the Plan.

**2.E**  It is understood that the Rental Network is solely responsible for contracting with Providers and for credentialing or determining their suitability to be a Provider.

# ADDENDUM #3

## CUSTODIAL BANKING PROCEDURES

Employer agrees to comply with the custodial banking procedures set forth herein.  Such procedures may be amended by UMR upon thirty (30) days prior notice to the Employer.

*1.*   Employer agrees to pay UMR a security deposit.  The initial estimate of such security deposit is $90,000.00.  UMR reserves the right to require adjustments of the security deposit based on actual average disbursement activity.  The security deposit is to cover periodic fluctuations in Claim activity and must remain in the account as long as UMR continues to issue checks against the account.

2.   Authorization to release payments drawn on the Employer's custodial account will be provided by UMR once Employer's funding obligations have been met.  It is understood and agreed that UMR is solely the claims paying agent for the Employer.

3.   UMR offers various frequencies (check holds) for the printing and release of checks.  The check hold on a custodial account must have a month end clear.  A month end clear means any checks held in queue at the end of the month will be printed and released on the last working day of the month.

4.   UMR will provide weekly reports regarding cash disbursements to the Employer via E-mail.

5.   Employer shall make weekly reimbursements of the account via ACH debit.

6.   The security deposit shall cover periodic fluctuations in disbursement activity.  In the event Employer's account balance falls below fifty percent (50%) of the security deposit amount, UMR reserves the right to either initiate an ACH for disbursements not funded or UMR will contact the Employer and request that the Employer wire transfer needed funds to its bank account for this product.

7.   In the event the account balance falls below twenty five percent (25%) of the security deposit, UMR reserves the right to suspend payment of Claims under the Employer's Plan(s).  Payment of such Claims will be restored when UMR has been reimbursed for all outstanding disbursements and the security deposit has been restored.

8.   In the event the disbursement activity creates a deficit in the account, UMR will immediately notify the Employer.  A same day wire deposit to the Employer's account will be made to fund all unpaid Claims and to restore the security deposit amount. Employer agrees to pay overdraft charges, when applicable, related to the maintenance of the custodial account.

9.   UMR will provide monthly reconciliation reports to the Employer.

## ADDENDUM #4

## COBRA

**Plans:**

The following Plans administered by UMR are covered by this COBRA Addendum:

Medical Plan – 7670-00-410975

UMR also agrees to provide COBRA services for the following outside carriers:  Aetna for dental services and Humana for vision services.

### Section 1 - Definitions

**1.A**   "COBRA" shall mean the federal Consolidated Omnibus Budget Reconciliation Act of 1985, and all rules and regulations promulgated thereunder.

**1.B**   "COBRA Enrollee" shall mean those Qualified Beneficiaries who have elected to receive continuation coverage.

**1.C**   "Qualified Beneficiary" shall mean Employer's eligible employees and their eligible  dependents, as defined in COBRA and as determined by Employer.

**1.D**   "Qualifying Event" shall mean an event triggering the right of COBRA continuation of coverage as required and defined under the Consolidated Omnibus Budget Reconciliation Act of 1985 and all rules and regulations promulgated thereunder.

### Section 2 - General Responsibilities of the Employer

**2.A**   Employer shall be responsible for the administration of the Plan except to the extent expressly delegated to UMR through this Agreement.

**2.B**   Employer is responsible for providing UMR with COBRA premium information and due dates at least two weeks prior to the effective date of the change, and for complying with the COBRA regulations governing the 12-month determination period.

**2.C**   Employer shall determine if a Qualifying Event occurs and such determination shall be binding upon UMR.  Within thirty (30) calendar days following notification of the Qualifying Event, Employer shall notify UMR of the Qualifying Event by either submitting a completed COBRA Action Form, or submitting information via the COBRA Online Web Notification system, or by utilizing another format that is mutually agreed upon.

**2.D**   Employer is fully and solely responsible for ensuring that its insurance policies or contracts with outside carriers are in compliance with COBRA regulations.  Employer is also responsible for notifying the outside carriers that all COBRA election forms and premium payments will be sent directly to UMR.  Employer is responsible for ensuring that its outside carriers agree that COBRA elections and payments will be considered timely if the election forms and monthly premiums are received by UMR or postmarked by the due date or within the thirty (30) day grace period.

### Section 3 - General Responsibilities of UMR

**3.A**   UMR shall provide the initial (general) COBRA written notice to newly hired employees, to those enrolling due to a change in status (special enrollment), and to new spouses, for the fee as stated on the Fee Schedule.

**3.B**     Upon notification from Employer of a Qualifying Event via the COBRA Action form or another acceptable means of written communication, UMR shall send a letter to the Qualified Beneficiaries advising them of their rights to continue coverage under federal COBRA.  Such letter shall include an appropriate enrollment form and payment information.

**3.C**     Upon receipt of a completed enrollment form and appropriate payment, UMR shall send a letter of confirmation to the COBRA Enrollee acknowledging such receipt.

**3.D**     UMR shall collect COBRA monthly payments from Enrollees and provide Employer with a monthly accounting of payments. All such payments shall be retained by UMR until the month end and then shall be returned to Employer in a mutually agreed upon manner.

**3.E**     In the event that a COBRA Enrollee's coverage terminates prior to the end of the maximum COBRA coverage period, UMR shall provide the COBRA Enrollee with a written notice of early termination in accordance with applicable federal COBRA regulations.

**3.F**     UMR agrees to send a Notice of Unavailability to a Qualified Beneficiary if it is determined by the Employer or UMR that the Qualified Beneficiary is not entitled to COBRA coverage in accordance with applicable federal COBRA regulations.  Employer agrees to notify UMR in a timely manner if Employer determines or has reason to believe that the Qualified Beneficiary is not entitled to COBRA.

**3.G**     UMR agrees to provide certain federal COBRA services for Qualified Beneficiaries who are enrolled in a benefit plan with an outside carrier.  Upon notification from the Employer that a qualifying event has occurred, UMR shall send a letter to the Qualified Beneficiaries advising them of their rights to continue coverage under federal COBRA.  Such letter shall include an appropriate enrollment form and payment information.  UMR assumes no liability for meeting state insurance regulations for the outside carriers or Employer.  The outside carriers that the Employer contracts with are fully and solely responsible for meeting all applicable insurance regulations.  UMR will consider a Qualified Beneficiary's election and payments to be timely if the election form and monthly payments are received by UMR or postmarked by the due date or within the thirty day grace period.  UMR assumes no liability if the outside carrier doesn't consider these timely, or if there are conflicts with the insurance policy.

# ADDENDUM #5

# PHARMACY SERVICES

**Responsibilities of Prescription Solutions**

1.  Prescription Solutions will accept and process Claims submitted by network pharmacies in the HIPAA designated standard format, or any other designated standard as required by law (or as otherwise permitted under the network provider agreement).

2.  Prescription Solutions shall accept and process Claims submitted by Covered Persons when such Covered Person submits Claims properly completed on a Prescription Solutions standard paper claim form, together with proper proof of payment.

3.  Prescription Solutions uses criteria for its Quantity Limit Program that is developed by its National Pharmacy and Therapeutics' Committee.  Prescription Solutions will receive and review requests from the Employer and/or Covered Persons for exceptions based on this criteria.  Employer will at all times retain the right to override the Prescription Solutions recommendation, at which time the override will be entered into the system by Prescription Solutions to allow coverage for the product and quantity requested

4.  Prescription Solutions will receive and review requests from Employer and/or Covered Persons for exceptions on quantity limit override based on the criteria determined by the Pharmacy & Therapeutic Committee.

5.  Prescription Solutions will provide customer service assistance to Employer with regard to Employer's pharmacy benefits programs.  Such assistance will include, but not be limited to, access to a call center for Covered Persons, providers and pharmacies to contact Prescription Solutions with any questions or comments regarding the pharmacy benefit program.

6.  Prescription Solutions agrees to provide Employer with a standard reporting package.

7.  Both parties understand that if pharmacy Claims are paid for a Covered Person prior to being notified by the Employer that the Covered Person has been terminated, Prescription Solutions will be under no obligation to recover payments made prior to said notification.

8.  Prescription Solutions will provide claims appeal services for Covered Persons who request a review of an Adverse Benefit Determination on pharmacy Claims, in accordance with the Department of Labor regulations.  Prescription Solutions will allow a five (5) calendar day mail time in addition to the maximum appeal timelines listed in the above documents.  It is understood that Prescription Solutions will provide appeal services for Covered Persons in accordance with the Employer's Summary Plan Description.  Any additional appeal options will be the sole responsibility of the Employer.

9.  Prescription Solutions uses commercially reasonable efforts to not reimburse Covered Persons for prescription drugs purchased outside of the United States, with the exception of prescription drugs purchased for emergency purposes.  An exception may also be made for Covered Persons who are covered by a United States health Plan, but who are living abroad.

10. Prescription Solutions agrees to share rebates with the Employer to the extent stated on the Fee Schedule.  In the event, however, that Employer terminates services with Prescription Solutions prior to the Renewal Date of this Agreement, Prescription Solutions will retain any portion of unpaid rebates.

**ADDENDUM #6**

**NETWORK DISCOUNT GUARANTEE**

UMR will guarantee a discount for Employer's Non-Medicare PPO and EPO members for claims incurred from July, 2011 through June, 2012 and paid through September, 2012. Any penalty due shall be based on the year-end results according to the table below.

The In-Network Discount Percentage is calculated by dividing total In-Network Discount Dollars by Total In-Network Eligible Charges.

- Total In-Network Discount Dollars include participating provider contracted discounts only and does not include any savings from medical management, care avoided savings, duplicate charges or any other ineligible savings.
- Total In-Network Eligible Charges will be participating provider eligible charges minus commercial and Medicare coordination of benefits Claims for participating providers.
- Excludes claimants with over $100,000 in Claims will be excluded from the calculation.

| In-Network Discount Percentage | Penalty Paid by UMR to Employer |
|---|---|
| 52.8% up to 62.7% | Risk Free Corridor:  No Penalty |
| 51.8% up to 52.7% | $0.50 PEPM |
| 50.8% up to 51.7% | $1.00 PEPM |
| 49.8% up to 50.7% | $1.50 PEPM |
| 48.8% up to 49.7% | $2.00 PEPM |
| 48.7%  or  less | $2.50 PEPM |

UMR reserves the right to revise or revoke the discount guarantees should there be a significant change in this employee distribution (plus or minus 10% change in enrollment overall from the proposed employee count of 297, or if the initial enrollment with UMR is less than 270 employees).

The above network discount percentages are based on the current distribution percentage of in-network employees by market and assumes total replacement with the following PPO network offering: UnitedHealthcare Choice Plus.

# ADDENDUM #7

# BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT ("BA Agreement") is incorporated into and made part of the Administrative Services Agreement ("Agreement") by and between UMR, Inc. on behalf of itself and its Affiliates ("Business Associate") and WAYNE AUTOMATIC FIRE SPRINKLERS, INC. ("Covered Entity") (each a "Party" and collectively the "Parties"), and is effective on July 1, 2011 (Effective Date).  This BA Agreement replaces the terms of any previous business associate agreement between the Parties.

The Parties hereby agree as follows:

**1.     DEFINITIONS**

**1.1**     Unless otherwise specified in this BA Agreement, all capitalized terms used in this BA Agreement not otherwise defined in this BA Agreement or otherwise in the Agreement have the meanings established for purposes of  the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations (collectively, "HIPAA") and ARRA, as each is amended from time to time.  Capitalized terms used in this BA Agreement that are not otherwise defined in this BA Agreement and that are defined in the Agreement shall have the respective meanings assigned to them in the Agreement.  To the extent a term is defined in both the Agreement and in this BA Agreement, HIPAA or ARRA, the definition in this BA Agreement, HIPAA or ARRA shall govern.

**1.2**     "Affiliate", for purposes of this BA Agreement, shall mean any entity that is a subsidiary of UnitedHealth Group.

**1.3**     "ARRA" shall mean the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, 42 U.S.C. §§17921-17954, and any and all references in this BA Agreement to sections of ARRA shall be deemed to include all associated existing and future implementing regulations, when and as each is effective.

**1.4**     "Breach" shall mean the acquisition, access, use or disclosure of PHI in a manner not permitted by the Privacy Rule that compromises the security or privacy of the PHI as defined, and subject to the exceptions set forth, in 45 C.F.R. 164.402.

**1.5**     "Compliance Date" shall mean, in each case, the date by which compliance is required under the referenced provision of ARRA and/or its implementing regulations, as applicable; provided that, in any case for which that date occurs prior to the effective date of this BA Agreement, the Compliance Date shall mean that Effective Date of this BA Agreement.

**1.6**     "Electronic Protected Health Information" ("ePHI") shall mean PHI as defined in Section 1.7 that is transmitted or maintained in electronic media.

**1.7**     "PHI" shall mean Protected Health Information, as defined in 45 C.F.R. 160.103, and is limited to the Protected Health Information received from, or received or created on behalf of, Covered Entity by Business Associate pursuant to the performance of the Services.

**1.8**     "Privacy Rule" shall mean the federal privacy regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & E).

**1.9**     "Security Rule" shall mean the federal security regulations issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended from time to time, codified at 45 C.F.R. Parts 160 and 164 (Subparts A & C).

29

**1.10**   "Services" shall mean, to the extent and only to the extent they involve the creation, use or disclosure of PHI, the services provided by Business Associate to Covered Entity under the Agreement, including those set forth in this BA Agreement in Sections 4.3 through 4.7, as amended by written agreement of the Parties from time to time.

**2.**   **RESPONSIBILITIES OF BUSINESS ASSOCIATE**

With regard to its use and/or disclosure of PHI, Business Associate agrees to:

**2.1**   use and/or disclose PHI only as necessary to provide the Services, as permitted or required by this BA Agreement and/or the Agreement, and in compliance with each applicable requirement of 45 C.F.R. 164.504(e) or as otherwise Required by Law.

**2.2**   implement and use appropriate administrative, physical and technical safeguards to (i) prevent use or disclosure of PHI other than as permitted or required by this BA Agreement; (ii) reasonably and appropriately protect the confidentiality, integrity, and availability of the ePHI that Business Associate creates, receives, maintains, or transmits on behalf of the Covered Entity; and (iii) as of the Compliance Date of 42 U.S.C. § 17931, comply with the Security Rule requirements set forth in 45 C.F.R. §§ 164.308, 164.310, 164.312, and 164.316.

**2.3**   without unreasonable delay, report to Covered Entity (i) any use or disclosure of PHI, of which it becomes aware, that is not provided for by this BA Agreement; and/or (ii) any Security Incident of which Business Associate becomes aware in accordance with 45 C.F.R. 164.314(a)(2)(i)(C).

**2.4**   with respect to any use or disclosure of Unsecured PHI not permitted by the Privacy Rule that is caused solely by Business Associate's failure to comply with one or more of its obligations under this BA Agreement, Covered Entity hereby delegates to Business Associate the responsibility for determining when any such incident is a Breach and for providing all legally required notifications to Individuals, HHS and/or the media, on behalf of Covered Entity.  Business Associate shall provide these notifications in accordance with the data breach notification requirements set forth in 42 U.S.C. §17932 and 45 C.F.R. Parts 160 & 164 subparts A, D & E as of their respective Compliance Dates, and shall pay for the reasonable and actual costs associated with such notifications.  In the event of a Breach, without unreasonable delay, and in any event no later than sixty (60) calendar days after Discovery, Business Associate shall provide Covered Entity with written notification that includes a description of the Breach, a list of Individuals (unless Covered Entity is an employer ineligible to receive PHI) and a copy of the template notification letter to be sent to Individuals.

**2.5**   require all of its subcontractors and agents that create, receive, maintain, or transmit PHI to agree, in writing, to the same restrictions and conditions on the use and/or disclosure of PHI that apply to Business Associate; including but not limited to the extent that Business Associate provides ePHI to a subcontractor or agent, it shall require the subcontractor or agent to implement reasonable and appropriate safeguards to protect the ePHI consistent with the requirements of this BA Agreement.

**2.6**   make available its internal practices, books, and records relating to the use and disclosure of PHI to the Secretary for purposes of determining Covered Entity's compliance with the Privacy Rule.

**2.7**   document, and within thirty (30) days after receiving a written request from Covered Entity or an Individual, make available directly to an Individual, an accounting of disclosures of PHI about the Individual, in accordance with 45 C.F.R. 164.528.

**2.8**     notwithstanding Section 2.7, in the event that Business Associate in connection with the Services uses or maintains an Electronic Health Record of PHI of or about an Individual, then Business Associate shall when and as reasonably directed by Covered Entity or an Individual, make an accounting of disclosures of PHI directly to an Individual within thirty (30) days after receiving a written request, in accordance with the requirements for accounting for disclosures made through an Electronic Health Record in 42 U.S.C. § 17935(c), as of its Compliance Date.

**2.9**     provide access, within thirty (30) days after receiving a written request from Covered Entity or an Individual, to PHI in a Designated Record Set about an Individual, directly to the Individual, in accordance with the requirements of 45 C.F.R. 164.524.

**2.10**   notwithstanding Section 2.9, in the event that Business Associate in connection with the Services uses or maintains an Electronic Health Record of PHI of or about an Individual, then Business Associate shall provide an electronic copy of the PHI, within thirty (30) days after receiving a written request, directly to an Individual or a third party designated by the Individual, all in accordance with 42 U.S.C. § 17935(e) as of its Compliance Date.

**2.11**   to the extent that the PHI in Business Associate's possession constitutes a Designated Record Set, make available, within thirty (30) days after a written request by Covered Entity or an Individual, PHI for amendment and incorporate any amendments to the PHI, as directed by Covered Entity or an Individual, all in accordance with 45 C.F.R. § 164.526.

**2.12**   request, use and/or disclose only the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure; provided, that Business Associate shall comply with 42 U.S.C. § 17935(b) as of its Compliance Date.

**2.13**   accommodate reasonable requests by Individuals for confidential communications in accordance with 45 C.F.R. 164.522(b) of the Privacy Rule.

**2.14**   not directly or indirectly receive remuneration in exchange for any PHI as prohibited by 42 U.S.C. § 17935(d) as of its Compliance Date.

**2.15**   not make or cause to be made any communication about a product or service that is prohibited by 42 U.S.C. § 17936(a) as of its Compliance Date.

**2.16**   not make or cause to be made any written fundraising communication that is prohibited by 42 U.S.C. § 17936(b) as of its Compliance Date.

**3.     RESPONSIBILITIES OF COVERED ENTITY**

In addition to any other obligations set forth in the Agreement, including in this BA Agreement, Covered Entity:

**3.1**     represents that it has ensured, and has received certification from Employer, that Employer has taken the appropriate steps in accordance with 45 C.F.R. 164.504(f) and 45 C.F.R. 164.314(b) to enable Business Associate on behalf of Covered Entity to disclose PHI to Employer, including but not limited to amending its Plan documents to incorporate, and agreeing to, the requirements set forth in 45 C.F.R. 164.504(f)(2) and 45 C.F.R. 164.314(b).  Covered Entity shall ensure that only employees authorized under 45 C.F.R. 164.504(f) shall have access to the PHI disclosed by Business Associate to Employer.

**3.2**     will not, without Business Associate's prior written consent, agree to an Individual's request for a restriction pursuant to 45 C.F.R. § 164.522(a) or include any restriction in Covered Entity's notice of privacy practices under 45 C.F.R. 164.520, to the

extent such restriction may adversely affect Business Associate's ability to use and/or disclose PHI as permitted or required under this BA Agreement.

3.3     will provide, or direct its other business associates to provide, to Business Associate only the minimum PHI necessary to accomplish the Services.

3.4     shall be responsible for using, or directing its other business associates to use, administrative, physical and technical safeguards at all times to maintain and ensure the confidentiality, privacy and security of PHI transmitted to Business Associate pursuant to the Agreement, including this BA Agreement, in accordance with the standards and requirements of HIPAA, until such PHI is received by Business Associate.

3.5     shall obtain any consent or authorization that may be required by applicable federal or state laws and regulations prior to furnishing, or directing any of its other business associates to furnish, the PHI to Business Associate.

## 4.     PERMITTED USES AND DISCLOSURES OF PHI

Unless otherwise limited herein, in addition to any other uses and/or disclosures permitted or required by this BA Agreement or the Agreement, Business Associate may:

4.1     make any and all uses and disclosures of PHI necessary to provide the Services to Covered Entity.

4.2     use and disclose to subcontractors and agents the PHI in its possession for its proper management and administration or to carry out the legal responsibilities of Business Associate, provided that any third party to which Business Associates discloses PHI for those purposes provides written assurances in advance that: (i) the information will be held confidentially and used or further disclosed only as Required by Law; (ii) the information will be used only for the purpose for which it was disclosed to the third party; and (iii) the third party promptly will notify Business Associate of any instances of which it becomes aware in which the confidentiality of the information has been breached;

4.3     De-identify any and all PHI obtained by Business Associate under this BA Agreement, which De-identified information does not constitute PHI, is not subject to this BA Agreement and may be used and disclosed on Business Associate's own behalf, all in accordance with the De-identification requirements of the Privacy Rule;

4.4     provide Data Aggregation services relating to the Health Care Operations of the Covered Entity, including through subcontractors and agents, all in accordance with the Privacy Rule.

4.5     identify Research projects conducted by Business Associate, its Affiliates or third parties for which PHI may be relevant; obtain on behalf of Covered Entity documentation of individual authorizations or an Institutional Review Board or privacy board waiver that meets the requirements of 45 C.F.R. 164.512(i)(1) (each an "Authorization" or "Waiver") related to such projects; provide Covered Entity with copies of such Authorizations or Waivers, subject to confidentiality obligations ("Required Documentation"); and disclose PHI for such Research provided that Business Associate does not receive Covered Entity's disapproval in writing within ten (10) days of Covered Entity's receipt of Required Documentation.

4.6     make PHI available for reviews preparatory to Research and obtain and maintain written representations in accord with 45 C.F.R. 164.512(i)(1)(ii) that the requested PHI is sought solely as necessary to prepare a Research protocol or for similar purposes preparatory to Research, that the PHI is necessary for the Research, and that no PHI will be removed in the course of the review.

**4.7**  use the PHI to create a Limited Data Set ("LDS") in compliance with 45 C.F.R. 164.514(e).

**4.8**  use and disclose the LDS referenced in Section 4.7 solely for Research, Health Care Operations,  or Public Health purposes; provided that, Business Associate shall (1) not use or further disclose the information other than as permitted by this Section 4.8 or as otherwise Required by Law; (2) use appropriate safeguards to prevent use or disclosure of the information other than as provided for by this Section 4.8; (3) report to Covered Entity any use or disclosure of the information not provided for by this Section 4.8 of which Business Associate becomes aware; (4) ensure that any agents or subcontractors to whom Business Associate provides the LDS agrees to the same restrictions and conditions that apply to Business Associate with respect to such information; and (5) not identify the information or contact the individuals.

**5.**  **TERMINATION AND COOPERATION**

**5.1**  <u>Term</u>.  The Term of this BA Agreement shall be effective as of the Effective Date, and shall terminate upon the final expiration or termination of the Agreement unless earlier terminated in accordance with Section 5.2 of this BA Agreement.

**5.2**  <u>Termination</u>.  If either Party knows of a pattern of activity or practice of the other Party that constitutes a material breach or violation of this BA Agreement then the non-breaching Party shall provide written notice of the breach or violation to the other Party that specifies the nature of the breach or violation.  The breaching Party must cure the breach or end the violation on or before sixty (60) days after receipt of the written notice.  In the absence of a cure reasonably satisfactory to the non-breaching Party within the specified timeframe, or in the event the breach is reasonably incapable of cure, then the non-breaching Party may do the following:

(i) if feasible, terminate the Agreement, including this BA Agreement; or

(ii) if termination of the Agreement is infeasible, report the issue to HHS.

**5.3**  <u>Effect of Termination or Expiration</u>.  Within sixty (60) days after the termination or expiration of the Agreement and/or this BA Agreement, Business Associate shall return or destroy all PHI, if feasible to do so, including all PHI in possession of Business Associate's agents or subcontractors.  If Business Associate determines that return or destruction of the PHI is not feasible, Business Associate may retain the PHI subject to this Section 5.3. Under any circumstances, Business Associate shall extend any and all protections, limitations and restrictions contained in this BA Agreement to Business Associate's use and/or disclosure of any PHI retained after the expiration or termination of the Agreement and/or this BA Agreement, and shall limit any further uses and/or disclosures solely to the purposes that make return or destruction of the PHI infeasible.

**5.4**  <u>Cooperation</u>.  Each Party shall cooperate in good faith in all respects with the other Party in connection with any request by a federal or state governmental authority for additional information and documents or any governmental investigation, complaint, action or other inquiry.

**6.**  **MISCELLANEOUS**

**6.1**  <u>Contradictory Terms; Construction of Terms</u>.  Any other provision of the Agreement that is directly contradictory to one or more terms of this BA Agreement ("Contradictory Term") shall be superseded by the terms of this BA Agreement to the extent and only to the extent of the contradiction, only for the purpose of Covered Entity's and Business Associate's compliance with HIPAA and ARRA, and only to the extent reasonably impossible to comply with both the Contradictory Term and the terms of this BA

33

Agreement. The terms of this BA Agreement to the extent they are unclear shall be construed to allow for compliance by Covered Entity and Business Associate with HIPAA and ARRA.

6.2    No Third Party Beneficiaries. Nothing in this BA Agreement shall confer upon any person other than the Parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

6.3    Survival. Sections 4.8, 5.3, 5.4, 6.1, 6.2, and 6.3 shall survive the expiration or termination for any reason of the Agreement and/or of this BA Agreement.

6.4    Independent Contractor. Business Associate and Covered Entity are and shall remain independent contractors throughout the term. Nothing in this BA Agreement or otherwise in the Agreement shall be construed to constitute Business Associate and Covered Entity as partners, joint venturers, agents or anything other than independent contractors.

IN WITNESS WHEREOF, the parties have signed this BA Agreement on the dates indicated below.

**UMR, Inc.**                                                    **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

By    _____          By    _____
         Signature                                                    Signature

         Jay Anliker                                                  Jeanne R. Jewett
         Print Name                                                   Print Name

Title    President and CEO                      Title    Human Resources Director

Date                                                          Date
Signed    8/23/11                               Signed    August 12, 2011

34

Agreement.  The terms of this BA Agreement to the extent they are unclear shall be construed to allow for compliance by Covered Entity and Business Associate with HIPAA and ARRA.

**6.2**  <u>No Third Party Beneficiaries</u>.  Nothing in this BA Agreement shall confer upon any person other than the Parties and their respective successors or assigns, any rights, remedies, obligations, or liabilities whatsoever.

**6.3**  <u>Survival</u>.  Sections 4.8, 5.3, 5.4, 6.1, 6.2, and 6.3 shall survive the expiration or termination for any reason of the Agreement and/or of this BA Agreement.

**6.4**  <u>Independent Contractor</u>.  Business Associate and Covered Entity are and shall remain independent contractors throughout the term.  Nothing in this BA Agreement or otherwise in the Agreement shall be construed to constitute Business Associate and Covered Entity as partners, joint venturers, agents or anything other than independent contractors.

IN WITNESS WHEREOF, the parties have signed this BA Agreement on the dates indicated below.

**UMR, Inc.**                                                      **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

By _____          By _____
        Signature                                                        Signature

        Jay Anliker _____          _____
        Print Name                                                       Print Name

Title   President and CEO _____          Title _____

Date                                                               Date
Signed _____          Signed _____

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
## WAYNE AUTOMATIC FIRE SPRINKLERS, INC.
### 7670-00-410975– Medical

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between WAYNE AUTOMATIC FIRE SPRINKLERS, INC.  and UMR, Inc., as follows:

**Effective July 1, 2012,** Addendum #1 of the Agreement (Fee Schedule) is hereby updated as follows, and replaces all previous Fee Schedules in the Agreement.

## ADDENDUM #1

## FEE SCHEDULE  (RENEWAL)

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| 0001 | Base Medical Service Fee | | |
| | • 7-1-2012 through 6-30-2013 | * PEPM | $31.66 |
| | • 7-1-2013 through 6-30-2014 | * PEPM | $32.60 |
| 0514 | Broker Commission | * PEPM | $11.30 |
| 1022 | OptumRx Fee Credit to Employer | * PEPM | -$7.00 |
| | **ADDITIONAL SERVICE FEES** | | |
| | **COBRA Services** | | |
| 0528 | COBRA Notification letter to new hire | * PEPM | $.30 |
| 0529 | Standard COBRA Services | * PEPM | $1.05 |
| 0531 | COBRA Administration for Outside carriers (Aetna Dental and Humana Vision) | * PEPM | $.10 |
| | **Enrollment Services** | | |
| 0526 | HIPAA - Certificates of Creditable Coverage | * PEPM | $.25 |
| | **ID Card Services** | | |
| 0200 | Mail ID Cards to Employee's Home - Ongoing | | Included in Base Fee |
| 0233 | ID Cards – Bulk Ship to Employer – Initial group | | No Charge |
| | **Banking Services** | | |
| 0306 | Custodial Banking Setup | | Fee Waived |
| 0307 | Custodial Banking Maintenance Charges | Per Month | $500 |
| | **Reporting/Special Data Services** | | |
| 0417 | Custom Ad-Hoc Reports – Request System | Per Hour | $100/hr after 2 hours per year |
| 0420 | Medstat Reporting/Medstat Advantage Suite®: (additional fees will apply for history loads) | | Included in Base Fee |
| 1203 | New York Surcharge – Filing and Administration | | Included in Base Fee |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **Network/Managed Care** | | |
| 1400 | OptumHealth Care Solutions (URN transplant network) | | Cost per transplant basis |
| 1406 | Network Access Fees | | |
| | UnitedHealthcare Choice Plus Network | | Included in Base Fee |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings Retained | 30% |
| | **Medical Management Services** | | |
| 0745 | Maternity Management | * PEPM | $.65 |
| 0744 | Utilization Management/Case Management (Includes NurseLine) | * PEPM | $3.65 |
| 0746 | Disease Management | * PEPM | $3.90 |
| 0740 | Medical Management Bundled Discount | * PEPM | - $0.80 |
| | **OptumRx Pharmacy Services** | | |
| 1003 | Pharmacy Prior Authorization | Per Review | $20 |
| 1006/ 1024 | Pharmacy Benefit Management- Rebates | Percent of rebates retained | 100% Incentivized Benefits |
| 1007 | Electronic Claim Fee | Per Electronic Claim | $0.00 |
| 1008 | Paper Claim Fee | Per Paper Claim | $1.75 |
| 1009 | Retail Discount Off Average Wholesale Price (AWP). | Brand Claim Net Effective Generic Claim | AWP minus 17.75% AWP minus 55% |
| 1010 | Mail Order Discount off Average Wholesale Price | Brand Claim Net Effective Generic Claim | AWP minus 24% AWP minus 68% |
| 1011 | Dispensing Fee | Per Retail Claim Per Mail Order Claim | $1.50 $0.00 |
| 1013 | Compound Retail Dispensing Fee | Per Claim | $7.50 |
| 1015 | Specialty Pharmacy Program<br>–   Dispensing Fee<br>–   AWP Discount | <br>Per Claim<br>Per Claim | <br>$2.50<br>Varies in price by individual product, generally ranging from AWP minus 5% to AWP minus 70% per Claim. |
| | **Booklets/SPD Services** | | |
| 0922 | SPD Booklet Printing (if requested) | Per Booklet | $4.40 (Quantity 750) |
| | **Billing** | | |
| 0808 | Vendor Contract Pass Thru (UMR remits revenue back to vendor) - Teledoc | | No Charge |
| | **Claim Services** | | |
| 0105 | Subrogation Services | Percent of Recoveries retained | 25% of recoveries; or 33% if handled by outside legal counsel. |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0136 | Stop Loss Interface Fee | | Included in Base Fee through 6-30-2014 |
| 0140 | Claim Reprocessing (in accordance with Claim Reprocessing provision of Agreement) | Per Claim | $25 |
| | **Miscellaneous Services** | | |
| 9933 | TelaDoc Services | * PEPM | $1.50 |

\*        PEPM – Per Employee Per Month (covered employee)

**NOTE:** The above fees do not include state or Federal surcharges, assessments, or similar taxes imposed by governmental entities or agencies on the Plan or UMR, including but not limited to those imposed pursuant to The Patient Protection and Affordable Care Act of 2010, as amended from time to time (e.g., the reinsurance fee to be processed by third-party administrators on behalf of self-funded plans) as these are the responsibility of the Plan.

**NOTE:** Certain pharmacies may be exempt from the above rates and discounts if they are located in a state that elects to participate at a state fee schedule rate.

**NOTE:** UMR agrees to use commercially reasonable efforts to ensure that the Plan remains cost neutral when Average Wholesale Pricing (AWP) modifications occur, however it is understood that UMR has no control over changes in federal, state or other applicable law or regulation that requires AWP modifications, or if there is a material change to the AWP as published by the pricing agency that establishes Average Wholesale Prices.

**NOTE:** Stop loss interface fee surcharge applies if stop loss coverage is not placed with a UMR preferred market. Consult your UMR representative for a list of preferred markets.

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective July 1, 2012,** Section 14.7 of the Agreement regarding Governing Law is hereby deleted and replaced as follows:

    **14.7**     **Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the state of Florida, except as to any applicable federal laws, without giving effect to the principles of conflicts of law thereof.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated on the above pages.

**UMR, Inc.**                                   **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

| | | | |
|---|---|---|---|
| By | _Signature_ | By | _Signature_ |
| | Jay Anliker<br>Print Name | | Jeanne R. Jewett<br>Print Name |
| Title | President and CEO | Title | Human Resources Director |
| Date Signed | 7/17/12 | Date Signed | July 16, 2012 |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0136 | Stop Loss Interface Fee | | Included in Base Fee through 6-30-2014 |
| 0140 | Claim Reprocessing (in accordance with Claim Reprocessing provision of Agreement) | Per Claim | $25 |
| | **Miscellaneous Services** | | |
| 9933 | TelaDoc Services | * PEPM | $1.50 |

\*      PEPM – Per Employee Per Month (covered employee)

**NOTE:** The above fees do not include state or Federal surcharges, assessments, or similar taxes imposed by governmental entities or agencies on the Plan or UMR, including but not limited to those imposed pursuant to The Patient Protection and Affordable Care Act of 2010, as amended from time to time (e.g., the reinsurance fee to be processed by third-party administrators on behalf of self-funded plans) as these are the responsibility of the Plan.

**NOTE:** Certain pharmacies may be exempt from the above rates and discounts if they are located in a state that elects to participate at a state fee schedule rate.

**NOTE:** UMR agrees to use commercially reasonable efforts to ensure that the Plan remains cost neutral when Average Wholesale Pricing (AWP) modifications occur, however it is understood that UMR has no control over changes in federal, state or other applicable law or regulation that requires AWP modifications, or if there is a material change to the AWP as published by the pricing agency that establishes Average Wholesale Prices.

**NOTE:** Stop loss interface fee surcharge applies if stop loss coverage is not placed with a UMR preferred market. Consult your UMR representative for a list of preferred markets.


## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective July 1, 2012,** Section 14.7 of the Agreement regarding Governing Law is hereby deleted and replaced as follows:

     **14.7**     **Governing Law:** This Agreement shall be governed by and construed in accordance with the laws of the state of Florida, except as to any applicable federal laws, without giving effect to the principles of conflicts of law thereof.


IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated on the above pages.

**UMR, Inc.**                               **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**


By   _____     By   _____
        Signature                                   Signature

       Jay Anliker  _____              _____
        Print Name                                Print Name

Title     President and CEO  _____     Title  _____

Date
Signed  _____     Date
                                                Signed  _____

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
**WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**
7670-00-410975 – Medical

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Wayne Automatic Fire Sprinklers, Inc. and UMR, Inc., as follows:

**Effective July 1, 2013,** Addendum #1 of the Agreement (Fee Schedule) is hereby updated as follows, and replaces all previous Fee Schedules in the Agreement.

## ADDENDUM #1

## FEE SCHEDULE  (RENEWAL)

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| 0001 | Base Medical Service Fee | *  PEPM | $32.60 |
| 0514 | Broker Commission | *  PEPM | $11.30 |
| 1022 | OptumRx Fee Credit to Employer | *  PEPM | -$7.00 |
| | **ADDITIONAL SERVICE FEES** | | |
| | **COBRA Services** | | |
| 0528 | COBRA Notification letter to new hire | *  PEPM | $.30 |
| 0529 | Standard COBRA Services | *  PEPM | $1.05 |
| 0531 | COBRA Administration for Outside carriers (Aetna Dental and Humana Vision) | *  PEPM | $.10 |
| | **Enrollment Services** | | |
| 0526 | HIPAA - Certificates of Creditable Coverage | *  PEPM | $.25 |
| | **ID Card Services** | | |
| 0200 | Mail ID Cards to Employee's Home - Ongoing | | Included in Base Fee |
| 0233 | ID Cards – Bulk Ship to Employer – Initial group | | No Charge |
| | **Banking Services** | | |
| 0306 | Custodial Banking Setup | | Fee Waived |
| 0307 | Custodial Banking Maintenance Charges | Per Month | $500 |
| | **Reporting/Special Data Services** | | |
| 0417 | Custom Ad-Hoc Reports – Request System | Per Hour | $100/hr after 2 hours per year |
| 0420 | Medstat Reporting/Medstat Advantage Suite®: (additional fees will apply for history loads) | | Included in Base Fee |
| 1203 | New York Surcharge – Filing and Administration | | Included in Base Fee |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **Network/Managed Care** | | |
| 1400 | OptumHealth Care Solutions (URN transplant network) | | Cost per transplant basis |
| 1406 | Network Access Fees | | |
| | UnitedHealthcare Choice Plus Network | | Included in Base Fee |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings Retained | 30% |
| | **Medical Management Services** | | |
| 0745 | Maternity Management | * PEPM | $.65 |
| 0744 | Utilization Management/Case Management (Includes NurseLine) | * PEPM | $3.65 |
| 0746 | Disease Management | * PEPM | $3.90 |
| 0740 | Medical Management Bundled Discount | * PEPM | - $0.45 |
| | **OptumRx Pharmacy Services** | | |
| 1003 | Pharmacy Prior Authorization | Per Review | $20 |
| 1006/ 1024 | Pharmacy Benefit Management- Rebates | Percent of rebates retained | 100% Incentivized Benefits |
| 1007 | OptumRx Administration Fee | Per Claim | $0.00 |
| 1008 | Paper Claim Fee | Per Paper Claim | $1.75 |
| 1009 | Retail Discount Off Average Wholesale Price (AWP). | Brand Claim Net Effective Generic Claim | AWP minus 15.75% AWP minus 62.75% |
| 1010 | Mail Order Discount Off AWP | Brand Claim Net Effective Generic Claim | AWP minus 21.50% AWP minus 70% |
| 1011 | Dispensing Fee | Per Retail Claim Per Mail Order Claim | $1.50 $0.00 |
| 1013 | Compound Retail Dispensing Fee | Per Claim | $7.50 |
| 1015 | Specialty Pharmacy Program – Dispensing Fee – AWP Discount | Per Claim Per Claim | $2.50 Varies in price by individual product, generally ranging from AWP minus 5% to AWP minus 70% per Claim. |
| | **Booklets/SPD Services** | | |
| 0922 | SPD Booklet Printing (if requested) | | Cost plus Postage |
| | **Billing** | | |
| 0808 | Vendor Contract Pass Thru (UMR remits revenue back to vendor) - Teladoc | | No Charge/Pass Through |
| | **Claim Services** | | |
| 0105 | Subrogation Services | Percent of Recoveries retained | 25% of recoveries; or 33% if handled by outside legal counsel. |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0136 | Stop Loss Interface Fee | | Included in Base Fee |
| 0140 | Claim Reprocessing (in accordance with Claim Reprocessing provision of Agreement) | Per Claim | $25 |
| | **Health Care Reform Services** | | |
| 0926 | Full/Partial Summary of Benefits and Coverage (SBC) creation with data UMR has on file for the Plan.  Includes initial SBC plus one amendment per year; electronic version only provided to Employer. | | Included in Base fee |
| 0927 | Two or more Summary of Benefits and Coverage (SBC) amendments requested by Employer per year. | Per SBC Per Benefit Plan | $500 |
| 0928 | Inclusion of outside vendor data in Summary of Benefits and Coverage (SBC) document, in UMR's standard format. | Per SBC Per Benefit Plan | $1,000 |
| 0929 | Print and Ship Summary of Benefits and Coverage (SBC) to Employer at open enrollment | | Cost Plus Postage |
| 0930 | Translation of Summary of Benefits and Coverage (SBC) into non-English text | | Cost of Translation |
| | **Miscellaneous Services** | | |
| 9933 | TelaDoc Services | *  PEPM | $1.50 |

\*        PEPM – Per Employee Per Month (covered employee)

**NOTE:**  The above fees do not include state or Federal surcharges, assessments, or similar taxes imposed by governmental entities or agencies on the Plan or UMR, including but not limited to those imposed pursuant to The Patient Protection and Affordable Care Act of 2010, as amended from time to time (e.g., the reinsurance fee to be processed by third-party administrators on behalf of self-funded plans) as these are the responsibility of the Plan.

**NOTE:**  Certain pharmacies may be exempt from the above rates and discounts if they are located in a state that elects to participate at a state fee schedule rate.

**NOTE:**  UMR agrees to use commercially reasonable efforts to ensure that the Plan remains cost neutral when Average Wholesale Pricing (AWP) modifications occur, however it is understood that UMR has no control over changes in federal, state or other applicable law or regulation that requires AWP modifications, or if there is a material change to the AWP as published by the pricing agency that establishes Average Wholesale Prices.

**NOTE:**  Stop loss interface fee surcharge applies if stop loss coverage is not placed with a UMR preferred market. Consult your UMR representative for a list of preferred markets.

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective July 1, 2013**, Section 9.7 is hereby added to the Agreement as follows:

9.7     **SBC Services:**  Upon receipt of a completed service election form from the Employer, UMR agrees to provide certain Summary of Benefits and Coverage (SBC) services, to help Employer comply with Section 2715 of the Public Health Services Act related to the Patient Protection and Affordable Care Act (PPACA).  Employer is responsible for providing UMR with written details about the Plan and benefit changes in an agreed upon period of time prior to the date Employer needs the final SBC from UMR.  As part of the Base fee that Employer pays UMR, UMR agrees to create one standard full SBC per benefit Plan design if UMR is the only vendor administering benefits for the Employer, or one standard partial SBC per benefit Plan design if UMR administers the medical Plan but Employer utilizes external vendors for other benefits.  UMR also agrees to provide one SBC update per year if needed. Employer is responsible for completing sections of the SBC related to the Employer and external vendors, if any, and returning applicable details to UMR within an agreed upon timeframe. UMR will post the final approved SBC to UMR's web portal for the Employer.  Employer is responsible for complying with SBC regulations, including but not limited to distribution of SBC's to Covered Persons. In the event that Employer requests UMR to provide other non-standard SBC services, UMR will charge a reasonable fee for agreed upon services.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated on the above pages.

UMR, Inc.                                                    WAYNE AUTOMATIC FIRE SPRINKLERS, INC.

By _____          By _____
    Signature                                                      Signature

    Jay Anliker _____               Jeanne R. Jewett _____
    Print Name                                                    Print Name

Title   President and CEO _____          Title   HR Director _____

Date                                                           Date
Signed   8/8/13 _____              Signed   August 2, 2013 _____

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective July 1, 2013**, Section 9.7 is hereby added to the Agreement as follows:

**9.7     SBC Services:**  Upon receipt of a completed service election form from the Employer, UMR agrees to provide certain Summary of Benefits and Coverage (SBC) services, to help Employer comply with Section 2715 of the Public Health Services Act related to the Patient Protection and Affordable Care Act (PPACA).  Employer is responsible for providing UMR with written details about the Plan and benefit changes in an agreed upon period of time prior to the date Employer needs the final SBC from UMR.  As part of the Base fee that Employer pays UMR, UMR agrees to create one standard full SBC per benefit Plan design if UMR is the only vendor administering benefits for the Employer, or one standard partial SBC per benefit Plan design if UMR administers the medical Plan but Employer utilizes external vendors for other benefits.  UMR also agrees to provide one SBC update per year if needed. Employer is responsible for completing sections of the SBC related to the Employer and external vendors, if any, and returning applicable details to UMR within an agreed upon timeframe. UMR will post the final approved SBC to UMR's web portal for the Employer.  Employer is responsible for complying with SBC regulations, including but not limited to distribution of SBC's to Covered Persons. In the event that Employer requests UMR to provide other non-standard SBC services, UMR will charge a reasonable fee for agreed upon services.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated on the above pages.

**UMR, Inc.**                                          **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

By _____          By _____
        Signature                                                  Signature

        Jay Anliker
        Print Name                                              Print Name

Title     President and CEO                      Title _____

Date                                                    Date
Signed _____          Signed _____

**AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT**
**WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**
7670-00-410975 – Medical

This amendment hereby modifies the Administrative Services Agreement (hereinafter referred to as "Agreement") between Wayne Automatic Fire Sprinklers, Inc. and UMR, Inc., as follows:

**Effective July 1, 2014,** Addendum #1 of the Agreement (Fee Schedule) is hereby updated as follows, and replaces all previous Fee Schedules in the Agreement.

# ADDENDUM #1

# FEE SCHEDULE  (RENEWAL)

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **BASE FEE:** | | |
| 0001 | Base Medical Service Fee | * PEPM | $33.42 |
| 0514 | Broker Commission | * PEPM | $11.30 |
| 1022 | OptumRx Fee Credit to Employer | * PEPM | -$7.00 |
| | **ADDITIONAL SERVICE FEES** | | |
| | **COBRA Services** | | |
| 0528 | COBRA Notification letter to new hire | * PEPM | $.30 |
| 0529 | Standard COBRA Services | * PEPM | $1.05 |
| 0531 | COBRA Administration for Outside carriers (Aetna Dental and Humana Vision) | * PEPM | $.10 |
| | **Enrollment Services** | | |
| 0526 | HIPAA - Certificates of Creditable Coverage **(Service is terminating 12/31/2014)** | | Included in Base Fee |
| | **ID Card Services** | | |
| 0200 | Mail ID Cards to Employee's Home - Ongoing | | Included in Base Fee |
| 0233 | ID Cards – Bulk Ship to Employer – Initial group | | No Charge |
| | **Banking Services** | | |
| 0306 | Custodial Banking Setup | | Fee Waived |
| 0307 | Custodial Banking Maintenance Charges | Per Month | $500 |
| | **Reporting/Special Data Services** | | |
| 0417 | Custom Ad-Hoc Reports – Request System | Per Hour | $100/hr after 2 hours per year |
| 0420 | Medstat Reporting/Medstat Advantage Suite®: (additional fees will apply for history loads) | | Included in Base Fee |
| 1203 | New York Surcharge – Filing and Administration | | Included in Base Fee |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| | **Network/Managed Care** | | |
| 1400 | OptumHealth Care Solutions (URN transplant network) | | Cost per transplant basis |
| 1406 | Network Access Fees | | |
| | UnitedHealthcare Choice Plus Network | | Included in Base Fee |
| 9938 | Cost Reduction & Savings Program (CRS) | Percent of Savings Retained | 30% |
| | **Medical Management Services** | | |
| 0745 | Maternity Management | *  PEPM | $.65 |
| 0744 | Utilization Management/Case Management (Includes NurseLine) | *  PEPM | $3.65 |
| 0746 | Disease Management | *  PEPM | $3.90 |
| 0740 | Medical Management Bundled Discount | *  PEPM | - $0.45 |
| | **OptumRx Pharmacy Services** | | |
| 1003 | Pharmacy Prior Authorization | | Included in Rx fees |
| 1006/ 1024 | Pharmacy Benefit Management- Rebates | Percent of rebates retained | 100% Incentivized Benefits |
| 1007 | OptumRx Administration Fee | Per Claim | $0.00 |
| 1008 | Paper Claim Fee | Per Paper Claim | $1.75 |
| 1009 | Retail Discount Off Average Wholesale Price (AWP). | Brand Claim Net Effective Generic Claim | AWP minus 16% AWP minus 62.75% |
| 1010 | Mail Order Discount Off AWP | Brand Claim Net Effective Generic Claim | AWP minus 21.50% AWP minus 70% |
| 1011 | Dispensing Fee | Per Retail Claim Per Mail Order Claim | $1.40 $0.00 |
| 1013 | Compound Retail Dispensing Fee | Per Claim | $7.50 |
| 1015 | Specialty Pharmacy Program<br>–    Dispensing Fee<br>–    AWP Discount | <br>Per Claim<br>Per Claim | <br>$2.50<br>Varies in price by individual product, generally ranging from AWP minus 5% to AWP minus 70% per Claim. |
| | **Booklets/SPD Services** | | |
| 0922 | SPD Booklet Printing (if requested) | | Cost plus Postage |
| | **Billing** | | |
| 0808 | Vendor Contract Pass Thru (UMR remits revenue back to vendor) - Teladoc | | No Charge/Pass Through |
| | **Claim Services** | | |
| 0105 | Subrogation Services | Percent of Recoveries retained | 25%; or 33% if handled by outside legal counsel. |
| 0136 | Stop Loss Interface Fee | | Included in Base Fee |

| Service Code | ITEM | BASIS | FEE |
|---|---|---|---|
| 0140 | Claim Reprocessing (in accordance with Claim Reprocessing provision of Agreement) | Per Claim | $25 |
| | **Health Care Reform Services** | | |
| 0926 | Full/Partial Summary of Benefits and Coverage (SBC) creation with data UMR has on file for the Plan.  Includes initial SBC plus one amendment per year; electronic version only provided to Employer. | | Included in Base fee |
| 0927 | Two or more Summary of Benefits and Coverage (SBC) amendments requested by Employer per year. | Per SBC Per Benefit Plan | $500 |
| 0928 | Inclusion of outside vendor data in Summary of Benefits and Coverage (SBC) document, in UMR's standard format. | Per SBC Per Benefit Plan | $1,000 |
| 0929 | Print and Ship Summary of Benefits and Coverage (SBC) to Employer at open enrollment | | Cost Plus Postage |
| 0930 | Translation of Summary of Benefits and Coverage (SBC) into non-English text | | Cost of Translation |
| | **Miscellaneous Services** | | |
| 9933 | Teladoc Services | *  PEPM | $1.50 |

\*        PEPM – Per Employee Per Month (covered employee)

**NOTE:**  The above fees do not include state or Federal surcharges, assessments, or similar taxes imposed by governmental entities or agencies on the Plan or UMR, including but not limited to those imposed pursuant to The Patient Protection and Affordable Care Act of 2010, as amended from time to time as these are the responsibility of the Plan.

**NOTE:**  Certain pharmacies may be exempt from the above rates and discounts if they are located in a state that elects to participate at a state fee schedule rate.

**NOTE:**  UMR agrees to use commercially reasonable efforts to ensure that the Plan remains cost neutral when Average Wholesale Pricing (AWP) modifications occur, however it is understood that UMR has no control over changes in federal, state or other applicable law or regulation that requires AWP modifications, or if there is a material change to the AWP as published by the pricing agency that establishes Average Wholesale Prices.

**NOTE:**  Stop loss interface fee surcharge applies if stop loss coverage is not placed with a UMR preferred market. Consult your UMR representative for a list of preferred markets.

## AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT

**Effective July 1, 2014**, Addendum #2 of the Agreement regarding Provider Rental Network Services  is hereby deleted and replaced as follows:

## ADDENDUM #2

## NETWORK ACCESS, MANAGEMENT AND ADMINISTRATION

### Section 1 - Definitions

**1.A**    "Network": The group of Network Providers UMR makes available to the Plan who have entered into or are governed by contractual arrangements under which they agree to provide services to Covered Persons and accept negotiated fees for these services.

**1.B** "Network Provider": The physician, or medical or dental professional or facility which participates in a Network. A provider is only a Network Provider if they are participating in a Network at the time services are rendered to the Covered Person.

### Section 2 – Network Services

**2.A** UMR will provide access to Networks and Network Providers, as well as related administrative services including physician (and other health care professional) relations, clinical profiling, contracting and credentialing, and network analysis and system development. The make-up of the Network can change at any time. Notice will be given in advance or as soon as reasonably possible.  UMR generally does not employ Network Providers and they are not UMR's agents or partners, although certain Network Providers are affiliated with UMR. Otherwise, Network Providers participate in Networks only as independent contractors. UMR is not responsible for the medical outcomes or the quality or competence of any provider or facility rendering services.

**2.B** Value Based Contracting Program:  UMR's contracts with some Network Providers may include withholds, incentives, and/or  additional payments that may be earned, conditioned on meeting standards relating to utilization, quality of care, efficiency measures, compliance with UMR's other policies or initiatives, or other clinical integration or practice transformation standards. Employer shall fund these payments due the Network Providers as soon as UMR makes the determination that the Network Provider is entitled to receive the payment under the Network Provider's contract, either upfront or after the standard has been met.  For upfront funding, if UMR makes the determination that the Network Provider failed to meet a standard, UMR will return to Employer the applicable amount.  UMR shall provide Employer reports describing the amount of payments made on behalf of Employer's Plan.  Only the initial claims based reimbursement to Network Providers will be subject to the Covered Person's copayment, coinsurance or deductible requirements. Employer will pay the Network Provider the full amount earned or attributable to Covered Persons, without a reduction for copayments or deductibles and agrees that there will be no impact from these payments on the calculation of the Covered Persons' satisfaction of their annual deductible amount.

IN WITNESS WHEREOF, the parties agree to amend the Administrative Services Agreement as stated on the above pages.

**UMR, Inc.**                                                    **WAYNE AUTOMATIC FIRE SPRINKLERS, INC.**

By _____        By _____
          Signature                                                         Signature

          Kimberly Hiatt _____                    _____
          Print Name                                                      Print Name

Title     Associate General Counsel _____        Title     _____

Date
Signed _____        Date
                                                                    Signed _____